UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK JAMES and<br>EDWARD JAMES,<br><br>Defendants. | **SEALED INDICTMENT**<br><br>26 Cr.<br><br>26 CRIM 029 |

### COUNT ONE
**(Continuing Financial Crimes Enterprise)**

The Grand Jury charges:

1.      From at least in or about 2018 through in or about 2025, PATRICK JAMES and EDWARD JAMES, the defendants, built and bankrupted First Brands Group, LLC ("First Brands"), fraudulently obtaining billions of dollars from lenders and enriching themselves.

2.      PATRICK JAMES and EDWARD JAMES, the defendants, and their co-conspirators, perpetrated a series of fraudulent schemes against the company's lenders and financing partners. As part of the defendants' schemes, First Brands faked and falsely inflated invoices for accounts receivable and payable; double- and triple-pledged loan collateral; falsified corporate financial statements; and concealed substantial liabilities from lenders. These schemes yielded billions of dollars in financing to First Brands and enabled PATRICK JAMES and EDWARD JAMES to reap millions of dollars in proceeds derived from their fraud.

3.      The defendants' schemes coincided with, and initially may have contributed to, the growth of First Brands, but those schemes also sowed the seeds of First Brands' demise. After years of acquisitions and expansion using fraudulently obtained financing, First Brands faced overwhelming liabilities and unsustainable cash requirements. In 2025, PATRICK JAMES and

EDWARD JAMES, the defendants, led efforts to refinance First Brands' debt or to sell the company, including through last-ditch attempts to deceive lenders and potential acquirers by disseminating false financials. These efforts failed when First Brands was unable to provide the prospective counterparties with the financial diligence they sought. On September 28, 2025, First Brands filed for bankruptcy. At the time of its bankruptcy, First Brands—a company that reported approximately $5 billion in net annual sales worldwide—declared $12 million in cash in its corporate bank accounts and over $9 billion in liabilities. As a consequence of the defendants' fraudulent schemes, First Brands' lenders and creditors now face billions in losses.

### First Brands and Its Financing Arrangements

4.    First Brands operated as an automotive aftermarket parts supplier that developed, marketed, and sold replacement parts such as brakes, filters, wipers, and lights under various brand names. The company sold its products into established retail and wholesale distribution channels that, in turn, sold them to commercial and individual consumers. First Brands' customer base included large automative retailers, wholesale part distributors, and the world's largest commercial retailers.

5.    PATRICK JAMES, the defendant, founded First Brands and served as its Chief Executive Officer. EDWARD JAMES, the defendant, was First Brands' former Senior Vice President and is PATRICK JAMES's brother. The defendants, along with other executives with whom they conspired, formed the senior business leadership team at First Brands.

6.    Since founding the company in 2013, PATRICK JAMES, the defendant, grew First Brands' market share by buying other automotive-parts businesses, including many well-known auto-parts brands. By in or about 2025, following numerous corporate acquisitions, PATRICK JAMES had built First Brands into one of the largest auto-parts businesses in the world.

7.    Under the direction of PATRICK JAMES, the defendant, First Brands' business required substantial cash to sustain its operations. First Brands' customers routinely negotiated extended payment terms—at times permitting payment up to a year after delivery—creating a significant gap between First Brands' manufacturing costs and cash receipts. PATRICK JAMES's growth-through-acquisition strategy added further financial pressure. He arranged for First Brands to acquire other businesses with borrowed money, accumulating significant debt and heavy recurring interest and repayment obligations.

8.    To address the cash lag from extended payment terms, First Brands used factoring. Factoring is a financing arrangement in which a business typically sells or assigns its accounts receivable (invoices) to a third party—commonly a bank or specialized finance company—in exchange for near-term cash, typically at a discount. The third party, called a "factor," then collects full payment when invoices become due. First Brands used two forms of receivable factoring: customer-linked factoring and third-party factoring. Under customer-linked factoring, once a customer verified and approved a First Brands invoice, a bank or financing company affiliated with that customer paid First Brands relatively quickly, even though the customer itself would not pay for months. When invoices ultimately came due, the customer then paid the bank or financing company directly, rather than First Brands. By contrast, when First Brands used third-party factoring, First Brands sold its customer invoices to finance companies unaffiliated with any customer. These factors advanced cash shortly after invoicing, but when customer invoices came due, First Brands—rather than the customer—remained responsible for collecting payment and remitting the full invoice amount to the factor. Because third-party factoring involved no relationship with the customer, invoices were generally not subject to customer verification.

9. First Brands also used third-party financing to pay its suppliers through accounts-payable factoring (also called supply-chain financing). Under these arrangements, financial institutions advanced funds against invoices First Brands owed to its suppliers. In some instances, the financer paid suppliers directly at a discount and First Brands repaid the financer on a later, fixed due date. In other instances, the financer paid First Brands, which then paid the supplier, with repayment due later to the financer. Each of these factoring arrangements had a maximum limit or "capacity" for borrowing. While the arrangements allowed First Brands to delay paying suppliers and improved short-term cash flow, they added another layer of financial obligations that depended on continuing access to cash.

10. Besides its widespread use of invoice factoring, First Brands relied on asset-based lending to finance its operations and acquisitions. Under these arrangements, the company borrowed billions of dollars from lenders secured by inventory and other physical assets such as manufacturing plants, equipment, and other fixed assets. The amount First Brands could borrow depended on the value of these assets, and the company was required to comply with the terms of its loan agreements, including regularly reporting to its lenders about the assets and their value.

11. These financing arrangements left First Brands vulnerable to cash-flow disruptions, sensitive to changes in collateral values, and dependent upon continued access to external financing.

### Accounts Receivable Financing Fraud

12. First Brands factored billions of dollars' worth of customer invoices through arrangements with lenders. At the direction and with the approval of PATRICK JAMES and EDWARD JAMES, the defendants, First Brands systematically obtained invoice-based financing from factors through a series of fraudulent schemes. As part of those schemes, and under the

defendants' direction and supervision, First Brands employees routinely submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties as if they represented valid, collectible receivables from customers. In some instances, invoices were generated for transactions that had never occurred, while in others the dollar amounts on invoices were altered to make them appear more valuable. At the defendants' direction, this fraudulent conduct was directed at and affected at least four factoring partners. Through the defendants' fraud schemes, First Brands sold its factoring partners billions of dollars of purported customer receivables that did not exist.

13.    PATRICK JAMES, the defendant, and his co-conspirators took steps to ensure that factoring firms did not learn of the company's fraudulent schemes, including by falsely representing that the invoices were bona fide accounts receivable, even where they were fictitious or overstated. Indeed, when First Brands' factoring counterparties raised questions about some of the company's invoices, PATRICK JAMES directed his co-conspirators to take steps to conceal their fraudulent conduct and to ensure that counterparties did not obtain information that might reveal the fraud. For instance, in approximately 2023, one of First Brands' third-party factors ("Factor-1") contacted First Brands seeking information about certain invoices that Factor-1 had purchased. When a lower-level First Brands employee provided the requested invoices to Factor-1, Factor-1's audit partner began questioning EDWARD JAMES, the defendant, and others about what the audit partner described as "huge" discrepancies between the amounts reflected on the First Brands invoices and the information about those same invoices that First Brands had previously provided to Factor-1. After EDWARD JAMES told PATRICK JAMES about the discovery that had been made by Factor-1, PATRICK JAMES directed that future emails from certain third parties, including Factor-1, be restricted to an inner circle of First Brands executives

involved in the fraudulent scheme, so that no low-level employee would inadvertently supply accurate information to an inquiring lender.

14.    The defendants continued their scheme to defraud third-party factors even after Factor-1 had flagged falsified invoices. For example, in April 2025, First Brands sold to Factor-1 a fictitious customer invoice in the amount of $3,239.18. As another example, in June 2025, after invoicing a customer for $8,976.24 in automotive parts, First Brands sold to Factor-1 what purported to be the same customer invoice, but it falsely claimed the invoiced amount to be $17,826.26. Three days later, First Brands sold the same customer invoice to another third-party factor, falsely claiming that the invoice amount was $463,734.92.

15.    In total, third-party factors now hold approximately $2.7 billion of fake accounts receivable.

**Accounts Payable Financing Fraud**

16.    First Brands also defrauded its accounts payable factoring partners. At the direction and with the approval of PATRICK JAMES and EDWARD JAMES, the defendants, First Brands submitted false and misleading invoice information and false and misleading information about First Brands' financial position to induce financers to increase the amount of funds advanced. Those false representations were material to the lenders. At First Brands' direction, certain financers sent funds to a third-party bill-processing intermediary based on fabricated invoices manufactured by First Brands. Contrary to the understanding of the financers, those funds were not used by the bill processor to pay First Brands' suppliers. Instead, those funds were routed to First Brands itself. At First Brands, these self-payments were referred to as "round trips" or, euphemistically, as "corporate initiatives." Their purpose was to inject additional cash into First Brands at moments when the company was unable to meet its payment obligations with legitimate

cash on hand. Rather than paying suppliers, "round trip" funds went toward paying interest on debt, rent, leases, or other operating costs.

17.    The mechanics of these fraudulent schemes were straightforward: To nominate invoices for funding, First Brands used online platforms provided by supply-chain financers. First Brands employees did not upload invoices themselves. Instead, they submitted spreadsheet-style data entries reflecting purported supplier invoice information—such as invoice amounts and dates—that was then transmitted to the financer. To maximize borrowing from the financers, First Brands fabricated the amounts it purportedly owed to suppliers. Those fabricated amounts did not correspond to real invoices or legitimate supplier payables. After submitting the fictitious line item amounts, First Brands directed the financer to transmit the funds to the third-party bill processor, which First Brands instructed to remit the proceeds back to First Brands.

18.    PATRICK JAMES and EDWARD JAMES, the defendants, closely monitored and managed these "round trip" transactions as part of First Brands' daily cash-management process. Internal treasury reports circulated to senior executives tracked available borrowing capacity, net cash flow, and the impact of "corporate initiatives." In multiple communications, PATRICK JAMES, EDWARD JAMES, and other senior executives discussed the scale, timing, and necessity of round-trip payments to manage short-term liquidity, including concerns by the Vice President of Finance—shared with PATRICK JAMES and EDWARD JAMES in August 2021—that the volume of round-trip activity was "getting out of control."

19.    As financers began requesting support for funding requests, First Brands engaged in further fraud to conceal their earlier deceptions. Around May 2023, for example, when a particular supply-chain financer requested the invoices underlying a particular line-item submission, a First Brands employee fabricated a "cover" invoice purporting to show aggregate

amounts owed to, or billed by, a third-party payment processor. These fabricated invoices were created solely to satisfy financer diligence requests and did not reflect real transactions. On multiple occasions, when different financers sought documentation for funded amounts, First Brands fabricated and submitted false aggregate invoices to conceal the absence of legitimate supplier obligations. When falsified aggregated invoices did not satisfy certain lenders, the defendants considered terminating that factor relationship. EDWARD JAMES, the defendant, for example, expressed concern when one financer requested physical invoices, asking another First Brands employee whether the factor had asked for such invoices in the past and declaring that he wanted to "kill" the relationship after the requested invoices had been collected.

20.    PATRICK JAMES and EDWARD JAMES, the defendants, also concealed from First Brands' lenders the enormity of First Brands' accounts-payable financing obligations. In consolidated financial statements, at the direction of PATRICK JAMES and EDWARD JAMES, the company reported supplier-finance amounts that were a fraction of the actual liabilities incurred through these programs. In reality, the company maintained outstanding supply-chain financing liabilities exceeding $1 billion.

### Fraud on First Brands' Senior Lenders
#### *Off-Balance-Sheet Debt*

21.    As part of their schemes to deceive counterparties and lenders, the defendants deliberately concealed massive amounts of debt incurred through inventory-financing arrangements. While this debt was, by design, nominally incurred by entities outside the First Brands corporate structure, it was purportedly secured by First Brands' inventory. Using that inventory, that is, finished goods and work-in-progress or raw materials held for sale, First Brands received billions of dollars in cash infusions. At the direction of PATRICK JAMES, the defendant, this inventory financing arrangement, which was maintained outside the First Brands corporate

balance sheet, was concealed from the company's lenders, who routinely requested and received First Brands' financial statements.

22.     The off-balance-sheet debt principally related to inventory-financing arrangements executed by entities wholly owned and controlled by PATRICK JAMES, the defendant (the "James Entities"). The James Entities were nominally separate from First Brands but, in fact, had no independent business operations. Through the James Entities, PATRICK JAMES entered financing arrangements with at least three inventory financers. These three lenders (the "Off-Sheet Lenders") advanced funds to the James Entities, which purportedly used those funds to purchase inventory from First Brands, which was pledged back to the Off-Sheet Lenders as collateral. In other cases, the James Entities entered sale-leaseback transactions, purportedly purchasing inventory from First Brands, selling it to Off-Sheet Lenders, and then leasing back the inventory to the James Entities—funneling the cash from the Off-Sheet Lenders to First Brands. These financing arrangements through the James Entities, and purportedly secured by First Brands' inventory, were not included on First Brands' financial statements.

23.     The financing arrangements with the Off-Sheet Lenders were directed by PATRICK JAMES, the defendant, negotiated by EDWARD JAMES, the defendant, and implemented through a series of deliberate and coordinated acts of fraud designed to conceal debt, mislead lenders, and obscure the true source and use of funds.

24.     First, the defendants defrauded First Brands' senior lenders by concealing the nature and scale of the off-balance-sheet financing, and, at times, by expressly disavowing that it had such agreements, even as the James Entities incurred billions of dollars in inventory-backed obligations using First Brands' inventory. First Brands repeatedly denied having undisclosed inventory-financing facilities at all. For example, in July 2025, in a response to high-priority lender

diligence requests, at the direction of PATRICK JAMES, the defendant, one of First Brands' senior executives falsely represented that First Brands had "no off-balance sheet financing" involving "special purpose entities" and that "all related party relationships" were fully disclosed in the company's financial statements. Those representations were materially false and misleading. By that time, First Brands had incurred approximately $2 billion in undisclosed off-balance-sheet debt through the James Entities.

25.    Second, the defendants made false and misleading representations to the Off-Sheet Lenders to fraudulently induce them to extend and expand financing. The James Entities pledged inventory that PATRICK JAMES and EDWARD JAMES, the defendants, purported to be unencumbered but in fact was already subject to liens by, or otherwise pledged to, First Brands' senior lenders and remained on First Brands' balance sheet. In addition, the defendants submitted falsified inventory schedules and account documentation to the Off-Sheet Lenders. The defendants repeatedly caused fake inventory schedules to be provided to satisfy lender diligence and reporting requirements. At the direction of EDWARD JAMES, bank transfers through various James Entities were structured to mimic the purchase and resale of inventory from First Brands, creating the false appearance of legitimate collateral and transaction activity supporting the loans.

26.    Third, PATRICK JAMES and EDWARD JAMES, the defendants, undertook extensive acts of concealment to disguise both the source of proceeds obtained from the Off-Sheet Lenders and flowing into First Brands and the repayment of obligations from First Brands to the Off-Sheet Lenders. Loan proceeds from the Off-Sheet Lenders were deliberately routed through a customer collections entity maintained outside the First Brands corporate structure and then were disbursed across First Brands subsidiaries before being swept back into First Brands' operating account. The defendants designed this flow of funds specifically so that the funds appeared to be

ordinary customer receipts from retail subsidiaries rather than loan proceeds from related-party financing arrangements with the James Entities. For example, the chart below depicts a December 2024 financing from one of the Off-Sheet Lenders, with funds being circuitously transferred from the lender to one of the James Entities, to a First Brands customer collections account, and then transferred and split across five different First Brands operating entities at arbitrary pre-determined percentages, where the funds were disguised as customer receipts.



27.    At the direction of PATRICK JAMES and EDWARD JAMES, the defendants, repayments to the Off-Sheet Lenders were similarly disguised by routing payments first through a third-party bill processor and then through the James Entities, supported by sham invoices falsely representing payables for inventory owed by First Brands. These circuitous transactions were designed to evade related-party-transaction disclosures in the company's audited financials, obscure the company's true leverage, and prevent lenders and auditors from detecting the existence and magnitude of the off-balance sheet debt.

28.    By laundering proceeds fraudulently obtained from Off-Sheet Lenders, the defendants were able to both conceal and advance their criminal schemes and personally profit from them. The inventory-financing arrangements functioned as a parallel borrowing structure designed to inject liquidity into the company while evading covenants, borrowing-base limitations, and disclosure requirements imposed by lenders. Additionally, through these transactions, PATRICK JAMES, the defendant, personally siphoned millions of dollars of Off-Sheet Lenders' funds into his personal accounts before the funds reached First Brands' corporate coffers. EDWARD JAMES, the defendant, also sought to personally enrich himself from the financing arrangements. As one example, while executing the financing agreements on behalf of the James Entities, EDWARD JAMES received millions in commission fees for brokering one of the purported inventory financings.

29.    As a result of these purported inventory financing arrangements, the defendants concealed enormous liabilities and thereby misrepresented First Brands' true financial condition, misrepresented the nature and extent of collateral to its inventory financers, and enriched themselves at the expense of lenders and other stakeholders.

### False and Misleading Statements about First Brands' Financial Condition

30.    PATRICK JAMES and EDWARD JAMES, the defendants, also defrauded First Brands' lenders by disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens.

31.    First, beginning at least as early as 2020, PATRICK JAMES and EDWARD JAMES, the defendants, caused First Brands to provide asset-backed lenders with financial statements that did not reflect the company's true financial position. At the direction and with the approval of PATRICK JAMES, First Brands employees made financial statement adjustments

untethered to business realities and instead designed to meet financial benchmarks set by PATRICK JAMES. For example, in August 2021, the Chief Financial Officer directed the Vice President for Finance to make fraudulent adjustments to First Brands' financials, at the direction of PATRICK JAMES: "Talked with PJ [PATRICK JAMES]. Want to: reduce factoring by 3. Reduce interest by 6. Reduce non cash by 14. Increase restructuring 14." PATRICK JAMES directed these adjustments to First Brands' financial reporting, which were designed to artificially decrease expenses and improve margins reported to First Brands' lenders. To implement these directives, First Brands employees maintained internal "bridge" files that juxtaposed accurate corporate financials with spurious financial adjustments needed to meet the benchmarks set by PATRICK JAMES. Those bridge files were then used to manually adjust entries in the corporate books of various First Brands' subsidiaries and were reflected in First Brands' financial statements and presentations. PATRICK JAMES caused these manipulated financials to be disseminated to lenders as accurate representations of the company's performance and condition.

32.    Second, PATRICK JAMES, the defendant, reinforced and sustained these falsehoods by misleading First Brands' outside auditors. PATRICK JAMES repeatedly certified that First Brands had no related-party arrangements, despite knowing that First Brands had purportedly sold billions of dollars' worth of inventory to the James Entities—wholly owned and controlled by PATRICK JAMES—and that the James Entities had incurred billions of dollars of liabilities using First Brands' inventory as collateral. These misrepresentations were intended to prevent auditors and lenders from discovering the existence and magnitude of First Brands' debts.

33.    Third, PATRICK JAMES and EDWARD JAMES, the defendants, also caused materially false and misleading information to be provided to the asset-backed lenders regarding the collateral allegedly securing their loans. Under the governing loan agreements, the asset-

13

backed lenders held priority liens on specific First Brands assets, such as inventory. Without the lenders' knowledge or approval, the defendants encumbered those assets, purporting to sell them free and clear to the Off-Sheet Lenders through the James Entities, notwithstanding the lenders' existing security interests.

### The First Brands Frauds Unravel

34.     By 2025, First Brands' fraudulent schemes could not forestall acute cash shortages and mounting liabilities at the company. PATRICK JAMES and EDWARD JAMES, the defendants, recognized the company's dire position and attempted to refinance First Brands' debt or sell the company. As that process was underway, the defendants closed ranks, restricting the flow of information outside the company in an effort to prevent the true financial picture at First Brands from being disclosed to creditors, auditors, and potential purchasers. In April and May 2025, at the defendants' direction, employees in their inner circle withheld information from factor partners and auditors. Members of the inner circle expressed concern in an email among themselves that if other employees were permitted to speak to First Brands' counterparties they might "slip and say the wrong thing," such as inadvertently revealing the existence of the James Entities or the off-balance-sheet debt.

35.     Even as the frauds unraveled and First Brands' financial issues mounted, PATRICK JAMES, the defendant, continued to enrich himself as the owner of First Brands. Through the series of frauds he directed, PATRICK JAMES caused billions of dollars in gross proceeds to flow into First Brands from counterparties and received at least hundreds of millions of dollars in gross proceeds into his personal accounts.

36.     On or about September 28, 2025, First Brands filed for bankruptcy. At that time, the company had over $9 billion in liabilities, stemming from debt obligations recorded on the

company's balance sheet, debt omitted from the company's balance sheet, and factoring liabilities in both accounts receivable and accounts payable.

### Statutory Allegations

37.     From at least in or about 2018 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES, the defendant, knowingly organized, managed, and supervised a continuing financial crimes enterprise, in that the defendant committed violations of Title 18, United States Code, Sections 1343 and 1344, including Counts Three through Eight set forth below, which violations were part of a series of violations of those statutes committed by at least four persons acting in concert, and from which the defendant received $5,000,000 and more in gross receipts from such enterprise during any 24-month period. The series of violations, as defined by Title 18, United States Code, Section 225, includes the violations set forth below in Counts Three through Eight of this Indictment.

(Title 18, United States Code, Sections 225 and 2.)

### COUNT TWO
#### (Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Bank Fraud)

The Grand Jury further charges:

38.     The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

39.     From at least in or about 2018 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, and to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

40.     It was a part and object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to make and cause to be made false and misleading statements to First Brands' lenders and financers regarding its financial condition and the existence, nature, and value of collateral that First Brands pledged or sold to its lenders and financers.

41.     It was further a part and an object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to make and cause to be made false and misleading statements to financial institutions regarding its financial condition and the existence, nature, and value of collateral that First Brands pledged to its lenders and financers.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
**(Wire Fraud Affecting a Financial Institution)**

The Grand Jury further charges:

42.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

43.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' factors through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts receivable, which affected a financial institution, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
**(Wire Fraud Affecting a Financial Institution)**

The Grand Jury further charges:

44.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

17

45.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' supply chain financers through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts payable and First Brands' financial condition, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Bank Fraud)

The Grand Jury further charges:

46.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

47.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to

obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, PATRICK JAMES and EDWARD JAMES, and others, executed a scheme and artifice to defraud financial institutions that provided supply chain financing to First Brands through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts payable and First Brands' financial condition.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT SIX
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

48.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

49.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' lenders through fraudulent representations and promises regarding First Brands' financial condition, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and

other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Bank Fraud)

The Grand Jury further charges:

50.      The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

51.      From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, PATRICK JAMES and EDWARD JAMES, and others, executed a scheme and artifice to defraud financial institutions that provided asset-backed financing to First Brands through fraudulent representations and promises regarding First Brands' financial condition.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT EIGHT
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

52.      The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

53.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' off-sheet lenders through fraudulent representations and promises regarding First Brands' financial condition and the nature, value, and existence of collateral and property that were the subject of financing agreements, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

54.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

55.    From at least in or about 2022 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, willfully and knowingly combined, conspired,

confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

56.    It was a part and an object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to disguise the proceeds of fraudulent representations to the Off-Sheet Lenders of First Brands, including through transactions designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity alleged in Count 8, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

57.    As a result of committing the offenses alleged in Counts One through Eight of this Indictment, PATRICK JAMES and EDWARD JAMES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Eight, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

58.    As a result of committing the offense alleged in Count Nine of this Indictment, PATRICK JAMES and EDWARD JAMES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

Substitute Assets Provision

59.     If any of the above-described forfeitable property, as a result of any act or omission

by the defendants:

  a.      cannot be located upon the exercise of due diligence;

  b.      has been transferred or sold to, or deposited with, a third party;

  c.      has been placed beyond the jurisdiction of the court;

  d.      has been substantially diminished in value; or

  e.      has been commingled with other property which cannot be divided

without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21, United States Code, Section 853; Title
28, United States Code, Section 2461.)

_____          _____
FORE                                      JAY CLAYTON
                                          United States Attorney

24