# EXHIBIT A

**quinn emanuel** trial lawyers | new york

295 5th Avenue, New York, New York 10016-7103 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7083**

WRITER'S EMAIL ADDRESS
**scotthartman@quinnemanuel.com**

March 18, 2026

**Via E-Mail**

Peter Davis
Assistant United States Attorney
Southern District of New York
26 Federal Plaza
New York, NY 10278

Re:    Specific Request for *Brady* Material
       *United States v. Patrick James*, 26 Cr. 29 (AT) (S.D.N.Y.)

Dear: Mr. Davis,

We write on behalf of our client, Defendant Patrick James, to request immediate production of all exculpatory and impeachment material required under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, as well as additional information concerning the discovery produced to date. In light of your refusal to support any adjournment of the trial, which is currently scheduled to begin on July 15, 2026, we request that all materials responsive to this request be produced no later than March 25, 2026.

## I.    FBG Internal Investigation Material and Information

First Brands has reported that it undertook a Special Committee investigation with the assistance of Alvarez & Marsal and Weil, Gotshal & Manges LLP. *See* Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, ECF No. 22 ¶ 32, *In re First Brands Group, LLC*, No. 25-90399 (CML) (Bankr. S.D. Tex. Sept. 29, 2025). We understand that, relying on the fruits of that investigation, First Brands Group, including its affiliates and subsidiaries, and its agents, including but not limited to Alvarez & Marsal, Lazard Frères & Co., and Weil, Gotshal & Manges LLP (together, "FBG"), have actively assisted and participated in the Government's[1]

---

[1]  For the purposes of this letter, "Government" refers to the United States Attorney's Office for the Southern District of New York, the United States Attorney's Office for the Northern District of Ohio, the Office of the Deputy Attorney General, the Criminal Division of the United States Department of Justice, the Securities and Exchange Commission, the Federal Bureau of Investigation, the United States Secret Service, and any other federal, state, or

**quinn emanuel urquhart & sullivan, llp**
ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DUBAI | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEW YORK | PARIS | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

investigation of Mr. James and his co-Defendant, Edward James, including by voluntarily produced large quantities of documents, made detailed factual proffers to the Government, advised the Government in its investigative efforts, and facilitated access to current and former FBG employees.  Accordingly, under *Brady v. Maryland* and its progeny, as well as Rule 16 of the Federal Rules of Criminal Procedure, we demand that you provide us with documents and data, including electronic data, in the possession of FBG, as well as communications evidencing coordination between FBG and the United States Government and evidence shared or withheld through that cooperation.  This request specifically includes but is not limited to:

1.      communications and correspondence, including notes of oral communications, between FBG and/or its employees, attorneys, or agents and any component of the United States Government, including but not limited to United States Attorney's Office for the Southern District of New York, the United States Attorney's Office for the Northern District of Ohio, and the Securities and Exchange Commission ("SEC"), including:

   (a)    communications or legal process issued by any component of the United States Government, including but not limited to the United States Attorney's Office for the Southern District of New York and/or the SEC, to FBG or its agents requesting documents or other information from FBG;

   (b)    communications, production letters, and responses made by FBG or its agents to the United States Attorney's Office for the Southern District of New York and/or the Securities and Exchange Commission ("SEC"), including cover letters for Volumes 3 and 4[2] and the underlying subpoena itself;

   (c)    communications between FBG or its agents and the Government concerning the coordination of civil and criminal discovery or the sharing of information between the bankruptcy proceedings, i.e., *First Brands Group, LLC v. Patrick James, et al.*, Adv. Proc. No. 25-03803 (Bankr. S.D. Tex.), or in the chapter 11 cases, Case No. 25-90399 (Bankr. S.D. Tex.), and this criminal investigation, including but not limited communications regarding a potential stay of civil discovery, whether sought by FBG or the Government;

   (d)    catalogues of documents (e.g., lists of documents bearing on particular issues) provided to the Government by FBG or its agents;

---

local agency that has participated in, contributed to, or otherwise assisted with the investigation of Mr. James, Edward James, or First Brands Group.

   [2] We are aware of production cover letters existing for Volumes 1-2 and 5-20.  *See, e.g.*, SDNY_JAMES_R02_00000340_FBG_DOJ_VOL001;       SDNY_JAMES_R02_00000371_FBG_DOJ_VOL020. Please confirm that there are no other supplemental cover letters, productions made after volume 20, or any documents produced by FBG without a corresponding cover letter.

2

(e)    presentations (e.g., PowerPoint decks and/or related agendas/summaries) provided to the Government by FBG or its agents;

(f)    notes of any oral presentations or summaries given by FBG or its agents, including the date on which such presentation or summary was given;

(g)    notes and memoranda concerning meetings between the Government and FBG or its agents;

(h)    communications reporting the substance of interviews conducted by FBG or its agents of current or former FBG employees or agents;

(i)    communications and correspondence between the Government and FBG or its agents regarding the timing, substance, sequencing, or manner of conducting FBG's witness interviews, including any guidance, requests, or instructions of any kind, oral or written, provided by the Government in connection with witness interviews (which would include any notes or suggested/recommended questions and/or talking points);

(j)    communications and correspondence between FBG or its agents and FBG's employees regarding the Government's investigations, including any communications to FBG's employees regarding whether and how they were encouraged, required, or compelled to participate in FBG's internal investigation or the Governments investigation, including but not limited to participation in interviews with FBG or its agents *or* the Government;

(k)    communications between FBG or its agents and the Government relating to cooperation credit in any Government matter (civil and/or criminal);

(l)    communications between FBG or its agents and the Government relating to the resolution of any criminal, civil enforcement, or administrative investigation or inquiry into FBG;

(m)    any and all agreements, whether formal or informal, between the Government and FBG, any agent thereof, or any current or former FBG employee, including but not limited to immunity agreements, non-prosecution agreements, deferred prosecution agreements, cooperation agreements, and proffer or "Queen-for-a-day" agreements;

(n)    communications between the Government and FBG or its agents relating to the identification, collection, and/or review of documents

3

by FBG, including in response to any subpoenas or document requests, communications regarding scope of production, search terms, date ranges, custodians, the review and production of non-custodial data, and the review and production of text messages and other instant messaging platforms;

(o)  the final search terms and custodian list(s) utilized by FBG or its agents in connection with the production of documents to the DOJ, the SEC, or any other government entity;

(p)  communications between the Government and FBG or its agents relating to FBG's assertion or waiver of the attorney-client or attorney work product privileges in producing documents and/or otherwise providing information to the Government, including but not limited to identification of any individuals whose communications were withheld due to such assertions and a log of all such communications;

(q)  any and all privilege logs produced to DOJ, the SEC, or any other government agency by FBG or its agents;

(r)  communications from the Government to FBG or its agents requesting or directing FBG or its agent to search for, identify, and/or produce exculpatory and/or impeachment information, as well as any responses to such requests[3];

(i)  To the extent not addressed in responding to the preceding request, please detail the means by which the Government assured that exculpatory and/or impeachment information in FBG's files and records has been identified and produced (e.g., if the Government conducted its own independent search of those files and records, please detail that effort).

(s)  to the extent not captured by the foregoing requests, all documents and communications between FBG or its agents and the SEC;

(t)  communications between FBG or its agents and the Government concerning the Special Committee investigation, including but not limited to the scope, findings, and conclusions of the investigation;

(u)  communications between the Government and FBG or its agents regarding the allegations made in the adversary proceeding

---

[3]  NOTE: If you elect not to produce materials in response to this request, please advise whether that election is based on the fact that you either (i) made such a request(s) but refuse to provide the relevant communications or details, **or** (ii) made no such request(s).  If you make a generalized assertion of awareness of your discovery obligations, we will assume that you made no such request(s).

4

captioned *First Brands Group, LLC v. Patrick James, et al.*, Adv. Proc. No. 25-03803 (Bankr. S.D. Tex.), or in the chapter 11 cases, Case No. 25-90399 (Bankr. S.D. Tex.).

2.  Exculpatory or otherwise discoverable documents and data in the possession, custody, or control of FBG, including but not limited to:

    (a)  all documents produced by FBG or its agents to any party in the adversary proceeding captioned *First Brands Group, LLC v. Patrick James, et al.*, Adv. Proc. No. 25-03803 (Bankr. S.D. Tex.), or in the chapter 11 cases, Case No. 25-90399 (Bankr. S.D. Tex.), as well all documents produced by any party to FBG in the same matters;

    (b)  all emails and communications sent or received by Patrick James, including where Mr. James was copied, in the possession of FBG;

    (c)  all calendar entries, including conference or video call invites, on which Mr. James was included, in the possession of FBG;

    (d)  all chat or instant message communications on which Mr. James was included in the possession of FBG;

    (e)  any memoranda or communications recounting an October 2025 conversation between Charles Moore and Andrew Brumbergs, as referenced in the November 10, 2025 testimony of Mr. Moore in *First Brands Group, LLC v. Patrick James, et al.*, Adv. Proc. No. 25-03803 (Bankr. S.D. Tex.);

    (f)  all factoring agreements, receivables purchase agreements, supply chain finance agreements, accounts payable financing agreements, credit agreements, revolving credit facilities, asset-based lending agreements, side letters, amendments, term sheets, borrowing base certificates, compliance certificates, and ancillary documents between FBG and any third-party factor, supply chain lender, or secured lender, together with all general ledgers, subledgers, trial balances, journal entries, account reconciliations, and documents reflecting the accounting treatment of such arrangements by FBG and/or BDO, including ASC 860 analyses, derecognition memos, general ledger mappings, auditor workpapers, management representation letters, BDO engagement letters, and audit committee communications, as well as any collateral audit or field examination reports, for FBG and each FBG subsidiary and SPV entity;

    (g)  all internal and external financial statements, on both a consolidated and individual entity basis, for FBG and each FBG subsidiary and SPV entity, including annual and monthly financial statements;

5

(h)     all monthly bank statements, in both PDF and electronic/raw data format, for FBG and each FBG subsidiary and SPV entity, together with check registers and raw system pulls reflecting all wire transfers, ACH transactions, and EFT payments, including vendor/payee, amount, and date for each transaction, and all bank reconciliations;

(i)     all accounts receivable subledgers at the customer-invoice level, including aging schedules; all accounts payable subledgers at the vendor-invoice level, including aging schedules; all inventory subledgers by entity; and all intercompany subledgers, for FBG and each FBG subsidiary and SPV entity;

(j)     all inventory, manufacturing, and logistics data for FBG and each FBG subsidiary and SPV entity, including bills of materials and master data management exports with revision history for customer SKUs and components; inventory management module tables, including receipts against purchase orders and advance ship notice receipts; warehouse management system data, including receipts, picks, cycle counts, and shipment confirmations; transportation management system data and third-party logistics records, including rate cards, routes, shipment records, and payments; and all import/export and trade compliance records, including incoterms, customs documentation, duties and tariffs paid, and broker communications;

(k)     all Electronic Data Interchange transaction files and archives, in raw electronic format, for FBG and each FBG subsidiary and SPV entity, including EDI 810 (Invoice), 850 (Purchase Order), 820 (Payment Order/Remittance), 856 (Advance Ship Notice), and 997 (Acknowledgment) transaction sets;

(l)     all internal support schedules, working files, SharePoint files, and submission packages used by FBG employees to evaluate, prepare, or submit accounts receivable for factoring, accounts payable for supply chain financing, and assets for off-balance-sheet financing arrangements, including for each submission the invoices evaluated, customer or vendor name, amount, date, and the identity of the FBG employee(s) who prepared, reviewed, or approved the submission, for FBG and each FBG subsidiary and SPV entity;

(m)     all raw data extractions from FBG's business intelligence, data warehouse, and reporting systems, including any scrape tools or automated extraction utilities used to pull data from FBG's enterprise resource planning systems, for accounts receivable and accounts payable data across FBG and each FBG subsidiary and

6

SPV entity, together with documentation of the extraction methodology, source systems, and any transformations applied to the data;

(n)     all documents, records, and data belonging to or relating to Mr. James's family office and personal entities that are currently in the possession, custody, or control of FBG, the Debtors, or any agent thereof, including but not limited to bank statements, general ledgers, subledgers, wire transfer confirmations, journal entries, account reconciliations, financial statements, tax records, and accounting records for the Patrick James Trust, Mayfair Enterprises LLC, Geauga Management Group LLC, PJ Management Group LLC, Battery Park Holdings LLC, Larchmont LLC, Bond Street Financing LLC, Bond Street Asset Management LLC, Executive American Mortgage Company LLC, Albion Realty LLC, and any other entity owned or controlled by Mr. James or the Patrick James Trust that is not a Debtor in the chapter 11 cases.  We understand that FBG has retained possession of these records notwithstanding that they belong to Mr. James and his personal entities, not to the Debtors' estates, and we request that the Government produce all such records in its possession;

(o)     all communications with any lender related to the transactions, accounts, or products at issue in the Government's investigation;

(p)     all communications with media or press outlets related to (i) the bankruptcy; (ii) the Government's investigation; and/or (iii) Patrick James.

## II.     **Additional *Brady* and Rule 16 Material, Including From Third Parties**

### A.     Specific Documents and Data

(a)     All underlying invoices reflected in Excels produced to date concerning FBG's operational and financial affairs, including the factoring arrangements, SPV financing structures, or accounts payable programs. *See, e.g.*, SDNY_JAMES_00144274 (listing underlying invoices in Column D).  To the extent the government has not obtained this information, please so indicate;

(b)     all "To," "From," "CC," "BCC," "Date Sent," "Time Sent" (if separate from "Date Sent"), "Subject," "Message ID", and "Author" metadata, as well as custodian designations, original folder path information, and the original Bates numbering provided by the producing party for every document in the Government's productions to date, including the approximately 5.9 million pages

7

produced on March 2, 2026. Based on our initial review, many documents in the production are missing this key metadata. *See, e.g.*, SDNY_JAMES_04628073 (containing no to/from data). Please advise as to why this metadata was not produced. To the extent the productions made to the Government did not contain this metadata, please so indicate;

(c)     all "File Name," "File Path," "File Size," "File Format/Extension," "Duration," "Date Created," "Date Modified," "Date Last Accessed," "Time Zone," "Camera/Device Make," "Camera/Device Model," "GPS Coordinates/Location Data," "Latitude/Longitude," "Frame Rate," "Resolution/Dimensions," "Codec," "Bit Rate," "Hash Value (MD5/SHA-1)," and "Author/Creator" metadata, as well as custodian designations, original folder path information, chain of custody documentation, and the original Bates numbering provided by the producing party for every video recording in the Government's productions to date, including the approximately ten videos produced on March 18, 2026. Based on our initial review, many video files in the production are missing original metadata. *See, e.g.*, SDNY_JAMES_05955867 (containing no device or location data). Please advise as to why this metadata was not produced. To the extent the productions made to the Government did not contain this metadata, please so indicate;

(d)     all documents concerning any confidential informant, cooperating witness, or undercover agent utilized in connection with this investigation or any related investigation, including the identity of any such individual, the nature and terms of any agreement with such individual, and any payments or other benefits provided. We note that the search warrant affidavits produced to date reference at least one confidential source who contacted the U.S. Secret Service Money Laundering Task Force in October 2022 to report alleged fraud at FBG, as well as a possible additional confidential source. *See* USAO_SDNY_00000220. We request all documents and communications concerning the identity, role, compensation, reliability, and prior statements of any such individual(s);

(e)     all grand jury transcripts, including the Government's introductory remarks and legal instructions to the grand jury;

(f)     all memoranda of witness interviews, witness statements, and materials subject to disclosure under 18 U.S.C. § 3500;

        (i)     NOTE: We have reason to believe the Government's investigation included interviews with current and former

8

FBG employees who denied that Mr. James directed, authorized, or was aware of the conduct now attributed to him, including the alleged fabrication or manipulation of invoices, the alleged misrepresentations to lenders and factors, and the alleged misuse of SPV financing arrangements. Such statements are *Brady* material and we accordingly demand prompt production of all notes, memoranda, and grand jury testimony related thereto.

(g)    all third-party production cover letters and communications between the Government and third parties concerning the scope, timing, and manner of their productions to the Government;

(h)    all privilege logs prepared by third parties in connection with their productions to the Government;

(i)    all oral, recorded, or written statements of Mr. James, including any statements made to law enforcement, FBG personnel, third parties, or any other individual;

(j)    all statements made by any alleged co-conspirator, including, but not limited to Edward James, Peter Andrew Brumbergs, and Stephen Graham, that the Government intends to offer at trial pursuant to Federal Rule of Evidence 801(d)(2)(E) or otherwise, including the identity of each declarant, the date and substance of each statement, and the predicate facts the Government intends to rely upon, as well as all statements by any alleged co-conspirator that are exculpatory as to Mr. James;

(k)    all evidence the Government intends to offer pursuant to Federal Rule of Evidence 404(b), and all evidence and witnesses through which such evidence will be offered;

(l)    all expert reports, summaries of expert testimony, and the qualifications of any expert the Government intends to call at trial.

B.    Document Review Procedures

1.    A description of the procedures employed by the Government to identify, segregate, and screen attorney-client privileged communications during the collection, review, and production of files, email accounts, and electronic data, whether obtained by search warrant or otherwise, any disputes regarding privilege designations, and any privileged materials that were reviewed by the prosecution team, whether inadvertently or otherwise;

(a)    The Government must provide the privilege review methodology it applied when reviewing documents for production, including how it

9

handled documents on which attorneys or individuals performing legal functions appeared as senders, recipients, or copyees, the criteria by which the Government determined whether such communications were privileged or non-privileged, and whether it reviewed or withheld them accordingly. Where the Government determined that communications involving such individuals were not privileged and therefore reviewed or produced them, the defense requests disclosure of the basis for that determination. Where the Government determined that such communications were privileged and withheld them, the defense requests a privilege log identifying each such document.

(b)     Separately, the Government must identify which third-party producers asserted privilege over any portion of their productions, which did not, and the volume of documents withheld or redacted on privilege grounds by each such producer, including whether the Government independently reviewed any third-party privilege assertions or simply accepted them.

2.     the criteria, protocols, and review methodology employed by the Government in determining which documents from the approximately 5.9 million pages produced on March 2, 2026 constitute *Brady* material, including the relevance and responsiveness criteria applied and the identity of any documents or categories of documents excluded from production on grounds other than privilege.

C.     Communications with "Victims" and Third-Party Subpoena Recipients

1.     All documents and communications of the type described in Section I of this letter, including but not limited to production correspondence, memoranda of witness interviews, notes of meetings, substantive legal or factual analysis, presentations, communications regarding the scope and manner of document collections and productions, cooperation-related communications, agreements of any kind, privilege logs, and communications regarding the identification and production of exculpatory and impeachment information, but between the Government and putative victims and other third-party recipients of grand jury subpoenas, trial subpoenas, or document requests in this matter, including but not limited to Jefferies Financial Group Inc. (including Leucadia Asset Management LLC and Point Bonita Capital Fund LLC), Katsumi, Onset Financial Inc., Evolution Credit Partners, Raistone, CarVal, Aequum, Factofrance, UBS, Bank of America, Wells Fargo, Truist, US Bank, UMB Bank, GLAS Trust Company LLC, PrimeRevenue, BDO, and any other entity the Government has identified or intends to identify as a victim in this case.

### III.    <u>Exculpatory and Impeachment Material Regardless of Source</u>

Furthermore, please produce any material (including but not limited to agent notes, memoranda of interviews, grand jury testimony) in which any individual or third-party provided any material about:

A.    <u>Universal Topics</u>

1. suggesting or supporting an inference that Mr. James did not knowingly or intentionally violate any law with respect to the sale of FBG's accounts receivables to any third-party, including, but not limited to, Katsumi, Leucadia, Evolution, Raistone, Onset, Aequum, Factofrance, and others.

2. suggesting or supporting an inference that Mr. James did not knowingly or intentionally violate any law with respect to the sale of FBG's accounts payable to any third-party, including but not limited to Raistone, Zenith, Wells Fargo, Bank of America, Truist, UBS, US Bank, Prime Revenue, and others.

3. suggesting or supporting an inference that Mr. James encouraged FBG employees to obey the law and/or to engage in ethical behavior;

4. suggesting or supporting an inference that Mr. James supported FBG's internal investigations of allegations regarding improper sales practices and/or improper revenue recognition;

5. suggesting or supporting an inference that Mr. James believed that accounts receivable and/or accounts payable sold to third-party factors or supply chain lenders reflected real invoices owed to or by FBG;

6. suggesting or supporting an inference that Mr. James believed that financing arrangements involving special purpose vehicles ("SPVs") affiliated with FBG were disclosed to FBG's other lenders and did not violate the terms of existing lending agreements;

7. suggesting or supporting an inference that Mr. James believed that representations concerning FBG's assets, including but not limited to inventory, made to lenders were accurate;

8. suggesting or supporting an inference that Mr. James was unaware of the alleged fabrication and/or manipulation of accounts receivable sold to third-party factors;

9. suggesting or supporting an inference that Mr. James was unaware of the alleged fabrication and/or manipulation of accounts payable sold to supply chain lenders;

10. suggesting or supporting an inference that Mr. James did not have expertise in accounting, revenue recognition, accounts receivable factoring, supply chain financing, and/or the structuring of SPV inventory financing arrangements, and/or relied on the advice of attorneys, accountants, and/or financial advisors in connection with the transactions at issue;

11. suggesting or supporting an inference that transfers from FBG to Mr. James, the Patrick James Trust, or any affiliated entity were recorded in FBG's general ledgers, known to FBG's accounting personnel, and/or reviewed or audited by BDO or any other external auditor, and/or constituted tax distributions, salary, bonuses, management fees, or other compensation consistent with the terms of FBG's operating agreements or governing documents;

12. suggesting or supporting an inference that FBG's liquidity crisis was caused or substantially contributed to by external market conditions, including tariffs, supply chain disruptions, or other macroeconomic factors, rather than by fraud or misrepresentation;

13. suggesting or supporting an inference that third-party factors, SPV lenders, and accounts payable lenders conducted their own independent due diligence, were aware of the nature and risks of their financing arrangements with FBG, did not rely solely on representations made by FBG or Mr. James, did not view the representations made by FBG or Mr. James as material, earned returns substantially above market rates, and/or would have entered into the same transactions on the same or substantially similar terms regardless of the accuracy of such representations;

14. suggesting or supporting an inference that any third-party factor or SPV lender did not suffer a loss, or suffered a loss attributable to factors other than any alleged misrepresentation, including market conditions, tariffs, FBG's bankruptcy filing, or the lender's own decision to extend credit on the terms it chose.

B. Andy Brumbergs

1. suggesting or supporting an inference that Mr. James lacked knowledge of the representations Andy Brumbergs made to third-party factors regarding the existence or value of certain accounts receivable;

2. suggesting or supporting an inference that Andy Brumbergs independently managed FBG's operational and financial affairs, including the factoring arrangements, SPV financing structures, accounts payable programs, and transfers from FBG to Mr. James or affiliated entities, and made decisions and representations to third-party factors, SPV lenders, supply chain lenders, or other counterparties regarding FBG's accounts receivable,

12

accounts payable, inventory, or financial condition without direction from, consultation with, or the knowledge of Mr. James;

3.      any and all agreements, whether formal or informal, between the Government and Andy Brumbergs, including but not limited to immunity agreements, non-prosecution agreements, deferred prosecution agreements, cooperation agreements, and proffer or "Queen-for-a-day" agreements.

C.    <u>Stephen Graham</u>

1.      suggesting or supporting an inference that Mr. James lacked knowledge of the representations Stephen Graham made to third-party factors regarding the existence or value of certain accounts receivable;

2.      suggesting or supporting an inference that Stephen Graham independently managed FBG's operational and financial affairs, including the factoring arrangements, SPV financing structures, accounts payable programs, and transfers from FBG to Mr. James or affiliated entities, and made decisions and representations to third-party factors, SPV lenders, supply chain lenders, or other counterparties regarding FBG's accounts receivable, accounts payable, inventory, or financial condition without direction from, consultation with, or the knowledge of Mr. James;

3.      any and all agreements, whether formal or informal, between the Government and Stephen Graham, including but not limited to immunity agreements, non-prosecution agreements, deferred prosecution agreements, cooperation agreements, and proffer or "Queen-for-a-day" agreements.

D.    <u>Michael Baker</u>

1.      suggesting or supporting an inference that Mr. James believed that Michael Baker reviewed the SPV agreements, factoring arrangements, accounts payable arrangements, or transfers from FBG to Mr. James to ensure compliance with applicable laws and existing contractual obligations;

2.      suggesting or supporting an inference that Michael Baker was acting as attorney for Mr. James or FBG, rather than in a purely business capacity, in connection with the transactions at issue, and/or that Mr. James communicated with Baker in confidence for the purpose of seeking or receiving legal advice;

3.      suggesting or supporting an inference that the Government obtained or reviewed communications between Mr. James and Michael Baker that Mr. James understood to be attorney-client privileged, and/or that FBG or its agents waived privilege over such communications in connection with their cooperation with the Government's investigation without Mr. James's knowledge or consent;

4.    suggesting or supporting an inference that Michael Baker independently managed FBG's operational and financial affairs, including the factoring arrangements, SPV financing structures, accounts payable programs, and transfers from FBG to Mr. James or affiliated entities, and made decisions and representations to third-party factors, SPV lenders, supply chain lenders, or other counterparties regarding FBG's accounts receivable, accounts payable, inventory, or financial condition without direction from, consultation with, or the knowledge of Mr. James;

5.    any and all agreements, whether formal or informal, between the Government and Michael Baker, including but not limited to immunity agreements, non-prosecution agreements, deferred prosecution agreements, cooperation agreements, and proffer or "Queen-for-a-day" agreements.

To the extent *Brady* material has already been produced in this matter, please specifically identify (via Bates range) such material. Our *Brady* requests herein are continuing requests and the requests provide thus far are not intended to be complete or exhaustive; we reserve the right to supplement and further these requests.

Finally, we request that the Government follow Justice Manual 9-5.001(c), which provides in part:

Department policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence. As a result, this policy requires disclosure by prosecutors of information beyond that which is "material" to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). * * * *

1.  **Additional exculpatory information that must be disclosed.** A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

2.  **Additional impeachment information that must be disclosed.** A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

14

3. **Information.** Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

4. **Cumulative impact of items of information.** While items of information viewed in isolation may not reasonably be seen as meeting the standards outlined in paragraphs 1 and 2 above, several items together can have such an effect. If this is the case, all such items must be disclosed.

Mr. James reserves all rights, including the right to supplement these requests.

\* \* \*

Thank you very much for your anticipated professional courtesy and cooperation. Please feel free to contact us if there is anything you would like to discuss.

Very truly yours,

Scott Hartman
William Burck
Sara Clark

cc:    AUSA Nicholas Chiuchiolo
       AUSA Marguerite Colson
       AUSA Sarah Mortazavi

15