UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

PATRICK JAMES and
EDWARD JAMES,

Defendants.

No. 26 Cr. 29 (AT)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' MOTIONS FOR BILL OF PARTICULARS**

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Nicholas Chiuchiolo
Marguerite B. Colson
Peter J. Davis
Sarah Mortazavi
Assistant United States Attorneys

- *Of Counsel* -

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ **II**

**PRELIMINARY STATEMENT** ........ **1**

**BACKGROUND** ........ **2**

A. Accounts Receivable Factoring Fraud ........ 3

B. Accounts-Payable Financing Fraud ........ 4

C. Inventory Financing Fraud ........ 5

D. False Financial Information ........ 6

E. The Charges ........ 7

**DISCUSSION** ........ **8**

A. Applicable Law ........ 8

B. The Court Should Deny Defendants' Demands for a Bill of Particulars ........ 11

1. The Defendants Have Abundant Information to Meet the Government's Proof ...... 11
2. The Court Should Deny Defendants' Request to Identify All Co-Conspirators ....... 14
3. The Court Should Deny the Request to Identify All Affected or Defrauded Financial Institutions and Each Lender, Victim, and Third Party ........ 19
4. The Court Should Deny the Request to Identify All False Statements and Omissions 23
5. The Court Should Deny the Request to Identify All Transactions, Entities, and Accounts Underlying the Money Laundering Conspiracy Charged in Count Nine.. 33
6. The Court Should Deny the Request to Identify Edward James's Role in the Alleged Schemes ........ 35

**CONCLUSION** ........ **39**

## TABLE OF AUTHORITIES

Cases Page(s)

*In re First Brands Group, et al.*,
No. 25-90399, Dkt. 3188, at 35-77 (S.D. Tex. Bankr. Apr. 27, 2026) ..............................14

United States v. Akhavan,
S3 20 Cr. 188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ........................................ 16

*United States v. Amendolara*,
No. 01 Cr. 694 (DAB), 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) .................................. 15

*United States v. Barrera*,
950 F. Supp. 2d 461 (E.D.N.Y. 2013)........................................................................... 20

*United States v. Bellomo*,
263 F. Supp. 2d 561 (E.D.N.Y. 2003)........................................................................... 10

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................................................. 10

*United States v. Bonventre*,
2013 WL 2303726 (S.D.N.Y. May 28, 2013)................................................................... 34

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987)................................................................................... 8, 9, 30

*United States v. Carona*,
No. SA CR 06-224-AG, 2008 WL 1970199 (C.D. Cal. May 2, 2008).................................... 38

*United States v. Chalmers*,
410 F. Supp. 2d 278 (S.D.N.Y. 2006)........................................................................... 23

*United States v. Chu*,
No. 25 Cr. 579 (PKC), 2026 WL 2364076 (S.D.N.Y. Aug. 14, 2026)............................. passim

*United States v. Coffey,*
361 F. Supp. 2d 102 (E.D.N.Y. 2005)........................................................................ 8, 15

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022).......................................................................................... 25

*United States v.Cordones*,
11 CR. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022).................................... passim

United States v. Davidoff,
845 F.2d 1151 (2d Cir. 1988)............................................................................ 22, 23, 38

*United States v. Fea*,
No. 10 Cr. 708 (PKC), 2011 WL 2119708 (S.D.N.Y. May 24, 2011) .................................... 19

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987).............................................................................. 10

*United States v. Gibson*,
175 F. Supp. 2d 532 (S.D.N.Y. 2001)........................................................................... 10

*United States v. Hwang*,
No. 22 Cr. 240 .......... 15, 32
United States v. Ikoli,
2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) .......... 18, 21, 32
*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) .......... 32
*United States v. Leon*,
No. 08 Cr. 65, 2008 WL 4966904 (D. Vt. Nov, 18, 2008) .......... 35
*United States v. Leonelli*,
428 F. Supp. 880 (S.D.N.Y. 1977) .......... 9
*United States v. Levy*,
No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) .......... 30, 34
*United States v. Mahabub*,
No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) .......... 10
*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010) .......... passim
*United States v. Middendorf*,
No. 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) .......... passim
*United States v. Mitlof*,
165 F. Supp. 2d 558 (S.D.N.Y. 2001) .......... 9, 37
*United States v. Murgio*,
209 F. Supp. 3d 698 .......... 38
*United States v. Murphy*,
No. 21 Cr. 280 (AKH), 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022) .......... 8, 11
*United States v. Nachamie*,
91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000) .......... 16, 18
United States v. Orena,
32 F.3d 704 (2d Cir. 1994) .......... 20
*United States v. Panza*,
750 F.2d 1141 (2d Cir. 1984) .......... 10
*United States v. Rajaratnam*,
No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .......... 24, 32, 33
*United States v. Rigas*,
258 F. Supp. 2d 299 (S.D.N.Y. 2003) .......... 10
*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) .......... 9, 15, 20, 37
*United States v. Rodriguez*,
No. 99 Cr.  (DLC), 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) .......... 15
*United States v. Russo*,
483 F. Supp. 2d 301 (S.D.N.Y. 2007) .......... 31

*United States v. Samsonov*,
No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan 23, 2009) ........................................ 10
*United States v. Savin*,
No. 00 Cr. 45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)............................................... 36, 37
*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013)............................................................................................... 11
United States v. Tourant,
22 Cr. 276, 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023)................................................... 21
*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990)................................................................................................. 8
*United States v. Triana-Mateus*,
No. 98 Cr. 958 (SWK), 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) ....................................... 9
*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001)................................................................................. 15
*United States v. Tucker*,
No.19 Cr. 91 (PKC)............................................................................................................. 15
*United States v. Vaid*,
No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017).......................... 30, 31, 39
*United States v. Wander*,
25 Cr. 473 (JPO).................................................................................................................. 11
*United States v. Wang*,
No. 23 Cr. 118 (AT), 2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024)…………………….passim
*United States v. Wey*,
No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)........................................ 30

Statutes

18 U.S.C. § 2........................................................................................................................ 7
18 U.S.C. § 225.................................................................................................................... 17
18 U.S.C. § 1349.................................................................................................................... 7
18 U.S.C. § 1344.................................................................................................................... 7

Rules

Fed.R.Crim.P. 7(f) ................................................................................................................ 9

The United States of America respectfully submits this memorandum to oppose the motions of defendants Patrick James ("P. James BOP Mot.") (ECF No. 85) and Edward James ("E. James BOP Mot.") (ECF No. 91) for a bill of particulars.

## PRELIMINARY STATEMENT

The defendants have received all the notice required to prepare for trial, and much more besides. The Indictment describes the criminal scheme, the essential elements of each offense, and the defendants' respective roles in the crimes. In correspondence, the Government has identified affected financial institutions, factoring partners, co-conspirators, and specific false and misleading statements. The Government has summarized witness statements, both in written disclosures and in search warrant affidavits, which narrate key events and interactions. The well-resourced defendants have access to computerized, text-searchable discovery in this prosecution—materials they can review and supplement with what they have learned from the First Brands bankruptcy litigation, where serial filings detail the misconduct at First Brands and even highlight notable documentary proof. And the defendants approach trial with the assurance that they will receive still more evidentiary detail from the Government's forthcoming expert disclosures, trial exhibits, witness lists, and Jencks Act material.

The defendants are not entitled to more. In their motions, the defendants feign confusion over the charges against them and demand a complete preview of the Government's trial evidence, specifically seeking: (1) the identities of every co-conspirator (P. James BOP Mot. at 2), including those "alleged to have acted with" Edward James specifically (E. James BOP Mot. at 3); (2) the financial institutions "affected or defrauded by the conduct in Counts One through Eight (P. James BOP Mot. at 2), including each "lender and victim" (E. James BOP Mot. at 3), and, as to Count One, "[t]he identities of any alleged victims and any other third party described in" that count (P.

James BOP Mot. at 2); (3) each false and misleading statement, invoice, representation, and omission in Counts One through Eight (P. James BOP Mot. at 2), including those "that [Edward] James allegedly directed or approved" (E. James BOP Mot. at 3); (4) "the specific transactions, entities, and accounts underlying the money laundering conspiracy charged in Count Nine," (E. James BOP Mot. at 3); and (5) information regarding "the nature and extent of [Edward James'] role in the alleged schemes." (E. James BOP Mot. at 3.)

The defendants' catalog of questions betrays their aim to acquire evidentiary detail, not fair notice. Taken together, their motions amount to a demand for the premature disclosure of trial witnesses, exhibits, and strategy, and a means to restrict the Government's proof at trial. As courts in the Second Circuit have routinely done when confronted with similar requests, the Court should deny the defendants' motions.

## **BACKGROUND**

First Brands Group, LLC ("First Brands" or "FBG") was a global automotive parts supplier founded by Patrick James. Brothers Patrick and Edward ran the business, intimately involved in the financial and operational details of First Brands. To the outside world, business was booming. As recently as May of 2025, First Brands boasted revenues of over $1 billion. Only a few months later, however, First Brands was in a financial tailspin. In September 2025, First Brands filed for bankruptcy and the truth emerged: Patrick James, the Chief Executive Officer of First Brands, and Edward James, a Senior Vice President, had fraudulently amassed billions for First Brands and millions for themselves through lies and deceit. In the wake of its collapse, First Brands has left creditors grappling with billions of dollars in losses and over 20,000 workers across the globe unexpectedly facing unemployment.

To sustain operations, First Brands required substantial cash. (Ind. ¶ 7.) In part, this was because First Brands' customers had extended payment terms, which generally allowed them to delay paying First Brands for up to a year after receiving a product. (*Id.*) But it also stemmed from Patrick James's growth-by-acquisition strategy, which required First Brands to borrow money to buy other businesses. (*Id.*) As detailed in the Indictment, Patrick and Edward James directed four fraudulent schemes to draw cash into the business and enrich themselves. These schemes pervaded First Brands' operations, reaching into accounts-receivable factoring, accounts-payable financing, and asset-based financing. To carry out the schemes, the brothers relied on two members of First Brands' C-suite, Chief Financial Officer Stephen Graham and Senior Vice President Andy Brumbergs, as well as their subordinates. Together, the conspirators faked and inflated accounts receivable and payable; double- and triple-pledged loan collateral; falsified company financials; and hid billions in debt from First Brands' lenders. Both Graham and Brumbergs have pleaded guilty to participating in this far-reaching fraud.

### A. Accounts-Receivable Factoring Fraud

To bring cash into the company, First Brands sold or "factored" its accounts receivable. (*Id.* ¶¶ 8-11.) First Brands' factoring program allowed it to sell its receivables (invoices) to a third party (a "factor") for a short-term payment at a discount. (*Id.*) Typically, when the invoices become due, the factor collected the full payment.

First Brands had two types of accounts receivables factoring—customer-linked factoring and third-party factoring. (*Id.* ¶¶ 8-9.) In its customer-linked factoring program, First Brands' customers verified and approved the First Brands invoices and were responsible for ultimately paying the factor, rather than First Brands, when their invoices became due. (*Id.*) The factor, usually a bank, would pay First Brands in the short term at a discount. Third-party factoring was

different. As with customer-linked factoring, First Brands sold invoices to a factor, which would pay First Brands in the near term at a discount. But instead of the First Brands customer paying the factor when the invoice became due, First Brands itself was responsible for collecting payment and ultimately paying the factor the full amount. (*Id.*) By placing itself in the middle of these arrangements, First Brands' invoices were generally not subject to customer verification. (*Id.*)

Under the defendants' supervision and direction, First Brands fraudulently obtained billions of dollars of invoice-based financing from factors. The mechanics of the fraud were straightforward: First Brands employees faked invoices, falsely inflated invoices, and double-pledged invoices to multiple factors. In all, third-party factors hold approximately $2.7 billion in fraudulent accounts receivable. (*Id*. ¶ 12)

**B. Accounts-Payable Financing Fraud**

In addition to factoring its accounts receivable, First Brands had factoring programs for its accounts payable. (*Id.* ¶¶ 16-20.) Under these programs, financers paid First Brands' suppliers at a discount in exchange for First Brands ultimately paying the full invoice amount to the financers when the invoices came due. (*Id.*) With the defendants' knowledge and under their supervision, First Brands defrauded its accounts-payable financers by supplying fake invoice information that directed the financers to pay a third-party bill payer for phantom accounts payable. (*Id.*) The bill payer would then route the funds back to First Brands itself. (*Id.*) These self-payments were referred to at First Brands as "round trips," or, euphemistically, "corporate initiatives." (*Id.*) The defendants closely monitored round trips as part of their daily supervision of First Brands' cash status. (*Id.*)

In addition to submitting false invoice information, employees acting at the defendants' direction also sent financers falsely inflated financial information about First Brands' financial

status so that the financers would increase the funding they advanced. Furthermore, the defendants hid the mammoth debt that First Brands had incurred under its accounts-payable factoring program.

**C. Inventory Financing Fraud**

In addition to factoring, the defendants fraudulently procured hundreds of millions of dollars in cash for First Brands through financing arrangements between inventory financers (the "Off-Sheet Lenders") and entities owned and controlled by Patrick James (the "James Entities"). (Ind. ¶¶ 21-29.) Although nominally incurred by the James Entities, these arrangements with the Off-Sheet Lenders were in fact secured by First Brands' inventory, and, at Patrick James's direction, hidden from First Brands' lenders. (*Id.*)

To keep the First Brands lenders in the dark about the massive debt incurred from the Off-Sheet Lenders, the defendants took several steps to conceal the inventory financing proceeds flowing into First Brands and the repayment obligations flowing out of First Brands to the Off-Sheet Lenders. (*Id.*) In addition to outright denying the existence of any undisclosed inventory financing facilities, First Brands obfuscated the payment routes to and from the Off-Sheet Lenders to conceal both the fact and the amount of the off-sheet obligations. (*Id.*) Specifically, First Brands routed the payments from the Off-Sheet Lenders to a customer collections entity outside of First Brands' corporate structure and then disbursed those payments to First Brands' subsidiaries and then to an operating account, so that the money appeared to be ordinary customer receipts rather than loan proceeds from related-party financing arrangements with the James Entities. (*Id.*) Repayments to the Off-Sheet Lenders were similarly disguised by using sham invoices to transfer the payments through a third-party bill processor, then the James Entities, and then to the Off-

Sheet Lenders, all in an effort to prevent lenders and auditors from gleaning a true picture of First Brands' debt. (*Id.*)

By laundering funds from the Off-Sheet Lenders, the defendants were able to not only deceive First Brands' lenders but also enrich themselves. (*Id.*) While Patrick James siphoned millions from the Off-Sheet Lenders' funds to his personal accounts, Edward James received millions in commissions for brokering certain inventory-financing arrangements. (*Id.*)

At the same time as First Brands was deceiving its lenders about the existence of the Off-Sheet Lenders, the defendants made false and misleading representations to the Off-Sheet Lenders to induce them to extend and expand their financing. (*Id.*) First Brands pledged to the Off-Sheet Lenders collateral known to be encumbered by its other lenders and submitted to the Off-Sheet Lenders fake inventory schedules and account documentation to satisfy lender diligence. (*Id.*) They also made phony bank transfers to mimic the purchase and sale of inventory to satisfy the Off-Sheet Lenders' concern that legitimate collateral and transaction activity supported their loans. (*Id.*)

**D. False Financial Information**

The defendants also consistently provided false and misleading information to First Brands' lenders. (Ind. ¶¶ 30-33.) Patrick James, together with Graham and Brumbergs acting at his direction, manufactured and messaged quarterly financial metrics that did not reflect business reality but instead Patrick James's chosen result. (*Id.*) Patrick James also misled First Brands' outside auditors by denying the existence of any related-party arrangements, despite knowing that the related James Entities had incurred billions of debt secured by First Brands' collateral. (*Id.*)

The four schemes unraveled in 2025, when First Brands' liquidity dried up and the company missed debt payments. Patrick and Edward James desperately sought to refinance their

debt (*id.* ¶ 34), but in so doing could not provide adequate diligence to support their requests. In September 2025, First Brands filed for bankruptcy. At the time of filing, the company held over $9 billion in liabilities. (*Id.* ¶ 36).

**E. The Charges**

The Indictment charges nine counts. Patrick James is charged in Count One with organizing, managing, and supervising a continuing financial crimes enterprise in violation of Title 18, United States Code, Sections 225 and 2. Both defendants are charged in Count Two with conspiring to commit wire fraud affecting a financial institution and bank fraud in violation of Title 18, United States Code, Section 1349, encompassing the false and misleading statements that the defendants and others agreed to make to First Brands' lenders, financers, and financial institutions regarding First Brands' financial condition and the existence, nature, and value of collateral it pledged or sold.

Counts Three through Eight are substantive offenses charging both defendants with wire fraud affecting a financial institution, in violation of Title 18, United States Code, Sections 1343 and 2 (Counts 3, 4, 6, and 8); and bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts 5 and 7). Count Three arises from the defendants' accounts-receivable fraud. Counts Four and Five arise from the defendants' accounts payable fraud. Counts Six and Seven arise from the defendants providing false financial information to FBG's lenders. Count Eight arises from the defendants' fraud on First Brands' Off-Sheet Lenders by providing them fraudulent representations and promises related to First Brands' financial condition and the nature, value, and existence of collateral and property that were subject to the financial agreements.

Finally, Count Nine charges both defendants with participating in a money laundering conspiracy to disguise the proceeds of their fraud in Count Eight in order to obtain money from the Off-Sheet lenders.

## DISCUSSION

The defendants' motions for a bill of particulars should be denied because the Indictment, discovery produced to date, additional information provided by the Government, and upcoming pre-trial disclosures of expert material, exhibits, and 3500 permit them to adequately prepare their respective defenses.

### A. Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022) (citation and quotation marks omitted). A bill of particulars is not required where an indictment "advises the Defendant[] of the nature of the charges against him," that is, "it describes with specificity the acts [the conspirators] allegedly committed and the nature of the conspiracy of which they are accused, and it explains (in language closely tracking that of the relevant statutes) the crimes alleged." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *1 (S.D.N.Y. Aug. 17, 2018) (denying bill of particulars in a complex fraud scheme where defendants demanded the Government particularize all false representations and identify co-conspirators).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (overruled on other grounds); *see also United States v. Coffey,* 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) (denying motion for bill of particulars and noting that a contrary holding would "convert a motion for bill of particulars into a motion for wide-sweeping and burdensome discovery which is plainly not contemplated by Fed.R.Crim.P. 7(f)"). The "wheres, whens and with whoms" are "beyond the scope of a bill of particulars." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001). Bills of particulars would undoubtedly be helpful to the defense in any case. But because "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *Mitlof*, 165 F. Supp. at 569. As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574.

Furthermore, Rule 7(f) does not require the Government "to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed"—*i.e.*, "information that would, in effect, give the defendant a preview of the Government's case before trial." *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002); *see also United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants

committed the crimes charged, or a preview of the Government's evidence or legal theories."); *Mitlof*, 165 F. Supp. 2d at 569 (collecting cases)).

It is for good reason that bills of particulars are justified only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. A bill of particulars "confines the Government's proof to particulars furnished," and as a result can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *see also United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan 23, 2009) (bill of particulars "must not be misused . . . to foreclose the Government from using proof it may develop as the trial approaches"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Finally, the law does not "allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle

[defendant] to a bill of particulars"). Courts instead "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000)).

**B. The Court Should Deny Defendants' Demands for a Bill of Particulars**

1. <u>The Defendants Have Abundant Information to Meet the Government's Proof</u>

Fundamentally, "[a]n indictment is sufficient," and a bill of particulars is unnecessary, if the indictment does two things: "first, [if it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [if it] enables him to plead an acquittal or conviction in bar of future prosecution of the same offense." *United States v. Stringer*, 730 F.3d 120, 123-24 (2d Cir. 2013) (quotation marks omitted). The twenty-four-page speaking Indictment meets both requirements, and neither defendant says otherwise. It fairly informs the defendants of the charges against them and allows them to invoke double-jeopardy protections in any future prosecution. The Indictment, therefore, discharges its constitutional obligations without need for further particularization. Courts "routinely" deny motions for bills of particular where, as in this case, the charging document is sufficiently detailed and further notice has been supplied through discovery. *See, e.g.*, *Murphy*, 2022 WL 1270958, at *3; *United States v. Wander*, 25 Cr. 473 (JPO), ECF No. 63 (Tr. of July 31, 2026) (denying defendant's request for identification of all co-conspirators and alleged misrepresentation in multiyear fraud scheme involving double-pledged collateral); *Middendorf*, 2018 WL 3956494, at *2 ("no further detail is required" where indictment delineated fraud scheme "with reasonable specificity" and Government provided extensive discovery).

No doubt the itemized information the defendants seek would be useful for organizing their defense and hemming in the Government's case six months before trial. But the purpose of a bill of particulars is not to provide information that "would be useful to the defendant." *United States v. Cordones*, No. 11 CR. 205 (AKH), 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022) (citation and quotation marks omitted). That is particularly true where, as here, the Government has given the defendant extensive information—both within the Indictment and outside its four corners—to help the defense meet the Government's proof at trial.

The speaking Indictment details the mechanics of each of the defendants' fraudulent schemes (*e.g.*, Ind. ¶ 12 (describing how First Brands, "routinely submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices"); *id.* ¶¶ 16, 17 (describing how First Brands, "fabricated the amounts it purportedly owed to suppliers" as part of "round trip" transactions)); it includes references to and quotes from specific documents produced in discovery (*e.g.*, Ind. ¶¶ 13, 18, 31). It also includes a visual example of the flow of funds that the defendants used to conceal their fraud. (*E.g.*, Ind. ¶ 26). This additional detail—which is not legally required—does not simply describe the charges; it previews how the Government is likely to prove its case.

The Government also has provided voluminous, text-searchable discovery that has been produced with detailed cover letters to assist the defendants' review. In addition, the Government has produced as Rule 16 discovery search warrant affidavits that provide document-level detail, as well as summaries of key witness statements. For example, the search warrant affidavits provide interview summaries describing the schemes, identify particularly relevant emails by date, participants in the scheme, and direct quotations.

The defendants give short shrift to the Government's answeres to their letter demands for particulars. In written correspondence, the Government has responded to the defendants' requests

for additional detail. For example, the Government's disclosure letters, Decl. of Seth DuCharme Ex. C (May 14, 2026 disclosure letter to Edward James ("May 14 Ltr.") (ECF No. 93-3)); *id.* Ex. D (April 3, 2026 Discovery Letter to Patrick James (the "Apr. 3 Ltr.") (ECF No. 92-4)), have: (1) identified 11 financial institutions affected by the schemes, Apr. 3 Ltr. at 3; (2) identified, by bates number, lists of factored receivables and First Brands receivables data, *id.*; (3) identified the four factoring partners listed in paragraph 12 of the Indictment, *id.*; (4) identified, by bates number, particular examples of reports and communications discussing the "round trip" payments described in the Indictment, *id.*; (5) identified, by bates number, organizational charts describing entities owned and controlled by the defendant described in the Indictment, *id.* at 4; (6) identified entities involved in the off-sheet lending described in the Indictment, *id.*; (7) identified the four Off-Sheet Lenders described in the Indictment, *id.*; (8) identified, by bates number, communications quoted in the Indictment, *id.*; and (9) identified particular communications in the discovery related to First Brands' communications with its auditors, *id.*

On top of the Indictment, search warrant affidavits, discovery, pre-indictment disclosures, post-Indictment disclosures, and forthcoming pretrial disclosures, the defendants also have the benefit of extensive filings and litigation in the First Brands bankruptcy litigation. For example, the independent bankruptcy examiner appointed by the United States Trustee has filed a 100-page report outlining evidence that "[s]ubstantial financing was raised through third-party factoring and off-balance sheet structures based on purported receivables and collateral that, in most instances, were fabricated, repeatedly pledged, or never transferred as represented." *In re First Brands Group, et al.*, No. 25-90399, Dkt. 2538-2, at 4 (S.D. Tex. Bankr. Apr. 27, 2026). The examiner's public report provides a detailed analysis of First Brands' factoring programs, *id.* at 46-73, and off-balance sheet transactions, *id.* at 74-94. Counsel for Patrick James has filed a response to that

report, *id.* at Dkt. 2541 (April 27, 2026), demonstrating his familiarity with this aspect of First Brands' operations. Further, the Chief Restructuring Officer of First Brands has filed a declaration outlining further details related to "False and Misleading Activity Relating to FBG's Factoring and Supply Chain Practices." *In re First Brands Group, et al.*, No. 25-90399, Dkt. 3188, at 35-77 (S.D. Tex. Bankr. Apr. 27, 2026). Counsel for Patrick James has likewise filed a detailed objection and response to the allegations in the Chief Restructuring Officer's Declaration, *id.* at Dkt. 3276 (July 20, 2026), again, reflecting his comprehension of key concepts related to this scheme. In other words, that Patrick James is capable of reviewing and responding to detailed factual allegations in the course of First Brands' bankruptcy proceedings reflects his fundamental understanding of core aspects of multiple of the charged fraud schemes.

The upshot is clear: The defendants understand the Government's theory of prosecution, they have command of the discovery and the underlying facts, and they stand able to prepare for trial—even before they receive the additional evidentiary detail in the form of notices, motions, and 3500 material.

2. <u>The Court Should Deny Defendants' Request to Identify All Co-Conspirators</u>

The defendants' demand for the identities of all unnamed co-conspirators is an improper request to preview the Government's witness list months before the defendants are due to receive it. The detailed Indictment, the Government's indexed discovery, as well as its response letters to serial defense requests, supply the defendants with more than adequate notice regarding the particulars of their co-conspirators.

Courts in this District routinely deny blanket requests for the identities of all co-conspirators. *See, e.g.*, *United States v. Chu*, No. 25 Cr. 579 (PKC), 2026 WL 2364076, at *5 (S.D.N.Y. Aug. 14, 2026) (denying bill of particulars for names of individuals besides the

defendant and the three named co-conspirators "who may have participated in the underlying violations" particularly because "there remains only one defendant, and the scheme was confined to the practices of one company"); *Wander*, 25 Cr. 473 (JPO), Tr. of July 31, 2026 (denying demand for identities of co-conspirators where Government had disclosed the identity of one charged co-conspirator); *Middendorf*, 2018 WL 3956494, at *2-3 (denying demand for identities of co-conspirators where fraud scheme involved employees of two entities, focused on the conduct of six co-conspirators); *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *1-2 (S.D.N.Y. Oct. 13, 1999) (denying request for identification of co-conspirators where none were alleged to have committed any overt acts and identity of the conspiracy as a whole was clear) (citing *Coffey*, 361 F. Supp. at 122 ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved.")); *see also United States v. Tucker*, No. 19 Cr. 91 (PKC), June 3, 2016 Conf. Tr., at 9-10 (denying request for co-conspirator identities, reasoning that a bill of particulars "[i]s

not an investigative tool. It's not a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.").

Furthermore, in assessing whether to require the Government to identify unnamed co-conspirators, courts have not hewed to the six-factor analysis cited by the defendants. (P. James BOP Mot. at 8-9 (citing *United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000)). But even if this Court were to examine those factors, they do not weigh in favor of requiring the Government to preview its witnesses six months prior to trial or jeopardize an ongoing investigation. To begin, this case does not implicate "a large number of co-conspirators." Indeed, it is a far cry from *Nachamie*, which involved "eight defendants and an unknown number of unindicted co-conspirators." 91 F. Supp. 2d at 573. Nor does it present Judge Rakoff's concern in *United States v. Akhavan*, in which "the indictment suggests that the co-conspirators represented several distinct organizations." No. 20 Cr. 188 (JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020).

Nevertheless, Patrick James claims that the number of co-conspirators is "unknowable" from the face of the Indictment. (P. James BOP Mot. at 9.) Not so. Most obvious, the Indictment clearly identifies co-defendants Edward James and Patrick James as co-conspirators. It also references members of the "senior business leadership team at First Brands, (Ind. ¶ 5), who conspired with the defendants, and well as an "inner circle" of First Brands executives involved in the fraudulent schemes, (*id.* ¶¶ 13, 35.) The defendants well know that the "inner circle" of leadership consisted of a circumscribed group occupying operations and finance roles atop First Brands' 26,000 employees. In any case, the Indictment identified two of those leaders by title—the Vice President of Finance, (*id.* ¶ 19), and the Chief Financial Officer, (*id.* ¶ 32), along with actions they took to perpetrate fraud at First Brands. Months ago, the Government identified those

individuals to the defense as charged co-conspirators and provided their pertinent case information. Apr. 3 Ltr. at 2. Further still, these two co-conspirators pleaded guilty in a separate case before the Court.

Patrick James protests that he is unable to discern whether the "4 persons acting in concert," as charged in Count One are distinct from the unnamed co-conspirators charged in Counts Two through Nine.[1] But the Indictment clearly delineates the four schemes, together with illustrative examples of fraudulent conduct underlying each. The examples include e-mails with direct quotations, (Ind. ¶¶ 14, 19), directives given by Patrick James to First Brands employees, (*id.* ¶¶ 14, 25 32), and fraudulent invoices submitted to financers, (*id.* ¶¶ 15, 20). Together they form primers for each fraudulent scheme, supplying the defendants with the relevant conduct and dates, from which they may easily discern the other "senior executives," and "members of Patrick James's "inner circle" referenced in the Indictment.

The Indictment is merely the starting point, however. The defendants would have this Court believe that they are fumbling in the dark for knowledge of co-conspirators, guided only by the Indictment's stray references to "unnamed others" and the docket information for "a separate criminal case" pertaining to the charged co-conspirators. (P. James BOP Mot. at 10.) That characterization ignores letters the Government has written in response to the defendants' repeated

---

[1] Patrick James fails to articulate why the four-person requirement in 18 U.S.C. § 225 should entitle him to a bill of particulars identifying his co-conspirators when *any* violation of federal conspiracy law requires the participation of at least two people. Instead, James draws the Court's attention repeatedly to the mandatory minimum he faces if convicted of Count One, which is legally irrelevant to the merits of his motion for further particulars. And in any event, the Court in *United States v. Chu* rejected a nearly identical argument by a defendant facing a charge under the same statute. 2026 WL 2364076, at *5 ("With respect to [the charge under section 225], Chu is not entitled to learn the identity of individuals besides himself, Kollar, Goodgame, and Seibold who may have participated in the underlying violations.").

demands for information, including a twenty-page letter cataloguing excerpts of witness interviews conducted by the Government. Those excerpts contain detailed information about participants in the charged conduct.

Nor do the defendants acknowledge the Government's robust discovery production, except to complain about its volume. But the defense's own cases recognize that voluminous discovery is problematic only when the defendants are otherwise ignorant of the "particular charges against them," *Nachamie*, 91 F. Supp. 2d at 573, and the Government's productions "unfairly overwhelm[]" defendants or drown them in pages of material "without any sort of guidance." (P. James BOP Mot. at 10 (citing *United States v. Ikoli*, 16 Cr. 148 (AJN), 2017 WL 396681, at *6 (S.D.N.Y. Jan. 26, 2017).) The well-resourced defendants cannot credibly claim to be "overwhelmed" or "unguided" by the Government's productions, which are unremarkable in volume and scope for a significant corporate fraud. More to the point, the Government has not simply dumped discovery on the defendants. The Government's rolling productions are text-searchable and accompanied by indexed cover letters. Guided by the allegations in the Indictment and the Government's letter disclosures, the defendants can conduct targeted and comprehensive searches for co-conspirators.

Finally, the defendants' multi-factor analysis gives the back of the hand to the integrity of the Government's ongoing investigation. Indeed, their motion collapses the fifth and sixth factors, with near-total focus on the absence of physical harm to any co-conspirators, something the Government does not dispute. But the defendants cannot seriously suggest that the Government's disclosure of interview excerpts or a publicly litigated bankruptcy in Texas obviates the risk of harm to the Government's active and ongoing investigation. *See* Order Denying Motion to Quash (ECF No. 56) ("The Government's *ex parte* letter indicates that the Government's investigation

into potential charges and potential co-conspirators is ongoing, and that the subpoena may lead to relevant information concerning this investigation.").

In light of the evidentiary detail in the Indictment, the Government's written disclosures, and indexed discovery, the defendants are not entitled to a witness list—*six months* before trial—delimiting the co-conspirators the Government may call to prove its case. As is routine, the Government will disclose a witness list and Jencks Act material sufficiently in advance of trial for the defense to adequately prepare. Accordingly, consistent with precedent in this Circuit and District, the defendants' request for the names of all co-conspirators, like the remainder of his request for further particulars, should be denied.

3. The Court Should Deny the Request to Identify All Affected or Defrauded Financial Institutions and Each Lender, Victim, and Third Party

The defendants' motions for a bill of particulars identifying every lender, affected financial institution, victim, financing partner, factoring partner, inventory financer, creditor, auditor, potential purchaser, or any third party[2] other than a cooperator is meritless. (P. James BOP Mot. at 2, 12-15; E. James BOP Mot. at 12-14.) At bottom, the defense seeks to compel the Government to identify every third party implicated by the offense conduct, disregarding the detailed discovery and disclosures they have received to date, and the pre-trial disclosures they can anticipate receiving before trial. The defendants' request fails for the same reason that the Government is not obliged to name each and every co-conspirator in this case: The defense is not entitled to a witness list this far in advance of trial, let alone an inventory of every alleged victim and third party.

Courts routinely deny requests for particulars identifying victims, particularly where, as here, the defense has received through discovery information sufficient to identify the intended

[2] Patrick James clarifies in his motion that he seeks the identity of "any other third party" as to Count One only. (P. James BOP Mot. at 2.) Even with that qualification, his request is overbroad.

targets of the charged offense. *See United States v. Fea*, No. 10 Cr. 708 (PKC), 2011 WL 2119708, at *2 (S.D.N.Y. May 24, 2011) (noting that defendant's request for bill of particulars identifying victims was meritless where government had produced other discovery containing the names of putative victims); *Rittweger*, 259 F. Supp. 2d at 292 (denying request for bill of particulars where defendants had received other discovery that they could use to determine the identities of the alleged victims); *United States v. Barrera*, 950 F. Supp. 2d 461, 478-79 (E.D.N.Y. 2013) (denying request for bill of particulars disclosing the names of the murder conspiracy's intended victims as unnecessary for the defendant to be adequately apprised of the specific crimes of which he is accused). The same principle applies all the more for third-party individuals, financial institutions, and lenders who may not have been victimized.

The Government has already supplied in its disclosure letters relevant entities that may aid in the defendants' trial preparations. This includes: (1) a list of financial institutions affected by the fraud, Apr. 3 Ltr. at 1; (2) four factoring partners referenced in Paragraph 12 of the Indictment, *id.*; (3) the identity of "Factor-1," *id.*; (4) a list of entities used in off-sheet lending, *id.* at 3; (5) the Off-Sheet Lenders that advanced funds to FBG, *id.*; (5) the identity of an audit partner that alerted Factor-1 to discrepancies in the financials, May 14 Ltr. ¶ 1; (6) two financers who requested physical invoices from First Brands Group, *id.* ¶ 2; (7) two of the Off-Sheet Lenders relevant to Edward James's negotiations with lenders as described in Paragraph 23 of the Indictment, *id.* ¶ 3; and (8) the financer relevant to the inventory financing arrangement referenced in Paragraph 28 of the Indictment, *id.* ¶ 5. In short, the Government's disclosures far exceed what the law requires.

The cases the defendants cite for support are inapposite and only underscore the defendants' overreach. For example, in *United States v. Orena*, the Second Circuit "perceive[d] no deficiency" where the prosecution "identified twelve intended victims, but added the phrase

'and others' at the end of the list to indicate that there might be others not then known to the government." 32 F.3d 704, 714 (2d Cir. 1994). That disclosure is analogous to what the Government has supplied here, namely, a fulsome but non-exhaustive list of financial institutions.

Likewise, in *Wang*, also cited by the defendants, this Court denied a motion for a bill of particulars seeking the identities of the 5,500 investors who were implicated across three different criminal schemes. *United States v. Wang*, No. 23 Cr. 118 (AT), 2024 WL 1251105, at *4 (S.D.N.Y. Mar. 22, 2024). In so ruling, this Court distinguished *United States v. Tournant*—also cited by the defense—on the basis that, unlike in *Tournant*, the fraudulent misrepresentations in *Wang* did not implicate "individual misrepresentations made to particular investors," which had to be identified "out of over 100 sophisticated institutional and individual investors spread across seventeen different funds," which "all had 'different investment objectives, risk strategies, and disclosures.'" *Id.* at *3 (quoting *Tournant*, No. 22 Cr. 276, 2023 WL 8649893, at *3-4 (S.D.N.Y. Dec. 13, 2023)). The frauds at issue in *Wang* were "not 'highly individualized,' and their details not so 'obscure'" as to justify further particulars. *Id.* The same is true here. To be sure, the Government has alleged four fraud schemes, each with a different objective and class of victims. But the entities and victims affected by each scheme are limited, paling in comparison to the (potentially) 100 investors in *Tournant* and the thousands of investors in *Wang*.[3] And in this case, each charged scheme involved

[3] Edward James argues in his brief that although the Government's disclosure to date has identified almost a dozen implicated entities, that notice is not "meaningful" where discovery includes documents "from more than 130 parties[.]" (E. James BOP Mot. at 13.) That reasoning is specious. The defendants and defense counsel are no doubt capable of discerning which producing parties are implicated in the scheme. For example, toll records from a major telecommunications provider, such as T-Mobile, is self-evidently distinct from emails produced by one of the entities identified by the Government in its disclosure letters. The number of producing parties does not *ipso facto* entitle the defendants to a bill of particulars, particularly where they have also received guidance on how to parse that discovery.

common misrepresentations (*e.g.*, fake invoices or false quarterly financials), rather than the individualized misrepresentations that were disseminated to the scores of victims in *Tournant.*

Stated differently, the defendants here are not left guessing which of 100 differently situated investors fell victim to a unique catalog of misrepresentations. Rather, as laid out in the Indictment and in the Government's supplemental disclosures, each respective fraud scheme had a common objective that was characterized by common misrepresentations, and each affected a circumscribed number of entities, the scale of which does not begin to approach the number of investors at issue in *Tournant* or even *Wang*, and which the Government has already identified in its disclosure letters. In short, *Tournant* is inapposite, and *Wang* is unsupportive of the defendants' argument.

*United States v. Davidoff*, which Patrick James relies on in his brief, is similarly inapt. (P. James BOP Mot. at 15.) In *Davidoff*, the defendant was charged with racketeering conspiracy and four counts of extortion offenses. 845 F.2d 1151, 1153 (2d Cir. 1988). The racketeering conspiracy count alleged that extortion offenses were part of the conspiracy and that those extortion offenses included, but were not limited to, the substantive extortion offenses also charged. The four extortion counts, in turn, alleged a particular company and its associated companies as the victims of extortionate demands. At trial, however, the Government introduced evidence of extortions against three entirely different companies. None of the three companies had been named in the indictment, and none of the extortions aimed at them otherwise involved the company that had been named in the indictment. *Id.* Furthermore, the Government's exhibits and pre-trial disclosures did not include the victim companies that were ultimately the subject of trial; defense counsel received notice of them only after jury selection and during trial in the form of 3500 material. *Id.* at 1155. Under those circumstances, the Second Circuit concluded it was "simply unrealistic to

think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies, allegations not made prior to trial." *Id.* at 1154. The court's ruling in *Davidoff* cannot be divorced from its singular context, where the defense commenced a trial with a completely different focus than that previously advanced by the prosecution team.

The Indictment, discovery, and letters have laid out how the fraudulent schemes were executed, and the Government's disclosure letters, discovery, and upcoming pre-trial disclosures have and will sufficiently identify the entities relevant to each scheme. No further particulars are required.

4. <u>The Court Should Deny the Request to Identify All False Statements and Omissions</u>

The defendants likewise move for an inventory of each false statement or omission made over the course of each charged offense. (P. James BOP Mot. at 2; E. James BOP Mot. at 3.) As with their other requests, motions for these types of specifics are frequently denied. An index of the date, time, and substance of every false utterance or concealment is neither customary nor necessary where the Government has already supplied extensive detail regarding each scheme, trial is not scheduled to commence for another six months, and where substantial pretrial disclosures in the form of exhibits and 3500 are anticipated to be produced.

The law is clear that "the Government need not specifically 'inform a defendant of all transmissions it will use to prove a defendant's guilt at trial in a bill of particulars.'" *Middendorf*, 2018 WL 3956494, at *2 (quoting *United States v. Chalmers*, 410 F. Supp. 2d 278, 285 (S.D.N.Y. 2006)). As this Court held in *Wang*, "the Government need not 'disclose in advance of trial every act it will prove that may violate some criminal statute,' or 'itemize all the overt acts committed in furtherance of the conspiracy.'" 2024 WL 1251105, at *5 (quoting *Davidoff*, 845 F.2d at 1154,

*Rajaratnam*, 2010 WL 2788168, at *3). Indeed, in *Wang*, the Court denied the defendant's request for a full accounting of "every transfer that [the Government] contends [was] illegal," and only granted the bill of particulars requested by the defendant for the names of specific accounts and entities at issue given that the Indictment alleged an expansive RICO enterprise involving 4 countries, 80 entities and over 500 accounts, and because trial was "set to begin in less than 60 days" at the time of the Court's ruling. *Id.* at 11 & n.4.

Courts often reject such claims for what they are: an "ill-disguised attempt at general pretrial discovery." *Mandell*, 710 F. Supp. 2d at 372 (rejecting defendant's demand for every alleged misrepresentation made to investors in case charging conspiracy to commit wire fraud and securities fraud). Where, as here, "the Indictment delineates the scheme to defraud . . . with reasonable specificity, and the Government has provided extensive discovery on [defendants'] relevant conduct, no further detail is required." *Middendorf*, No. 18 Cr. 36 (JPO), ECF No. 122 at 3 (rejecting defense request in wire fraud scheme for all wire transmissions and false representations the Government intended to use at trial). Most recently in *Chu*, the Court denied a request for specificity regarding each false statement the Government intended to use at trial, reasoning that the "examples of alleged false statements" described in the Indictment sufficiently "narrowed the universe of relevant conduct" such that the Government was "not required to do more." *Chu*, 2026 WL 2364076, at *7.

Where courts have granted demands for particulars concerning false statements, the circumstances are readily distinguishable. Patrick James relies on *United States v. Connolly*, which involved a sophisticated scheme to manipulate LIBOR through false submissions, and consequently affect derivative trades. 16 Cr. 00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017). For one thing, Judge McMahon denied the defendants' request for every "fraudulent

statement" at issue, the very information that Patrick and Edward James seek here. *Id.* at *7. But even in requiring the Government to identify the fraudulent trades at issue, Judge McMahon was clear that "[i]n the ordinary course—in the ordinary case," the Court would have denied the defense's request. *Id.* at *5. The Court was persuaded to grant the defense's motion due to bespoke factors that are absent here, including that: the LIBOR trade data involved millions of trades, not all of which were manipulated; the defense could not discern information as basic as the counterparties to each trade based on the information the Government had produced; and the Government's methodology for navigating the trade data proved to be flawed, casting doubt on the defense's ability to independently discern the data it had received. *id.* at *4-7.

The fraud schemes alleged in this case do not remotely resemble the derivatives trades in *Connolly*. Not in number, and certainly not in complexity. In connection with the accounts-receivable factoring fraud, the Indictment specifies that employees "submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties," including by generating invoices for non-existent transactions, and by altering bona fide invoices "to make them appear more valuable." (Ind. ¶ 12.) The April 3 Letter supplies the bates numbers for "a listing of factored receivables" and directs the defense to review a specific production of data "for factored receivables." Apr. 3 Ltr. at 2. It further identifies the four factoring partners referenced in the indictment. *Id.*

In executing this scheme, Patrick James and others took steps to conceal the false invoices. (Ind. ¶ 13.) The Indictment even outlines a specific instance of such subterfuge, which resulted in Patrick James directing "that future emails from certain third parties, including Factor-1, be restricted to an inner circle of First Brands executives involved in the fraudulent scheme, so that no low-level employee would inadvertently supply accurate information to an inquiring lender."

(*Id.*) The Indictment further identifies two false invoices, searchable by date and amount. (Ind. ¶ 14.) The May 14 Letter goes one step further, identifying the relevant audit partner referenced in the Indictment and providing the bates number for the email described in the Indictment. May 14 Ltr. at 2.

The defense has also received internal First Brands' data of authentic receivables to compare against the receivables that First Brands factored with third parties. The Government's April 3 Letter identifies FBG's internal Vizion data containing authentic sets of receivables, as well as listings of factored receivables from third parties Katsumi, Jefferies, Bank ABC, Evolution, and ING—that can be used for comparison purposes. Apr. 3 Ltr. at 2.[4] Running a mechanical comparison of internal and external data sets to determine discrepancies between invoices, or to identify invoices missing from an authentic set, is within the capabilities of sophisticated and well-resourced defense counsel. (*See* P. James BOP Mot. at 19 & n.3.) Further still, the Government's expert disclosures, exhibits, and Rule 3500 material will each provide detail, including invoice-level detail, that proves the charged schemes, further facilitating the defense's preparations well in advance of trial.

In connection with the accounts-payable financing fraud, the Indictment states that with the defendants' approval and at their direction, First Brands submitted false and misleading invoice information and false financials "to induce financers to increase the amount of funds advanced" and "to inject additional cash into First Brands at moments when the company was unable to meet

[4] The Government received an updated listing of factored receivables related to Raistone, which was produced to the defendants and stamped with bates number SDNY_JAMES_00187686 (FBG_DOJ_00029207). Jefferies also recently produced to the Government additional information for invoices that were fully paid by First Brands at the date of the bankruptcy, which the Government has produced to the defense today. The Government will continue to timely produce any relevant data it receives moving forward.

its payment obligations with legitimate cash on hand." (Ind. ¶ 16.) The Indictment further describes in detail the types of documents used to execute this fraud, including "spreadsheet-style data entries reflecting purported supplier invoice information" that contained "fabricated amounts [that] did not correspond to real invoices or legitimate supplier payables," "[i]nternal treasury reports circulated to senior executives" to track this activity, and "consolidated financial statements" that grossly understated "the enormity of First Brands' accounts-payable financing obligations," in addition to an August 2021 email in which the Vice President of Finance at First Brands stated that the scale of this fraud "was 'getting out of control.'" (*Id.* ¶¶ 17-20.) As with the description of the accounts-receivable factoring fraud, the Indictment describes efforts to conceal this deception, including: (1) "[a]round May 2023" when a "supply-chain financer requested the invoices underlying a particular line-item submission," prompting an employee to "fabricat[e]" an aggregate "'cover' invoice purporting to show aggregate amounts owed to, or billed by, a third-party payment processor," and (2) through a specific directive by Edward James "to 'kill' the relationship" with a particular financer after they had requested physical invoices. (*Id.* ¶ 19.) The Government's May 14 Letter names two of the financers that were the target of the defendants' deception. May 14 Ltr. at 2.

As the defendants know from their involvement in the accounts-payable scheme, the universe of implicated supply-chain financers was limited, and even smaller was the universe of online platforms to which First Brands uploaded the false invoice information. There are just four. Even smaller than that is the number of payment processors, which the defendants can readily identify from the discovery as Next Process, ITS Traffic Systems, and VercyFi. The defendants thus have all the tools they need to map out the particulars of the accounts-payable fraud, including

by comparing veritable invoices issued *to* First Brands against cover invoices and invoice information submitted *by* First Brands to the four online platforms for supply chain financing.

In connection with the fraud on First Brands' senior lenders, the Indictment specifies that this scheme was executed by (1) concealing from those lenders off-balance-sheet debt and (2) falsely misrepresenting First Brands' financial condition. (*Id.* ¶¶ 21, 30.) The Indictment describes the off-balance-sheet debt as consisting of inventory-financing arrangements entered into by the James Entities—and thus concealed from First Brands' financials—despite being secured by First Brands' inventory. (*Id.* ¶¶ 21-22.) The Indictment further enumerates various examples of lies and omissions made in furtherance of this scheme: (1) "expressly disavowing" that First Brands had such agreements, including in or about July 2025 where such a denial was made by a senior executive to a "high-priority lender," (*id.* ¶ 24); (2) submitting "falsified inventory schedules and account documentation to the Off-Sheet Lenders . . . to satisfy lender diligence and reporting requirements" (*id.* ¶ 25); (3) routing loan proceeds from the Off-sheet Lenders "through a customer collections entity maintained outside the First Brands corporate structure . . . so that the funds appeared to be ordinary customer receipts . . . rather than loan proceeds from related-party financing arrangements" (*id.* ¶ 26); (4) concealing repayments to the Off-Sheet Lenders by routing payments through a third-party bill processor and the entities controlled by Patrick James, "supported by sham invoices," resulting in the circumvention of "related-party transaction disclosures in the company's audited financials" and concealment of "the company's true leverage" and "the existence and magnitude of the off-balance sheet debt" (*id.* ¶ 27.) The May 14 Letter identifies multiple relevant lenders implicated in this scheme, May 14 Ltr. at 2, 3; while the April 3 Letter names several entities implicated in this scheme and directs the defendants to the

bates numbers for documents setting forth the "listing of entities owned and controlled by" Patrick James. Apr. 3 Ltr. at 3.

The Indictment further describes the types of documents created to present a false picture of First Brands' financial condition. These include "bridge" files that compared false and accurate financials for the company, and false financial statements that the defendants caused to be submitted to the lenders, including, in particular, through an August 2021 directive. (Ind. ¶ 31.) The April 3 Letter supplements this description by pointing the defense to the relevant discovery from which they can retrieve relevant false financials. April 3 Ltr. at 3. Additionally, Patrick James falsely certified to First Brands' outside auditors that there were no related-party transactions, despite knowing the extent of the James Entities' involvement in concealing First Brands' debt. (*Id.* ¶ 32.) The April 3 Letter provides bates ranges for multiple such false certifications. Apr. 3 Ltr. at 3. Further, through these arrangements, the defendants concealed the encumbrance of inventory over which First Brands' asset-backed lenders held priority liens, undermining governing loan agreements with those lenders. (Ind. ¶ 33.)

Setting aside that Rule 16 discovery amply equips the defense with all the information it needs to conduct its own analysis into these fraud schemes, the Government also anticipates disclosing—months in advance of trial—one or more expert reports that analyze the Government's anticipated evidence as to multiple fraud schemes, further undermining any need for a bill of particulars.

Notwithstanding this roadmap, the defense attempts to weaponize the volume of discovery as a purported basis to preview the Government's trial evidence, repeating its complaints in connection with the purported need to identify all the defendants' co-conspirators. But, as argued above, *see supra* Part B.2, courts have routinely denied motions for a bill of particulars premised

on the fact that discovery is voluminous, especially in situations where the defendants have had (or will have) many months to review it. *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *21 (S.D.N.Y. Jan. 18, 2017) ("[T]he discovery volume alone simply does not necessitate a bill of particulars."); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) (denying request for bill of particulars based on amount of discovery and noting that "[w]hile the Court may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced by the Government, the applicable Indictment was filed almost eight months ago, and counsel has had the opportunity to review discovery materials as the Government has produced them").

Edward James specifically anchors his discovery complaints—and his resulting request for each false statement—on the incorrect premise that *Bortnovsky* mandates particulars where discovery is voluminous. In *Bortnovsky*, the Government offered the defense no way to discern from the discovery or the Indictment which "of some fifteen burglaries would be demonstrated to be staged," because the Government itself was not certain. 820 F.2d at 574. The result was that the defendants in that case were left "unguided" to search for *three* fraudulent documents among thousands and then impermissibly burdened at trial to prove whether certain burglaries had, in fact, occurred. That is a far cry from the descriptions of the fraud schemes and the discovery set forth in the Indictment and disclosure letters. *United States v. Vaid*, on which both defendants rely, is similarly distinguishable. There, the Court required the Government to disclose which of 500,000 insurance claims were either medically unnecessary or the product of "no treatment at all," in order "to prevent surprise." No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017). But the insurance claims at issue in *Vaid* are inherently different from the factored receivables at issue in this case. (E. James BOP Mot. at 16.) In *Vaid*, the defense could not readily deduce a false

statement (*i.e.*, that the treatment was medically unnecessary) from the face of a claim. Nor could the defense compare real versus fabricated claims for that information. To take as one example, with respect to the accounts-receivable factoring fraud, the defense has received as part of Rule 16 discovery *bona fide* invoices reflected in FBG's internal Vizion data, and sets of falsified invoices from factoring partners, and is thus able to compare the two sets to determine which were fabricated. The types of data and analysis required here are meaningfully distinct from that required in *Vaid*. What is more, the court in *Vaid* required the Government to provide further particulars on the false insurance claims "by 60 days prior to trial." 2017 WL 3891695, at *11. The defendants here seek that information a half-year before trial.

The decision in *United States v. Mandell* is instructive. The defendants in that case sought "detailed particulars with respect to thirteen categories of information" including "the names of defrauded investors and the specific content of the alleged misrepresentations made to investors," arguing that "given the scope of the alleged conspiracy, the number of investors allegedly involved and the scope of discovery in [the] case, the defendant cannot navigate the discovery and prepare a defense without the requested particulars." 710 F. Supp. 2d at 384. The court found that the defendant's "request for information regarding material misstatements [was] completely unfounded," because the "detailed information provided in the thirty-four page Indictment [was] more than sufficient." *Id.* at 385. Similarly, the court found that the defendant's request for a list of the defrauded victims was "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars" and noted that the court had previously denied requests for bills of particular specifying the names of defrauded investors. *Id.* at 384 (quoting *United States v. Russo*, 483 F. Supp. 2d 301, 311 (S.D.N.Y. 2007)) (quotations omitted). The defense in *Mandell* likewise grounded their motion on "the massive amount of

discovery" produced by the Government, but the Court dismissed this complaint as irrelevant because the mere existence of "mountains of documents" does not entitle the defendant to a bill of particulars. *Id.* at 385; *see also United States v. Hwang*, No. 22 Cr. 240 (AKH) (S.D.N.Y. Mar. 23, 2023), ECF No. 66 at 3 (denying motion for particulars regarding specific misrepresentations made where indictment and additional disclosures provided categorical descriptions and examples of misrepresentations).

Far from justifying a bill of particulars, the remaining cases cited by the defendants undermine their arguments. *See, e.g.*, *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) (denying request for bill of particulars "identifying the particulars of the false representations alleged" where "the Indictment gives specific notice of four allegedly fraudulent letters sent to investors," the Government's motion papers gave "additional detail about the alleged false representations outlined in the Indictment," and the defendants had possessed for months all the documentation containing those lies); *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at *5 (S.D.N.Y. Jan. 26, 2017) (denying request for bill of particulars where indictment had only a handful of pages of substantive allegations because the Government "has represented that it is 'willing to discuss the discovery and its relation to each defendant with counsel for each of the defendants'"); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *9 (S.D.N.Y. July 13, 2010) (denying in part motion for bill of particulars in insider trading case seeking "itemization of the trades at issue in the conspiracy counts" and any further particularization "where the inside information is based solely on wiretap intercepts" produced to the defense because defendants "are as capable of drawing inferences from tapped conversations as the government is.").

The defendants are aware of the object and method of each scheme, have been supplied examples of how each scheme was executed, have been apprised of several of the entities involved, and can expect even more detailed pre-trial disclosures in the weeks preceding trial. These factors conclusively foreclose the defendants' request for each and every false statement or omission.

5. The Court Should Deny the Request to Identify All Transactions, Entities, and Accounts Underlying the Money Laundering Conspiracy Charged in Count Nine

Edward James's request for additional evidentiary detail as to the money laundering count again ignores the detailed allegations in the Indictment. Contrary to Edward James's argument that the Indictment "fail[ed] to specify any account or entity that was implicated in the alleged money laundering conspiracy" (E. James BOP Mot. at 20), the Indictment explains that the loan proceeds from the Off-Sheet Lenders were "deliberately routed through a customer collections entity maintained outside of the First Brands Corporate structure and then were disbursed across First Brands subsidiaries before being swept back into First Brands' operating account." (Ind. ¶ 26.) The Indictment explains that these transactions were designed to disguise the funds as "ordinary customer receipts from retail subsidiaries rather than loan proceeds from related-party financing arrangements with the James Entities." (*Id.*) The Indictment also provides a visual example of one such deceptive transaction from December 2024, showing the flow of funds from an Off-Sheet Lender to the relevant James Entity, to the First Brands customer collections account, and then "transferred and split across five different First Brands operating entities at arbitrary pre-determined percentages, where the funds were disguised as customer receipts." (*Id.*) The Indictment likewise details how the defendants similarly disguised repayments to the Off-Sheet Lenders by routing them first "through a third-party bill processor and then through the James Entities, supported by sham invoices falsely representing payables for inventory owed by First Brands." (*Id.* ¶¶ 27-28.)

To the extent Edward James seeks specifics surrounding the "dates and amounts of the alleged transactions and the specific entities and accounts involved," such "evidentiary minutiae" is not a proper basis for a bill of particulars—and, in any event, is contained in the bank and financial records produced in discovery and already in the defendant's possession.[5] *Levy*, 2013 WL 664712, at *4, 13 (in case charging stock manipulation through false representations by corrupt brokers, request for bill of particulars recounting "each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted); *see also, e.g.*, *United States v. Bonventre*, No. 10 Cr. 228 LTS, 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, all "allegedly false records upon which the Government intends to rely to prove its case," "the specific entries [in specific books and records] that the Government alleges [the defendants] knew were false," "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," and "all unnamed clients and allegedly fake trades referred to in" a particular count).

[5] If not already evident from the description in the Indictment and the Government's discovery, relevant accounts engaged in this money laundering scheme include the following bank accounts: the Bowery Collection Account held at Wells Fargo and ending in -4822; the Trico Products (ending in -7088), FRAM Group Ops (ending in -9571), Champion Laboratories (ending in -1879), Brake Parts Inc. (ending in -7294), and ASC (ending in -6878) subsidiary operating accounts held at Bank of America; and the FBG Collection Account held at Bank of America and ending in -6975.

Edward James also relies on cases that denied a defendant's requests for bills of particulars as to money laundering charges. In *United States v. Leon*, No. 08 Cr. 65, 2008 WL 4966904, at * 1 (D. Vt. Nov, 18, 2008), the Court denied a defendant's request for the "exact known source" of cash payments and the "specific date" each payment was obtained because, "[t]hrough discovery, the Government provided [the defendant] with the date of each money laundering transaction, as well as cash receipts for 'many' of the monthly rent payments." *Id.* The same is true here—the Indictment and discovery provide the defendants with the relevant information and "[a] bill of particulars is not available simply to compel the Government to disclose the details of how it intends to prove the charges." *Id.*[6] As numerous courts have found, where specific examples are offered, as here, the Government need not produce a bill of particulars containing an inventory of every act it plans to prove that constituted part of the offense.

6. The Court Should Deny the Request to Identify Edward James's Role in the Alleged Schemes

Edward James separately moves for the particulars of each and every way he participated in the charged schemes. Although styled as a request for a bill of particulars, this motion demands a silver-platter preview of the Government's entire case against him. But as Judge Castel made clear in *Chu*, defendants are "not entitled to learn 'each specific action [the government] intends to rely on as evidence of [that defendant's] organization, management, or supervision of an underlying violation." *Chu*, 2026 WL 2364076, at *5 (citation omitted). The Indictment specifically mentions "the Defendants"—there are only two—or otherwise identifies "Edward

[6] As discussed above, Edward James's only other cited authority, *Wang*, ordered the Government to particularize only the entities and accounts at issue, and denied a request, like Edward James's request here, to particularize each transaction. 2024 WL 1251105, at *3-4. As to the accounts and entities at issue in the charge, they are described in the Indictment and further identified in this memorandum. *Supra* n.5.

James" throughout. Edward James is not entitled to any further enumeration of his role in the charged offenses. *See Wang*, 2024 WL 1251105, at *4 (citing *United States v. Savin*, No. 00 Cr. 45, 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) for "denying a request for evidentiary detail regarding defendant's 'alleged role' in the offense")).

Edward James altogether ignores allegations in the Indictment that he directed and approved fraudulent conduct (*e.g.*, Ind. ¶¶ 12, 16, 27), as well as the specific details about his hand in each fraud scheme. For example, as to the Accounts Receivable Factoring Fraud, the Indictment details how Edward James fielded questions about discrepancies regarding First Brands' invoices after they had been submitted to Factor-1; how Edward James told Patrick James about the discovery that had been made by Factor-1; and how Patrick James reacted by restricting communications with that factor to an inner circle of First Brands executives going forward. (Ind. ¶ 13.) As to the accounts-payable financing fraud, the Indictment specifies that Patrick and Edward James "closely monitored and managed" "'round trip' transactions as part of First Brands' daily cash-management process" and that the Vice President of Finance told Patrick and Edward James that these round trips were "'getting out of control.'" (*Id.* ¶ 18.) Further, the Indictment specifies that Edward James responded to additional diligence by supply chain financers by declaring that he wanted to "'kill'" the relationship. (*Id.* ¶ 19.) And, finally, the Indictment alleges that Edward James defrauded First Brands' lenders by "disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens." (*Id.* ¶ 30.)

Similarly, on the Off-Sheet Lenders fraud, the Indictment details that Edward James negotiated these arrangements and, at Edward James's direction, First Brands employees made bank transfers to mimic the purchase and sale of legitimate inventory. (Ind. ¶¶ 23, 25.) The

Indictment also alleges that Edward James received millions in commissions for brokering one of the inventory financings. Ind.. ¶ 28.

Apart from understating the specific allegations in the Indictment, Edward James's request is contrary to the well-settled principle that "[t]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *Rittweger*, 259 F. Supp. 2d at 291 (citing *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases)). Indeed, in *Wang*, this Court applied these precedents to reject a defendant's request for particulars on a similar request for particulars regarding "how the Government alleges that she conducted the GTV Private Placement, including which securities purchases and sales were involved" because the request "impermissibly seeks evidentiary detail." 2024 WL 1251105, at *4.

Just as the indictment in *Wang* alleged that the defendant "control[ed] bank accounts in which investor funds were deposited" and "misappropriate[ed]" funds in those accounts, *id.*, the Indictment here alleges that Edward James directed and supervised the accounts-receivable fraud, including by responding to particular concerns raised by factors, "closely monitored and managed" the round trip payments as part of the accounts payable scheme, negotiated the Off-Sheet Lender transactions and personally enriched himself by doing so, and directed and approved fake bank transfers to mimic legitimate collateral transfers. "Further specification is not necessary." *Id.* at *4 (citing *Savin*, 2001 WL 243533, at *5).

Edward James's request finds no support in his other cited authorities. Tellingly, none are fraud cases. In *United States v. Murgio*, 209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016), the Court granted a defendant's request that the Government particularize the specific duties and regulations

that he intended to violate when he accepted bribes in exchange for installing certain personnel on the board of a federal credit union. *Id.* at 705, 720. Unlike the bribery charge in *Murgio*, there is no parallel requirement that the Government prove that the defendants violated any regulation or legal duty as part of their scheme. Accordingly, that request has no bearing on the defendant's request here that the Court force the Government to further identify particular conduct by any specific defendant and prematurely cabin its proof.[7]

Edward James's reliance on *United States v. Davidoff* is no more helpful to the defense than his brother's. As mentioned above, *Davidoff* related to a RICO prosecution in which the Government surprised the defense by introducing evidence of three extortionate schemes separate from those named in the indictment and involving victims that had not been identified in pretrial discovery. 845 F.2d at 1154. The holding in *Davidoff* had nothing to do with the defendant's request for additional detail about a specific defendant's role. To the contrary, the Second Circuit disclaimed Edward James's very proposition, emphasizing, "[w]e do not mean to imply that . . . the prosecution must always disclose in advance of trial every act it will prove that may violate some criminal statute." *Id.* Yet that is precisely what Edward James asks here.

Similarly, the *Vaid* Court denied requests for a bill of particulars setting forth "'the conduct upon which the Government intends to rely at trial' with respect to" each defendant, *Vaid*, 2017 WL 3891695, at *11, including a defendant's separate, specific request for how a he had "'acted in furtherance of any of the crimes charged against him' and how any actions attributable to him

---

[7] In the same way, *United States v. Carona*, No. SA CR 06-224-AG, 2008 WL 1970199, at *2 (C.D. Cal. May 2, 2008), analyzed a substantive witness tampering charge that had no "allegations of specific acts" occurring in the three-year time period. Even taking this out-of-circuit district court's analysis of a different statute at face value, the Indictment here contains far more evidentiary detail explaining Edward James's specific conduct in furtherance of the schemes.

were allegedly in furtherance of the conspiracies or other crimes alleged in the Indictment." *Id.* at *12. The same outcome is warranted here.

**CONCLUSION**

For the foregoing reasons, the defendants' motions should be denied.

Dated: New York, New York
August 31, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Nicholas Chiuchiolo
Marguerite B. Colson
Peter J. Davis
Sarah Mortazavi
Assistant United States Attorneys