UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

PATRICK JAMES and
EDWARD JAMES,

Defendants.

No. 26 Cr. 29 (AT)

**OMNIBUS MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Nicholas W. Chiuchiolo
Marguerite B. Colson
Peter J. Davis
Assistant United States Attorneys

- *Of Counsel* -

**CONTENTS**

TABLE OF AUTHORITIES .......... IV

PRELIMINARY STATEMENT .......... 1

I. THE COURT SHOULD DENY DEFENDANTS' SEVERANCE MOTIONS (ECF NOS. 108, 111.) .......... 3

A. Applicable Law .......... 3

1. Joinder – Rule 8(b) .......... 3
2. Severance of Properly Joined Charges – Rule 14(a) .......... 4
3. Severance Based on Mutually Antagonistic Defenses .......... 8

B. Discussion .......... 9

1. A Single Trial Will Promote Fairness and Efficiency .......... 9
2. The Defendants' Proposed Defenses Are Reconcilable and Not Mutually Antagonistic .......... 10
3. Defendants have posited typical finger pointing, not double prosecution .......... 13
4. A Joint Trial Carries No Added Risk of Prejudice .......... 17

II. THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO COMPEL THE GOVERNMENT TO PRODUCE DOCUMENTS HELD BY PRIVATE ACTORS AND INDEPENDENT GOVERNMENT AGENENCIES (ECF NOS. 113, 118, AND 119) .......... 20

A. Applicable Law .......... 21

B. Discussion .......... 28

1. The Government Did Not Conduct a Joint Investigation with the SEC (ECF No. 119.) .......... 28
2. The Government Has Already Searched and Produced Materials in the Possession of Multiple Other Agencies that Have Formed Part of the Prosecution Team (ECF No. 119) .......... 36
3. The Government Did Not Conduct a Joint Investigation with First Brands (ECF No. 113) .......... 40
4. The Court Should Deny Edward James's Motion to Compel the Government to Request and Produce First Brands Documents Pursuant to Grand Jury Subpoenas (ECF No. 118) .......... 50

III. EDWARD JAMES'S MOTION TO DISMISS SHOULD BE DENIED (ECF NO. 114) .......... 52

A. The Defendant's Multiplicity Motion Should be Denied ........ 52

1. Applicable Law ........ 52

2. Discussion ........ 54

B. The Indictment Easily Satisfies Rule 7 ........ 57

C. The Indictment Sufficiently Alleges Venue in the Southern District of New York . 60

IV. THE COURT SHOULD DENY DEFENDANTS' MOTION TO PRECLUDE EVIDENCE BECAUSE THEY FAIL TO IDENTIFY ANY DISCOVERY VIOLATION OR PREJUDICE. (ECF NOS. 118, 137) ........ 62

A. Background ........ 64

B. Applicable Law ........ 64

C. The Court Should Deny Defendants' Motion for Preclusion ........ 66

1. Edward James Has Not Identified any Discovery Violation Or Any Prejudice ........ 67

2. Patrick James Has Not Identified any Discovery Violation Or Any Prejudice ........ 69

V. EDWARD JAMES'S MOTION TO SUPPRESS SHOULD BE DENIED (ECF NO. 122) 71

A. Background ........ 72

i. *The Ohio Warrant* ........ 72

ii. *The SDNY Warrant* ........ 75

iii. *The Government's Review of Search Warrant Materials* ........ 77

B. Applicable Law ........ 79

1. Standing in Fourth Amendment Challenges ........ 79

2. Deference to Judicial Findings of Probable Cause ........ 81

3. Overbreadth in Complex Investigations ........ 83

4. Particularity in Complex Investigations ........ 84

5. Reasonableness of Government Conduct ........ 86

6. Good-Faith Reliance on Judicially Authorized Warrants ........ 88

C. Argument ........ 89

1. Edward James Lacks Standing to Challenge the Seizure of Property Obtained Pursuant to the Ohio Warrant and SDNY Warrant ....................................... 89

2. There is No Basis to Disturb the Substantial Deference Owed to the Judges Who Issued the Challenged Warrants. ......................................................... 92

3. The Government's Review was Reasonable ................................................ 95

4. The Government Acted in Good Faith ........................................................ 98

VI. THE COURT SHOULD DENY PATRICK JAMES'S MOTION FOR EARLY WITNESS STATEMENTS (ECF NO. 116)............................................................................ 99

CONCLUSION............................................................................................................. 106

# TABLE OF AUTHORITIES

Page(s)

Cases

*Blockburger v. United States*,
284 U.S. 299 (1932) ........ 53

*Dalia v. United States*,
441 U.S. 238 (1979) ........ 86

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ........ 81

*Ferreira v. United States*,
350 F. Supp. 2d 550 (S.D.N.Y. 2004) ........ 24

*Garrity v. State of N.J.*,
385 U.S. 493 (1967) ........ 48

*Golino v. City of New Haven*,
950 F.2d 864 (2d Cir. 1991) ........ 89

*Groh v. Ramirez*,
540 U.S. 551 (2004) ........ 85

*Hamling v. United States*,
418 U.S. 87 (1974) ........ 57, 58

*Herring v. United States*,
555 U.S. 135 (2009) ........ 88

*Hudson v. Michigan*,
547 U.S. 586 (2006) ........ 66

*Illinois v. Gates*,
462 U.S. 213 (1983) ........ 81, 82, 83

*In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990*,
741 F. Supp. 1059 (S.D.N.Y. 1990) ........ 51

*Jones v. United States,*
362 U.S. 257 (1960) ........ 82

*Kaley v. United States*,
571 U.S. 320 (2014) ........................................................................................................ 81

*Kyles v. Whitley*,
514 U.S. 419 (1995) ........................................................................................................ 22

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
19 F.4th 177 (2d Cir. 2021)............................................................................................. 39

*O'Connor v. Ortega*,
480 U.S. 709 (1987) ........................................................................................................ 80

*Pennsylvania Bd. of Probation and Parole v. Scott*,
524 U.S. 357 (1998) ........................................................................................................ 66

*Rakas v. Illinois*,
439 U.S. 128 (1978) ................................................................................................. 79, 80

*Richardson v. Marsh*,
481 U.S. 200 (1987) ................................................................................................... 5, 10

*Russell v. United States*,
369 U.S. 749 (1962) ........................................................................................................ 58

*SEC v. Shkreli*,
No. 15 Civ. 7175 (KAM), 2016 WL 1122029 n.6 (E.D.N.Y. Mar. 22, 2016).......................... 45

*SEC v. Stanard*,
No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007)........................... 24, 32

*Texas v. Brown*,
460 U.S. 730 (1983) ........................................................................................................ 82

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
141 S. Ct. 777 (2021) ................................................................................................ 39, 41

*United States v. Abakporo*,
No. 12 Cr. 340 (SAS), 2013 WL 6188260 (S.D.N.Y. Nov. 25, 2013) ................................ 9, 16

*United States v. Ables*,
167 F.3d 1021 (6th Cir. 1999)......................................................................................... 85

*United States v. Agnello*,
367 F. Supp 444 (E.D.N.Y. 1973)..................................................................................... 18

*United States v. Aguilar*,
20 Cr. 390 (ENV) (E.D.N.Y. July 7, 2023) .......... 88, 96

*United States v. Alexandre*,
No. 22 Cr. 326 (JPC), 2023 WL 416405 (S.D.N.Y. Jan. 26, 2023) .......... 25, 30

*United States v. Alfonso,*
143 F.3d 772 (2d Cir. 1998) .......... 57

*United States v. Almaleh*,
17 Cr. 25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) .......... 96

*United States v. Alvarez*,
987 F.2d 77 (1st Cir. 1993) .......... 65

*United States v. Anderson*,
481 F.2d 685 (4th Cir. 1973) .......... 38

*United States v. Attanasio*,
870 F.2d 809 (2d Cir. 1989) .......... 3, 4

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998) .......... 22, 35, 49

*United States v. Avenatti*,
559 F.Supp.3d 274 (S.D.N.Y. 2021) .......... 23, 47

*United States v. Awan,*
459 F. Supp. 2d 167 (E.D.N.Y. 2006) .......... 59

*United States v. Bankman-Fried*,
179 F.4th 104 (2d Cir. 2026) .......... passim

*United States v. Bankman-Fried*,
No. 22 Cr. 673 (LAK), 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) .......... 104

*United States v. Barcelo*,
628 F. App'x 36 (2d Cir. 2015) .......... 22, 23, 27

*United States v. Barcelo*,
No. 13 Cr. 38 (RJS), 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014) .......... 23

*United States v. Bellomo*,
954 F. Supp. 630 (S.D.N.Y. 1997) .......... 19

*United States v. Bennett*,
485 F. Supp. 2d 508 (S.D.N.Y. 2007) ..... 7

*United States v. Bin Laden*,
91 F. Supp. 2d 600 (S.D.N.Y. 2000) ..... 53

*United States v. Bin Laden*,
109 F. Supp. 2d 211 (S.D.N.Y. 2000) ..... 6

*United States v. Blaszczak*,
308 F.Supp.3d 736 (S.D.N.Y. 2018) ..... 25, 31, 32

*United States v. Blondet*,
No. 16 Cr. 387 (JMF), 2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019) ..... 61

*United States v. Blumhagen*,
No. 09 Cr. 79S, 2016 WL 3563219 (W.D.N.Y. July 1, 2016) ..... 56

*United States v. Bonventre*,
No. 10 Cr. 228 (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ..... 23, 47, 48

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ..... 39

*United States v. Bowen*,
689 F. Supp. 2d 675 (S.D.N.Y. 2010) ..... 86

*United States v. Brumbergs and Graham*,
No. 26 Cr. 25 (AT) ..... 74

*United States v. Buck*,
813 F.2d 588 (2d Cir. 1987) ..... 98

*United States v. Cafaro,*
480 F.Supp. 511 (S.D.N.Y. 1979) ..... 38

*United States v. Calandra*,
414 U.S. 338 (1974) ..... 66

*United States v. Cardascia*,
951 F.2d 474 (2d Cir. 1991) ..... passim

*United States v. Carson*,
702 F.2d 351 (2d Cir. 1983) ..... 6, 7, 17

*United States v. Carton*,
No. 17 Cr. 680 (CM), 2018 WL 3559172 (S.D.N.Y. Jul. 10, 2018)........................................ 14

*United States v. Casamento*,
887 F.2d 1141 (2d Cir. 1989)................................................................................ 8, 19

*United States v. Castillero*,
No. 23 Cr. 622 (JMF), 2024 WL 4815672 (S.D.N.Y. Nov. 18, 2024) .................................... 25

*United States v. Chacko*,
169 F.3d 140 (2d Cir. 1999)........................................................................................ 53

*United States v. Chalmers*,
410 F. Supp. 2d 278 (S.D.N.Y. 2006)........................................................................... 26

*United States v. Chalmers*,
474 F. Supp. 2d 555 (S.D.N.Y. 2007)............................................................................. 3

*United States v. Chierchio*,
No. 20 Cr. 306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022)..................................... 15

*United States v. Chocron*,
No. 20 Cr. 400 (JSR), 2021 WL 3005086 (S.D.N.Y. July 14, 2021) ...................................... 60

*United States v. Chow*,
No. 17 Cr. 667 (GHW)......................................................................................... 26, 32

*United States v. Chu*,
No. 25 Cr. 579 (PKC), 2026 WL 2742739 (S.D.N.Y. Sept. 16, 2026)............................ 90, 100

*United States v. Chuang*,
897 F.2d 646 (2d Cir. 1990)................................................................................... passim

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011).............................................................................. 83, 89, 98

*United States v. Codner*,
No. 18 Cr. 609 (RJD), 2022 WL 3139119 (E.D.N.Y. Aug. 5, 2022) ...................................... 15

*United States v. Colasuonno*,
697 F.3d 164 (2d Cir. 2012)...................................................................................... 101

*United States v. Collins*,
409 F. Supp. 3d 228 (S.D.N.Y. 2019).................................................... 25, 30, 31, 33

*United States v. Connolly*,
No. 16 Cr. 370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019);
*id.*, 2017 WL 945934 (S.D.N.Y. Mar. 2, 2017) ........ 26, 47

*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001) ........ 105

*United States v. D'Amico*,
734 F. Supp. 2d 321 (S.D.N.Y. 2010) ........ 85

*United States v. Daskal*,
676 F. Supp. 3d 153 (E.D.N.Y. 2023) ........ 97

*United States v. Diaz*,
878 F.2d 608 (2d Cir. 1989) ........ 18

*United States v. Dionisio*,
410 U.S. 1 (1973) ........ 50, 59

*United States v. DiScala*,
No. 14 Cr. 399 (ENV), 2018 WL 1187394 (E.D.N.Y. Mar. 3, 2018) ........ 15

*United States v. Dumitru*,
No. 18 Cr. 243 (LAK), 2018 WL 3407703 (S.D.N.Y. June 26, 2018) ........ 56

*United States v. Dupigny*,
18 Cr. 528 (JMF), 2019 WL 2327697 (S.D.N.Y. May 30, 2019) ........ 14, 61

*United States v. Dupree*,
781 F. Supp. 2d 115 (E.D.N.Y. 2011) ........ 84

*United States v. Elam*,
678 F.2d 1234 (5th Cir. 1982) ........ 38

*United States v. Elcock*,
No. 07 Cr. 582 (CM), 2008 WL 123842 (S.D.N.Y. Jan. 10, 2008) ........ 60

*United States v. Eskow*,
422 F.2d 1060 (2d Cir. 1970) ........ 54

*United States v. Estime*,
19 Cr. 711 (NSR), 2020 WL 6075554 (S.D.N.Y. Oct. 14, 2020) ........ 88

*United States v. Euceda-Hernandez*,
768 F.2d 1307 (11th Cir. 1985) ........ 66

*United States v. Ezeobi*,
No. 10 Cr. 669 (DLC), 2011 WL 3625662 (S.D.N.Y. Aug. 17, 2011).................................... 16

*United States* v. *Falso*,
544 F.3d 110 (2d Cir. 2008)................................................................................................ 98

*United States v. Fancher,*
195 F Supp. 448 (D. Conn. 1961) ....................................................................................... 51

*United States v. Ferguson*,
246 F.R.D. 107 (D. Conn. 2007).................................................................................... 7, 25

*United States v. Fermin Castillo*,
829 F.2d 1194 (1st Cir. 1987) ............................................................................................. 54

*United States v. Feyrer*,
333 F.3d 110 (2d Cir. 2003)............................................................................................ 3, 5

*United States v. Finnerty*,
411 F. Supp. 2d 428 (S.D.N.Y. 2006).................................................................................. 24

*United States v. Fiore*,
381 F.3d 89, 94 (2d Cir. 2004)............................................................................................ 31

*United States v. Galpin*,
720 F.3d 436 (2nd Cir. 2013)........................................................................................ 83, 84

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016)................................................................................................ 86

*United States v. Garcia*,
509 F. App'x 40 (2d Cir. 2013)............................................................................................ 27

*United States v. Giffen,*
379 F. Supp. 2d 337 (S.D.N.Y. 2004)............................................................... 34, 35, 51

*United States v. Goffer*,
No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010).................................................................. 32

*United States v. Gotti*,
42 F. Supp. 2d 252 (S.D.N.Y. 1999)................................................................. 84, 86, 94

*United States v. Graham*,
No. 99 Cr.  (CFD), 2000 WL 1902425 (D. Conn. Dec. 21, 2000)............................... 65, 66, 69

*United States v. Guerrerio*,
670 F. Supp. 1215 (S.D.N.Y. 1987) ........ 24

*United States v. Guerrero*,
No. 09 Cr. 339 (RWS), 2010 WL 1790400 (S.D.N.Y. Apr. 30, 2010) ........ 65, 66

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014) ........ 19

*United States v. Gupta*,
848 F. Supp. 2d 491 (S.D.N.Y. 2012) ........ 33, 34

*United States v. Gupta,*
No. 11 Cr. 907 (JSR), 2012 WL 1066804 (S.D.N.Y. Mar. 27, 2012) ........ 56, 57

*United States v. Gutwein*,
11 CR 134 (SG), 2014 WL 201500 (E.D.N.Y. Jan. 16, 2014) ........ 87

*United States v. Halkbank*,
No. 15 Cr. 867 (RMB), 2020 WL 5849512 (S.D.N.Y. Oct. 1, 2020) ........ 56

*United States v. Hameedi*,
No. 17 Cr. 137 (JGK) 2017 WL 5152991 n.2 (S.D.N.Y. Nov. 3, 2017) ........ 15

*United States v. Haqq*,
278 F.3d 44 (2d Cir. 2002) ........ 79

*United States v. Hatcher*,
622 F.2d 1083 (2d Cir. 1980) ........ 22, 27

*United States v. Heinze*,
361 F. Supp 46 (D. Del. 1973) ........ 59

*United States v. Hernandez*,
No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ........ 83

*United States v. Hunter*,
32 F.4th 22 (2d Cir. 2022) ........ 23, 26

*United States v. Hwa*,
No. 18 Cr. 538 (MKB), 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ........ 48

*United States v. Hwang*,
No. 22 Cr. 240 (AKH) (S.D.N.Y. Mar. 23, 2023) ........ 25

*United States v. Ingarfield*,
No. 20 Cr. 416 (RA) (S.D.N.Y. Apr. 27, 2023) ........ 25

*United States v. Jacobson*,
4 F. Supp. 3d 515 (E.D.N.Y. 2014) ........ 83, 85, 93, 94

*United States v. Javice et al.*,
No. 23 Cr. 251 (AKH) ........ 51

*United States v. Jimenez*,
824 F. Supp. 351 (S.D.N.Y. 1993) ........ 5, 10

*United States v. Johnson*,
No. S2 No. 10 Cr. 431 (CM), 2013 WL 150104 (S.D.N.Y. Jan. 10, 2013) ........ 19

*United States v. Josephberg*,
459 F.3d 350 (2d Cir. 2006) ........ 57

*United States v. Kakkera*,
No. 22 Cr. 398 (GHW) (S.D.N.Y. July 19, 2023) ........ 25

*United States v. Kazarian*,
No. 10 Cr. 895 (PGG), 2012 WL 1810214 (S.D.N.Y. May 18, 2012) ........ 80, 89

*United States v. Kwok*,
No. 23 Cr. 118 (AT) (S.D.N.Y. Dec. 21, 2023) ........ 25, 36

*United States v. Lanza*,
790 F.2d 1015 (2d Cir. 1986) ........ 7

*United States v. Lebovits*,
11 Cr. 134 (SG), 2012 WL 10181099 (E.D.N.Y. Nov. 30, 2012) ........ 87

*United States v. Lee*,
916 F.2d 814 (2d Cir. 1990) ........ 80

*United States v. Leech*,
24 Cr. 658 (GHW) ........ 60

*United States v. Leon*,
468 U.S. 897 (1984) ........ 66, 88, 89, 98

*United States v. Levy*,
No. S5 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ........ 84

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993) ........ 26

*United States v. Lumiere*,
16 Cr. 483 (JSR), 2016 WL 7188149 ........ 87

*United States v. Lustyik*,
57 F. Supp. 3d 213 (S.D.N.Y. 2014) ........ 83, 84, 85, 93

*United States v. Mahaffy,*
446 F. Supp. 2d 115 (E.D.N.Y. 2006) ........ 49

*United States v. Mangano*,
No. 16. Cr. 540 (JMA), 2018 WL 851860 (E.D.N.Y. Feb. 9, 2018) ........ 15

*United States v. Marshall*,
132 F.3d 63 (D.C. Cir. 1998) ........ 66

*United States v. Martin*,
426 F.3d 68 (2d Cir. 2005) ........ 81, 82

*United States v. Martin*,
426 F.3d 83 (2d Cir. 2005) ........ 93

*United States v. Martino*,
664 F.2d 860 (2d Cir. 1981) ........ 82

*United States v. Martoma,*
990 F. Supp 2d 458 (S.D.N.Y. 2014) ........ 33

*United States v. Marzano*,
160 F.3d 399 (7th Cir. 1998) ........ 4

*United States v. Mason*,
6 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) ........ 68

*United States v. Mattera*,
No. 24 Cr. 117 (LAP), 2025 WL 2841162 (S.D.N.Y. Oct. 7, 2025) ........ 104

*United States v. Maxwell*,
534 F. Supp. 3d 299 (S.D.N.Y. 2021) ........ 48

*United States v. Mendlowitz*,
17 Cr. 248 (VSB), 2019 WL 1017533 (S.D.N.Y. Mar. 2, 2019) ........ 87, 88, 96

*United States v. Meregildo*,
920 F. Supp. 2d 434, 443 (S.D.N.Y. 2013) ........................................................ passim

*United States v. Merlino*,
349 F.3d 144 (3d Cir. 2003) ........................................................ 27

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........................................................ 96, 97

*United States v. Middendorf*,
No. 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) ........................................................ passim

*United States v. Miller*,
116 F.3d 641 (2d Cir. 1997) ........................................................ 65

*United States v. Milton*,
No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ........................................................ 60

*United States v. Milton*,
No. 21 Cr. 478 (ER), 2022 WL 4110256 (S.D.N.Y. Sept. 8, 2022) ........................................................ 43

*United States v. Monsanto Lopez*,
798 F. App'x 688 (2d Cir. 2020) ........................................................ 65, 66

*United States v. Morgan*,
302 F.R.D. 300 (S.D.N.Y. 2014) ........................................................ 26

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) ........................................................ 61

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ........................................................ 88

*United States v. Nerlinger*,
862 F.2d 967 (2d Cir. 1988) ........................................................ 4, 19

*United States v. Niftalijev*,
No. 18 Cr. 678 (JPO), 2020 WL 3472431 (S.D.N.Y. June 25, 2020) ........................................................ 10

*United States v. Nordlicht,*
No. 16 Cr. 640 (BMC), 2018 WL 1796542 ........................................................ 15

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010) ........................................................ 60, 61

*United States v. Olivo*,
No. 22 Cr. 582 (VEC), 2023 WL 8432864 (S.D.N.Y. Dec. 5, 2023) ........................................ 87

*United States v. Page*,
657 F.3d 126 (2d Cir. 2011) ........................................................................................... 6, 7

*United States v. Panza*,
750 F.2d 1141 (2d Cir. 1984) ............................................................................................ 7

*United States* v. *Paulino*,
850 F.2d 93 (2d Cir. 1988) ............................................................................................. 81

*United States v. Payne*,
591 F.3d 46 (2d Cir. 2010) ............................................................................................. 61

*United States v. Payner*,
447 U.S. 727 (1980) ....................................................................................................... 79

*United States v. Pena*,
932 F. Supp. 2d 464, 466 (S.D.N.Y. 2013) ..................................................................... 19

*United States v. Percoco*,
No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ................................... 60

*United States v. Peterson*,
357 F. Supp. 2d 748 (S.D.N.Y. 2005) .............................................................................. 60

*United States v. Pierre*,
No. 22 Cr. 19 (PGG), 2023 WL 8550322 (S.D.N.Y. Dec. 11, 2023) ...................................... 48

*United States v. Pineros*,
532 F.2d 868 (2d Cir. 1976) ............................................................................................ 66

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ................................................................ 83, 86, 97

*United States v. Pirro*,
76 F. Supp. 2d 478 (S.D.N.Y. 1999) ................................................................................. 6

*United States v. Quinn*,
445 F.2d 940 (2d Cir. 1971) ............................................................................................ 26

*United States v. Rahme*,
813 F.2d 31 (2d Cir. 1987) ......................................................................................... 79, 80

*United States v. Ramirez*,
420 F.3d 134 (2d Cir. 2005) ... 53

*United States v. Ramos*,
346 F. Supp. 2d 567 (S.D.N.Y. 2004) ... 7, 16, 17

*United States v. Regan*,
706 F. Supp. 1102 (S.D.N.Y. 1989) ... 86

*United States v. Regensberg*,
604 F. Supp. 2d 625 (S.D.N.Y. 2009) ... 53

*United States v. Rhodes*,
18 Cr. 887 (JMF), 2019 WL 316221 (S.D.N.Y. July 16, 2019) ... 31

*United States v. Rigas*,
281 F. Supp. 2d 660 (S.D.N.Y. 2003) ... 53

*United States v. Rigas*,
583 F.3d 108 (2d Cir. 2009) ... 24

*United States v. Rigas*,
No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ... 26, 32

*United States v. Riley*,
906 F.2d 841 (2d Cir. 1990) ... 85, 86, 93, 94

*United States v. Riley*,
No. 13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014) ... 61

*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ... 62

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008) ... 4, 6, 17

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) ... 7, 17, 83

*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010) ... 85, 88

*United States v. Rowe*,
414 F.3d 271 (2d Cir. 2005) ... 61

*United States v. Rubin/Chambers, Dunhill*,
828 F. Supp. 2d 698 (S.D.N.Y. 2011) ........ 105

*United States v. Rucker*,
586 F.2d 899 (2d Cir. 1978) ........ 6

*United States v. Ruggiero*,
824 F. Supp. 379- (S.D.N.Y. 1993) ........ 90

*United States v. Saab*,
No. 19 Cr. 676 (PGG), 2021 WL 5868157 & n.6 (S.D.N.Y. Dec. 10, 2021) ........ 56

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ........ 6, 17

*United States v. Santiago*,
174 F. Supp. 2d 16 (S.D.N.Y. 2001) ........ 7, 16

*United States v. Scali,*
No. 16 Cr. 466 (NSR), 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018) ........ 105

*United States v. Schulte*,
No. 17 Cr. 548 (PAC), 2020 WL 133620 (S.D.N.Y. Jan. 13, 2020) ........ 104

*United States v. Scott*,
637 F. App'x 10 (2d Cir. 2015) ........ 8, 16

*United States v. Scully*,
877 F.3d 464 (2d Cir. 2017) ........ 101

*United States v. Serpoosh*,
919 F.2d 835 (2d Cir. 1990) ........ 8

*United States v. Sezanayev*,
No. 17 Cr. 262 (LGS), 2018 WL 2324077 (S.D.N.Y. May 22, 2018) ........ 14, 100

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007) ........ 4

*United States v. Sherriff*,
546 F.2d 604 (5th Cir. 1977) ........ 38

*United States v. Shi Yan Liu*,
239 F.3d 138 (2d Cir. 2000) ........ 84

*United States v. Shkreli*,
260 F. Supp. 3d 247 (E.D.N.Y. Aug. 5, 2020) .......... 13, 14

*United States v. Shoher*,
555 F. Supp. 346 (S.D.N.Y. 1983) .......... 38

*United States v. Skeddle*,
176 F.R.D. 258 (N.D. Ohio 1997) .......... 51

*United States v. Smith*,
9 F.3d 1007 (2d Cir. 1993) .......... 82

*United States v. Sorcher,*
No. 05 CR 0799 NG RLM, 2007 WL 1160099 (S.D.N.Y. Apr. 18, 2007) .......... 91

*United States v. Sosa*,
379 F. Supp. 3d 217 (S.D.N.Y. 2019) .......... passim

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003) .......... 7, 17, 18

*United States v. Stein*,
429 F. Supp. 2d 633 (S.D.N.Y. 2006) .......... 60

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006) .......... 22, 27

*United States v. Stewart*,
513 F.2d 957 (2d Cir. 1975) .......... 100, 101

*United States v. Strauss*,
285 F.2d 953 (5th Cir. 1960) .......... 59

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013) .......... 57, 58

*United States v. Szur*,
No. S5 97 Cr.  (JGK), 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) .......... 61

*United States v. Tadros*,
310 F.3d 999 (7th Cir. 2002) .......... 23

*United States v. Thomas*,
2026 WL 1972091 (D. Vt. July 8, 2026) .......... 69

*United States v. Tomasetta*,
No. 10 Cr. 1205, 2012 WL 896152 (S.D.N.Y. Mar. 16, 2012) ... 48

*United States v. Torres*,
949 F.2d 606 (2d Cir. 1991) ... 80, 91

*United States v. Tournant*,
No. 22 Cr. 276 (LTS), 2023 WL 5001186 (S.D.N.Y. Aug. 4, 2023) ... 25, 30

*United States v. Tranquillo*,
606 F. Supp. 2d 370 (S.D.N.Y. 2009) ... 90

*United States v. Travisano*,
724 F.2d 341 (2d Cir. 1983) ... 83

*United States v. Trevino,*
556 F.2d 1265 (5th Cir. 1977) ... 51

*United States v. Triumph Cap. Grp., Inc.*,
211 F.R.D. 31 (D. Conn. 2002) ... 80, 90, 92

*United States v. Turkiye Halk Bankasi A.S.*,
16 F.4th 336 (2d Cir. 2021) ... 56

*United States v. Turoff*,
853 F.2d 1037 (2d Cir. 1988) ... 3, 4

*United States v. Tuzman*,
301 F. Supp. 3d 430 (S.D.N.Y. 2017) ... 14

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) ... 84, 85

*United States v. Van Hise*,
No. 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013) ... 61

*United States v. Velissaris*,
No. 22 Cr. 105 (DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022) ... 25

*United States v. Ventresca*,
380 U.S. 102 (1965) ... 82

*United States v. Villegas*,
899 F.2d 1324 (2d Cir. 1990) ... 79

*United States v. Wagner*,
989 F.2d 69 (2d Cir. 1993) .......... 81, 92

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998) .......... 6

*United States v. Walsh,*
194 F.3d 37 (2d Cir. 1999) .......... 58, 59

*United States v. Walters*,
No.16 Cr. 338 (PKC) (S.D.N.Y. Dec. 2, 2016) .......... 26

*United States v. Webb*,
No. 15 Cr. 252 (PKC), 2020 WL 6393012 (E.D.N.Y. Nov. 11, 2020) .......... 15

*United States v. Wey*,
No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .......... 105

*United States v. Wynder*,
147 F. 4th 200 (2d Cir. 2025) .......... 63, 64

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008) .......... 57, 58

*United States v. Young*,
745 F.2d 733 (2d Cir. 1984) .......... 85, 86

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) .......... 8, 11, 12, 19

*United States v. Zafiro*,
945 F.2d 881 (7th Cir. 1991) .......... 5, 10

*United States v. Zemlyansky*,
945 F. Supp. 2d 438 (S.D.N.Y. 2013) .......... 84

*Walczyk v. Rio*,
496 F.3d 139 (2d Cir. 2007) .......... 81, 82

*Zafiro v. United States*,
506 U.S. 534 (1993) .......... passim

Statutes

15 U.S.C. §§ 78j(b) & 78ff ........ 75
18 U.S.C. § 2 ........ 75
18 U.S.C. § 225 ........ 75
18 U.S.C. § 371 ........ 75
18 U.S.C. § 1344 ........ 75, 93
18 U.S.C. § 1956 ........ 75
18 U.S.C. § 1962(c) ........ 75
18 U.S.C. § 3237(a) ........ 61
18 U.S.C. § 3500 ........ 37
18 U.S.C. §§ 1343 ........ 73, 75
18 U.S.C. §§ 1349 ........ 75
28 U.S.C. §§ 515(a) ........ 50

Rules

Fed. R. Crim. P. 7(c)(1) ........ 57
Fed. R. Crim. P. 16(a)(1)(B)(i) ........ 65
Fed. R. Crim. P. 16(a)(1)(E) ........ 21
Fed. R. Crim. P. 16(d)(2) ........ 65
Fed. R. Crim. P. 41(e)(2) ........ 87
Federal Rule of Criminal Procedure 8(b) ........ 3
Federal Rule of Criminal Procedure 14(a) ........ 4, 5
Federal Rule of Criminal Procedure 16 ........ 65, 66, 69

Regulations

17 C.F.R. § 240.10b-5 ........ 75

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendants Patrick James's and Edward James's pretrial motions. The motions should be denied:

(1) Motions for Severance (ECF Nos. 108, 111): Defendants' motions to sever fail to allege anything other than finger-pointing codefendants that is commonplace in co-conspirator trials and consistently rejected as a basis for severance. They do not allege mutually exclusive defenses—they do not even appear to concede that the fraud as alleged in the indictment occurred—and they do not allege any serious risk of prejudice. Nor do the defendants provide any reason that standard limiting instructions for multidefendant co-conspirator trials would be insufficient here. Defendants have not come close to meeting their heavy burden to override courts' overwhelming preference for joint trials or to justify conducting the same multiweek trial twice.

(2) Motions to Compel Discovery from Government Agencies and Private Actors (ECF Nos. 113, 118, 119): Defendants' request that the Government search for and produce documents held by other government agencies and First Brands fails to allege any joint prosecution and is largely moot. The Government has gone far and above its discovery obligations and has requested and produced much of what the defendants seek in their motion. As to their remaining arguments, the defendants fail to allege any joint investigation between with First Brands or the SEC. Instead, they have pointed to standard cooperation and parallel investigations that courts—including a recent Second Circuit case—have found do not establish a joint investigation.

(3) Edward James's Motion to Dismiss (ECF No. 114): Edward James moves to dismiss certain counts as multiplicitous, for lack of specificity, and for failing to allege venue. Each of these arguments is barred under established caselaw. As the defendant concedes, each wire can be charged as a separate count, so there can be no multiplicity challenge, which is premature anyway. The 24-page indictment also far exceeds the minimal requirements of Rule 7 and contains the same venue allegations that have been upheld as sufficient time and again in this Circuit.

(4) Motion to Preclude Evidence (ECF Nos. 118, 137): Defendants' request for the drastic remedy of suppression fails in fact and in law. Defendants have not identified any untimely productions, any potential prejudice from any production, and not even suggested a hint of bad faith. Defendants do not even ask for more time to review additional material, which is the obvious and preferred remedy for any untimely discovery production. Instead, defendants highlight minimal productions that the Government has made months before trial that demonstrate the Government's continuing good faith discovery process. They also highlight the Government's continuing document productions of new discovery material that the Government has produced on a rolling basis. But when the government produces discovery material it obtains as it obtains it, the government is *complying* with its discovery obligations. Defendants have therefore failed to show they are entitled to any relief.

(5) Edward James's Motion to Suppress (ECF No. 122): The defendant's motion to suppress the fruits obtained pursuant to two search warrants signed by neutral magistrates in two different Judicial Districts lacks any factual or legal foundation. As an initial matter, the defendant lacks standing to challenge the searches and does not assert, much less meet his burden of establishing, that he held some kind of personal privacy interest in the electronic accounts at issue. Even if the defendant has standing, he has utterly failed to put forward a basis to disturb the "substantial deference" owed to the probable cause findings made by the judges who signed the warrants. Nor can he. Both warrants are supported by robust factual proffers and are not overbroad or unparticularized. Moreover, law enforcement acted within the wide range of reasonableness afforded to them in executing the warrants. The defendant also complains that the Government has taken too long to review materials obtained pursuant to the warrants, but his complaints are misplaced. Other than time devoted to filtering potentially privileged materials—which was delayed significantly by the defendants' voluminous and wide-ranging privilege assertions—the Government's review of nearly 2 million documents was completed in just over five months.

(6) Patrick James's Motion for Early Witness Statements (ECF No. 116): Patrick James's "*Brady*" motion for "attorney witness statements" is a recycling of his earlier request, which the Court denied, for early Section 3500 disclosures for attorney witnesses. The Government has complied with its *Brady* obligations in all respects—it has made robust disclosures beyond what the law requires, and the defendant is aware of the identities of the witnesses he claims to be in possession of exculpatory information and knows how to contact them.

## I. THE COURT SHOULD DENY DEFENDANTS' SEVERANCE MOTIONS (ECF NOS. 108, 111.)

The defendants' bid for separate trials should be denied. Both Patrick and Edward James ask the Court to depart from the strong federal preference for joint trials by recasting ordinary co-conspirator blame-shifting as something far more exotic. But as the Second Circuit has long recognized, disagreements among co-defendants about who bears greater responsibility for a shared scheme are the norm, not a basis for severance. What matters is whether a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment. Nothing in defendants' submissions approaches that demanding standard. The Indictment charges a unified course of conduct, the alleged schemes are intertwined, and the anticipated evidence substantially overlaps. Trying defendants together will promote fairness, efficiency, and consistency, while the speculative harms they cite are either illusory or fully addressed by established trial safeguards.

### A. Applicable Law

1. Joinder – Rule 8(b)

Federal Rule of Criminal Procedure 8(b) governs joinder of offenses and defendants. *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988). The rule permits the Government to "charge 2 or more defendants" in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has held that Rule 8(b) allows joinder of offenses and defendants where two or more persons' criminal "acts are 'unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'" *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)). As evidenced by use of the disjunctive, satisfaction of either prong may support joinder. *See, e.g.*, *United States v. Chalmers*, 474 F. Supp. 2d 555, 571 (S.D.N.Y. 2007)

("joinder is appropriate where, as in this case, the defendants' criminal acts are alleged to arise out of a common plan or scheme").

To assess the propriety of joinder, courts in this Circuit "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either . . . of the defendants resulting from the joinder." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotation marks omitted); *see also United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007); *Turoff*, 853 F.2d at 1044. Joinder is presumptively appropriate where defendants are charged with participating in a single conspiracy. *See, e.g.*, *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."); *Rittweger*, 524 F.3d at 178 ("[T]he 'simplest case for joinder is where the defendants are charged with having conspired with each other.'" (quoting *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998))). Rule 8(b) also permits the joinder of defendants charged in distinct conspiracies so long as those defendants share either a substantial identity of facts or participants, or a common plan or scheme. *See, e.g.*, *Attanasio*, 870 F.2d at 815 (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts"); *Rittweger*, 524 F.3d at 178 (upholding joinder of defendants involved in separate conspiracies even though certain defendants did not participate in or have knowledge of the other scheme).

2. Severance of Properly Joined Charges – Rule 14(a)

Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief

that justice requires." Fed. R. Crim. P. 14(a). The Supreme Court has made plain that there is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also Feyrer*, 333 F.3d at 114 (citing "economy, convenience, and avoidance of delay" as some of the reasons underlying the preference for joint trials). This preference reflects a settled precept in criminal law: "Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)).

The presumption in favor of joint trial informs any analysis of prejudice under a Rule 14 motion. As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson*, 481 U.S. at 210; *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated with depriving the jury of making its determinations based on "the full picture"), *aff'd*, 506 U.S. 534 (1993). Thus, even where a joint trial may cause some prejudice to a defendant, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). The question under Rule 14 is whether that prejudice "'is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy

multiple trials.'" *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998)).

The presumption in favor of joint trials "is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999); *see also United States v. Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)).

Moreover, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *see also Cardascia*, 951 F.2d at 483 (A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance."). Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials." *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978); *see also Rittweger*, 524 F.3d at 179; *Carson*, 702 F.2d at 367.

The issue under Rule 14 is accordingly not whether a defendant would prefer to be tried alone or might suffer some prejudice from being tried with his or her co-defendants. Rather the question is whether claimed prejudice from a joint trial "is sufficiently severe to outweigh the

judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted). A discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

"'[L]ess drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *Page*, 657 F.3d at 129 (quoting *Zafiro*, 506 U.S. at 539). For example, "'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.'" *United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) (quoting *Carson*, 702 F.2d at 367). Rather, "to the extent that a category of evidence is irrelevant to [a particular defendant], a limiting instruction will suffice to remove any prejudice." *United States v. Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007); *United States v. Ferguson*, 246 F.R.D. 107, 125 (D. Conn. 2007) ("A limiting instruction may adequately reduce the risk of prejudice to a defendant even in cases where evidence is presented against one defendant that would not be admissible in a separate trial of a co-defendant."); *United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004) ("Such 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multicount trial.'" (quoting *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001))). Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

3. Severance Based on Mutually Antagonistic Defenses

The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *Cardascia*, 951 F.2d at 484-85. To that end, "[m]ere fingerpointing does not require severance." *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989); *see also United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.").

The term "mutually antagonistic" has been adopted to describe a narrow category of adversarial-defense cases where severance may be warranted because "accepting one defense requires that the jury must *of necessity* convict a second defendant." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (emphasis added); *see also Zafiro*, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").

At the same time, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial *per se*," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39. Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can demonstrate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *see also United States v. Scott*, 637 F. App'x 10, 13 (2d Cir. 2015) (summary order) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial."). "In those rare instances where

a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Abakporo*, No. 12 Cr. 340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013).

Accordingly, to determine if severance is warranted on the basis of asserted antagonistic defenses, the Court must undertake a three-step analysis. *First*, the Court must determine whether the adversarial defenses are in fact "mutually antagonistic," such that acceptance of one defense necessarily precludes the acceptance of the other, or if they are merely "finger pointing." *Second*, the Court must determine whether, if the defenses are in fact "mutually antagonistic," such defenses are "prejudicial" to one or both defendants. *Third*, even if the Court determines that one or both defendants might suffer prejudice as a result of a joint trial, the Court must find that there is a serious risk that a "joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment" about the defendants' guilt or innocence that cannot be mitigated by a less drastic measure than severance, such as through limiting instructions. *Zafiro*, 506 U.S. at 538-39.

## B. Discussion

### 1. A Single Trial Will Promote Fairness and Efficiency

Severing the trial would fly in the face of judicial economy and efficiency. The core evidence, spanning the same financing structures, wire transmissions, and financial records, would be presented in substantially the same form in two separate trials. At severed trials, the Government would introduce virtually the same testimony and exhibits, wasting judicial and government resources, burdening witnesses, creating unnecessary duplication, providing unfair advantage to the defendant tried second, and running counter to the compelling public interest in trying together jointly indicted defendants who are alleged to have committed their crimes together. That is precisely the scenario the Supreme Court has warned against. *See, e.g.*, *Richardson*, 481 U.S. at

210 ("It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying."); *Zafiro*, 945 F.2d at 886 (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated with depriving the jury of making its determinations based on "the full picture"); *Jimenez*, 824 F. Supp. at 366 ("The risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits."). Defendants offer no reason, let alone a compelling one, to justify two separate trials expected to last approximately six weeks each.

**2. The Defendants' Proposed Defenses Are Reconcilable and Not Mutually Antagonistic**

The defendants' motions fail because they have not articulated mutually antagonistic defenses. Rule 14 requires more than tension or inconsistency; it requires a direct, inescapable conflict where accepting one defense *necessarily* requires conviction of the other. Although Patrick James claims that the defenses are "irreconcilable," courts have found that "[d]efenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Cardascia*, 951 F.2d at 484. But his say-so cannot change the fact that the co-defendants' defenses do not "of necessity convict" the other. *Id.*; *see also United States v. Niftalijev*, No. 18 Cr. 678 (JPO), 2020 WL 3472431, at *2 (S.D.N.Y. June 25, 2020) ("Niftalijev has not demonstrated the presence of 'mutually exclusive' defenses, which means that severance is unwarranted.").

Consider each of the defendants' positions. Patrick James has posited that he will argue that Edward James "engineer[ed] damaging side deals" for Edward James's personal benefit and "concealed his self-dealing from Patrick." (P.J. Br. 1.) But Patrick James's purported defense does

not meet the charges against Edward James, let alone require convicting him. Pointing to a co-defendant's self-interested conduct, while denying knowledge and intent oneself, does not transform a standard conspiracy defense into a mutually antagonistic one. Edward James is not charged with a crime arising from his "concealment" of self-dealing. While Edward James's (and Patrick James's) financial profits may bear on motive, Edward James's alleged concealment of his personal financial gain from Patrick James is not a charged offense. Indeed, Patrick James's theory amounts to an uncharged dispute between the brothers, not a defense that compels conviction of either one. Even if the jury were to accept Patrick James's assertion that Edward James concealed his personal financial gain, the jury could still find that the schemes charged in the indictment did not occur, that Edward James did not have intent to defraud, or that Edward James did not participate in the charged schemes. That alone defeats mutual antagonism because "accepting one defense" here does not require "that the jury must *of necessity* convict a second defendant." *United States v. Yousef*, 327 F.3d at 151 (emphasis added).

Edward James's purported defenses fare no better at establishing mutual antagonism. From what can be discerned through his heavily redacted brief, he suggests he will argue that Patrick James "controlled, concealed, and benefited exorbitantly from the alleged misconduct," while he remained "in the dark." (E.J. Br. 1.) But this careful wording—calling the fraud "*alleged*"—forecloses any finding of mutual antagonism. Patrick James plays the same semantic game: arguing that Ed's self-dealing "conduct shows that he alone organized, managed, and directed the alleged fraud."[1] Neither Patrick James nor Edward James concedes that the fraud as alleged in the

[1] There is additional reason to be skeptical that Patrick James will stipulate that the fraud as charged in the indictment occurred: although Patrick James' supposed defense is that Edward James "funneled tens of millions of dollars" into his own pockets from First Brands' financing

indictment occurred or that their co-defendant is guilty as charged. Edward James's theory therefore leaves ample room for the jury to conclude that Patrick James may have exercised influence or benefited financially but still lacked knowledge, participation, or intent to defraud. His defense does not require the jury to convict his co-defendant to acquit him and therefore falls far short of the standard required to find mutual antagonism. *Yousef*, 327 F.3d at 151. Because both defendants advance theories under which the jury could find that no fraud occurred at all, their defenses are not mutually exclusive—and severance is unwarranted.

Patrick James relies on *United States v. Cardascia*, for the proposition that "severance should be granted when antagonism at the essence of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." 951 F.2d at 484. But that opinion makes clear that "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *Id.* at 484-85. Indeed, the Court in *Cardascia* upheld the denial of severance where a defendant, just as Patrick James does here, "alleged that he had been victimized by the codefendants and, as a result, was forced during his trial to prosecute them in order to reveal the fraud they had perpetrated upon him." *Id.* at 484. Severance was not required even though the defenses were "antagonistic and at points inconsistent" because "the essence of both defenses—that each defendant was not involved in the conspiracy—plainly is typical of co-conspirator trials and does not warrant severance." *Id.* at 484-45. Accordingly, the Court held that

counterparties, Patrick James did the same thing. For example, on April 7, 2025, an SPV lender made a $153 million payment to an SPV, which then made a $58 million payment to Patrick James's trust account on that same day.

the proposed defenses "were not mutually exclusive at their core or essence." *Id.*at 485. The same is true here—both defendants are denying that they participated in the conspiracy and, just as in *Cardascia*, both defendants have at best suggested that they have "conflicting defenses" that are not mutually exclusive at their "core" or "essence." *Id.*

**3. Defendants have posited typical finger pointing, not double prosecution**

Unable to present mutual antagonistic defenses or anything beyond what is "typical of co-conspirator trials," *Cardascia*, 951 F.2d at 484-85, Patrick and Edward James next assert that severance is required because they will need to serve as prosecutors against each other. But that theory collapses immediately, because neither concedes that the charged schemes occurred at all. To act as a second prosecutor, each defendant must assert that the fraud *did* occur and that the co-defendant committed it, otherwise the defendants are not mutually antagonistic. Neither defendant even approaches that showing.

Neither defendant has submitted a sworn affidavit admissible at trial stipulating that the Government has proved (1) the conspiracy and schemes as charged in the indictment existed beyond a reasonable doubt and (2) that the other brother is guilty beyond a reasonable doubt—a minimum courts have required in the rare cases where severance was granted on this basis. The defendants' primary authority, *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. Aug. 5, 2020), involved precisely such a sworn declaration. Here, by contrast, both defendants repeatedly describe the fraud as only "alleged," refusing to make the key concession that could implicate the principles of *Shkreli*.

Moreover, the attorney-client relationship central to *Shkreli* has no analogue here. In *Shkreli*, Greebel's counsel represented—in a sworn affidavit and again in open court—that he would argue at trial that "Shkreli is guilty" and that Greebel was "a victim of Shkreli's fraud." *Id.* at 256. Greebel was not simply Shkreli's co-defendant but also his attorney during the scheme.

Accordingly, Shkreli wanted to present an advice-of-counsel defense that relied on Greebel's advice, while Greebel planned to argue that "Shkreli withheld information from and/or provided false information to Greebel," so that Shkreli used him and Shkreli's other attorneys as a "pawn[s] in fraudulent schemes." *Id.* The unique attorney-client dynamic in *Shkreli* is far afield from the relationship between Edward James and Patrick James. Most obvious, the brothers did not have an attorney-client relationship, and neither brother is purporting to advance an advice-of-counsel defense based on the other defendant's legal advice. Whereas the lawyer in *Shkreli* had to prove that Skhreli lied to him to defeat allegations that he was a witting member of the conspiracy, the same is not true of Patrick James. Whether Ed concealed his self-dealing is not dispositive of Patrick James's membership in the charged conspiracies.

Courts have almost uniformly declined to follow *Shkreli*, which Judge Matsumoto was careful to limit to the unique facts arising from the attorney-client dynamic. *See id.* 257 (granting severance due to extraordinary and unique facts of the case); *see also id.* at 256 (noting the court's "serious concerns . . . under the *unique* circumstances presented"); *see also Tuzman*, 301 F. Supp. 3d at 444 (declining to follow *Shkreli* in case where defendants asserted antagonistic defenses); *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *6 (S.D.N.Y. May 22, 2018) (declining to follow *Shkreli* and noting that "is not a Second Circuit case and does not dictate the result here."); *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 3559172, at *4 (S.D.N.Y. Jul. 10, 2018) (declining to follow *Shkreli*, and noting the unique facts of that case, including that Greebel's counsel "swore under oath that he intended to argue that Shkreli was guilty as sin but Greeble [*sic*] was simply a victim of Shkreli's nondisclosure."); *United States v. Dupigny*, 18 Cr. 528 (JMF), 2019 WL 2327697, at *1 (S.D.N.Y. May 30, 2019) (declining to follow *Shkreli* when a defendant claimed a co-defendant's defense "may bolster the Government's

case" against that defendant); *United States v. Hameedi*, No. 17 Cr. 137 (JGK) 2017 WL 5152991, at *6 n.2 (S.D.N.Y. Nov. 3, 2017) (declining to follow *Shkreli*, noting that the "unique facts of that case. . . provide[] little guidance for the disposition" of the severance motion under consideration); *United States v. Chierchio*, No. 20 Cr. 306 (NGG), 2022 WL 523603, at *6 (E.D.N.Y. Feb. 22, 2022) (declining to follow *Shkreli*); *United States v. Webb*, No. 15 Cr. 252 (PKC), 2020 WL 6393012, at *5 (E.D.N.Y. Nov. 11, 2020) (same); *United States v. Codner*, No. 18 Cr. 609 (RJD), 2022 WL 3139119, at *2 (E.D.N.Y. Aug. 5, 2022) (same); *United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394, at *23 (E.D.N.Y. Mar. 3, 2018) (same); *United States v. Mangano*, No. 16. Cr. 540 (JMA), 2018 WL 851860, at *9 (E.D.N.Y. Feb. 9, 2018) (same).

The opinion in *Nordlicht* likewise underscores why the drastic remedy of severance is not appropriate. In *Nordlicht*, the defendant's trial argument was that "that the other defendants kept the frauds hidden from him, and that when he became aware of what his co-defendants were doing, he immediately brought it to the attention of the SEC and other authorities" 2018 WL 1796542, at *1. The defendant further maintained that that he would support this argument by introducing "out-of-court statements that he made to investigators, which apparently detail his discovery of the charged criminal conduct." Accordingly, to present fully the defense of good faith, this defendant in *Nordlicht* needed to introduce evidence that the other defendants were guilty. That is, the defendant had to establish at trial that (1) he discovered a fraud; (2) he tried to stop it. Neither Patrick nor Edward James has previewed a good faith defense that he discovered his brother's participation in the charged schemes, identified those schemes as fraudulent, and sought to report them to law enforcement. Again, neither brother even flatly concedes the charged conduct was fraudulent. Accordingly, the risks present in *Nordlicht* and *Shkreli* are not present here—neither defendant *must* prove the other's guilt to defend themselves.

Indeed, Edward and Patrick James do not explain—because they cannot—why their after-the-fact view that their brother is guilty would be a relevant to the charges as courts routinely instruct juries on the impropriety of defense arguments about another co-defendant's guilt. *See Abakporo*, 2013 WL 6188260, at *5 (holding that a defense lawyer's opening and closing statements that argued that her client's co-defendant was "guilty of the crimes charged" was "not evidence[;]" that the jury was properly instructed that the "case is not to be decided on the rhetoric of the attorneys[;]" and the remarks were, in any event "not truly antagonistic" to the co-defendant).

What's left of defendants' arguments on this point is that they both will deny that they were members of the conspiracy and that they will instead point the finger at the other as more blameworthy. Such arguments are the sort of classic "finger-pointing" that do not justify a severance. *See Scott*, 637 Fed. App'x. at 13. Instead, to the extent there is any prejudice that comes from typical co-conspirator trials, courts routinely issue limiting instructions rather than sever. *See United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004) ("Such 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial.'") (quoting *United States v. Santiago*, 174 F. Supp. 2d 16, 23 (S.D.N.Y. 2001)); *United States v. Ezeobi,* No. 10 Cr. 669 (DLC), 2011 WL 3625662, at *2 (S.D.N.Y. Aug. 17, 2011) ("The Court may presume that the jury is capable of understanding and following limiting instructions provided during the course of and at the conclusion of the trial with regard to the manner in which it may use evidence."). Indeed, "[p]rejudicial spillover warranting severance is, in general, 'an unlikely occurrence when all the defendants are charged under the same conspiracy count.'" *Ramos*, 346 F. Supp. 2d at 572 (quoting *Salameh*, 152 F.3d at 115).

**4. A Joint Trial Carries No Added Risk of Prejudice**

Patrick James is wrong that in a case against Patrick alone, "the jury would not hear days or potentially weeks of evidence related only to Ed's misconduct." (P.J. Severance Br. 17.) To begin, his premise is incorrect: in any trial against Patrick alone, co-conspirator evidence would be fully admissible in proving the existence of that conspiracy, to establish *other* members' motives to participate in the charged crimes, and to prove the overt acts of the conspiracy. *See, e.g.*, *Rosa*, 11 F.3d at 341 ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); *Spinelli*, 352 F.3d at 55-56 (affirming denial of severance where "much of the evidence about [a co-conspirator's] crimes would have been admissible at a separate trial of [the appellant], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved")). For the same reasons, the Government would be entitled to, and would, introduce evidence of Edward James's activities related to the charged conspiracies in any trial against Patrick James alone.

Because the evidence that Patrick James and Edward James describe would be introduced at joint or severed trials, there is no merit to Patrick James' claim that a trial against him alone would be shorter by days, much less weeks. Indeed, a case against Patrick James or Edward James alone would be largely the same in length, witnesses, and exhibits. Even if there were some subset of evidence admissible against only one defendant, the Second Circuit has been clear that it would not require a severance: "'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.'" *Rittweger*, 524 F.3d at 179 (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)) (citations omitted). Instead, a "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *Cardascia*, 951 F.2d at 483. This Second Circuit caselaw

undercuts both defendants' arguments that evidentiary or culpability differences warrant severance of co-conspirators.

Patrick James's reliance on *Zafiro v. United States*, 506 U.S. at 539, and *United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003), further undermines his argument for severance. In *Zafiro*, the Supreme Court found that there was no "legally cognizable prejudice" and a district properly denied severance even where "two defendants both claim they are innocent and each accuses the other of the crime." *Id.* at 540. The Supreme Court found that, "even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions," including the standard instruction on the Government's burden to prove each defendant guilty on each charge beyond a reasonable doubt based on evidence applicable to each defendant. *Id.* at 540-41. And in *Spinelli*, the Second Circuit again rejected a defendant's argument that a disparity in proof could justify a severance because, "much of the evidence" would have been admissible at a separate trials; even if there was evidence admissible against only one defendant, that does not necessarily require severance; and "the district court explicitly instructed the jury to consider the defendants individually." 352 F.3d 48 (2d Cir. 2003). The same result is appropriate here.[2]

Indeed, it is well-established that any potential spillover prejudice can be adequately addressed by limiting instructions. *See, e.g.*, *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989) ("In this conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible . . . ."); *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (explaining that co-conspirator statements made in furtherance of the conspiracy are not hearsay under Fed. R. Evid. 801(d)(2)(E)). Patrick James claims that limiting instructions, though sufficient to cure any

---

[2] Patrick James also cites *United States v. Agnello*, 367 F. Supp 444, 447 (E.D.N.Y. 1973), but there the prosecution agreed to severance "on the ground that the indictment is unmanageable," an argument Patrick James does not make.

potential prejudice in most cases, would be ineffective here. But "[the defendant's] conclusory statements regarding prejudice do not meet Rule 14(a)'s 'extremely difficult burden.'" *United States v. Pena,* 932 F. Supp. 2d 464, 466 (S.D.N.Y. 2013) (quoting *United States v. Johnson*, No. S2 No. 10 Cr. 431 (CM), 2013 WL 150104, at *2 (S.D.N.Y. Jan. 10, 2013)); *see also United States v. Yousef*, 327 F.3d at 151-52 (jury instructions sufficed to cure any prejudice resulting from mutually antagonistic defenses), *overruled on other grounds as stated in United States v. Yousef*, 750 F.3d 254, 261 (2d Cir. 2014).

Thus, neither defendant can meet the "extremely heavy burden," *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (internal quotation marks and citation omitted), of establishing that the risk of prejudicial spillover is "so great as to deprive him of his right to a fair trial." *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (citing *Casamento*, 887 F.2d at 1149).[3]

---

[3] Without notice and hours before the Government's opposition was due, Edward James filed a supplemental brief in support of his motion to sever. (ECF No. 141.) The timing of this brief is consistent with the defendants' redaction efforts: both are designed to prevent the Government from responding to the full scope of their arguments. If necessary, the Government respectfully requests leave to file a supplement opposition. But for now, even a cursory review of Edward James's supplemental arguments makes clear they are meritless. First, the defendant is wrong to criticize the Government's delayed production of the materials related to Lisa Ruth, because the Government sought and obtained this Court's approval to do just that. Second, the introduction of evidence demonstrating Patrick James's consciousness of guilt is not prejudicial to Edward James or a basis for severance. Indeed, as explained, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *Cardascia*, 951 F.2d at 483. Nor does this evidence present any risk of double prosecution. Instead, these arguments are just more of the same finger pointing that the caselaw routinely rejects as warranting severance.

## II. THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO COMPEL THE GOVERNMENT TO PRODUCE DOCUMENTS HELD BY PRIVATE ACTORS AND INDEPENDENT GOVERNMENT AGENCIES (ECF NOS. 113, 118, AND 119).

The implosion of First Brands sent shockwaves through the financial markets.[4] By all appearances, First Brands was an enormous auto-parts company that employed 26,000 people and reported billions in yearly sales. But in the fall of 2025, the public began to learn the truth about Patrick James and the massive fraud at First Brands. When First Brands filed for bankruptcy in September 2025, it revealed *billions* in previously undisclosed liabilities. A creditor reported that nearly $2 billion in cash had simply vanished.[5]

As is typical when a company collapses under the weight of massive undisclosed liabilities, multiple actors began investigating the cause. First Brands and its creditors undertook their own inquiries, and several government agencies initiated separate investigations. The U.S. Attorney's Office for the Southern District of New York began its criminal investigation almost immediately, contacting First Brands' counsel two days after the company's bankruptcy, and serving a grand jury subpoena shortly thereafter. The SEC, acting independently under its civil enforcement authority, opened a parallel, non-criminal investigation into First Brands.

Although these parallel inquiries unfolded against the same backdrop of corporate collapse, the Second Circuit has drawn a sharp line between the work of the prosecution team and the activities of other government bodies or private actors. The Government's disclosure obligations under Rule 16 and *Brady* extend only to materials in the prosecution team's possession, custody, and control. The Second Circuit has made clear that where separate investigations by private

---

[4] https://www.wsj.com/business/first-brands-collapse-patrick-james-306d7869.

[5] https://www.nytimes.com/2025/10/10/business/first-brands-bankruptcy-wall-street.html.

counsel, bankruptcy professionals, or independent regulatory agencies proceed in parallel with a federal criminal inquiry, the records gathered by those entities are not within the prosecution team's possession, custody, or control. *United States v. Bankman-Fried*, 179 F.4th 104, 120-22 (2d Cir. 2026). Here, records held solely by First Brands' private counsel or by the SEC in its separate civil investigation fall outside that boundary. Those entities did not participate in investigative decision-making, were not subject to the prosecutors' direction, and therefore their files are not imputed to the Government for discovery purposes.

Nonetheless, Patrick James asks this Court to make the exceptional finding that the prosecution team here encompasses private actors that are under subpoena and represented by private counsel, as well as separate government agencies pursuing their own investigative mandates. P. James Motions to Compel (Dkts. 113, 119); *see also* E. James Mot. to Preclude and Compel at 18-28 (Dkt. 118). In support, Patrick James misstates facts, relies on pure speculation (much of the motions are based on his "information and belief"), and elides Second Circuit case law rejecting his arguments.

Further, Patrick James's motions related to the involvement of other government agencies are largely moot. As Patrick James acknowledges, the Government months ago identified several other agencies whose files had been searched for the purpose of identifying disclosable materials, and it has produced any discoverable material to the defense in accordance with the pretrial schedule. Even as to the SEC, the Government has gone above and beyond what is legally required. The motions should be denied.

### A. Applicable Law

Rule 16 of the Federal Rules of Criminal Procedure provides for pretrial discovery of items "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Likewise,

the Government's obligation to produce exculpatory materials under *Brady* extends to those materials in the prosecutors' custody, as well as information in the possession of "others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The notion of "possession" is not "so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about." *United States v. Hatcher*, 622 F.2d 1083, 1088 (2d Cir. 1980). "Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." *Id*. An "unlimited duty on prosecutors" to inquire about and obtain evidence not in their possession "would condemn the prosecution of criminal cases to a state of paralysis." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

The Circuit counsels that "the relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order). "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *United States v. Meregildo,* 920 F. Supp. 2d 434, 443 (S.D.N.Y. 2013). "Generally, a principal is responsible for the knowledge of an agent when that agent has a duty to give the principal information or when the agent acts on his knowledge regarding a matter that is within his power to bind the principal. An agent's duty to disclose is thus linked to his power to bind the principal." *Id.* In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case,

act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team—in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

"*Brady* ... does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel" at their request. *United States v. Meregildo*, 920 F. Supp. 2d at 445, *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)); *United States v. Avenatti*, 559 F.Supp.3d 274, 280 (S.D.N.Y. 2021) (same); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense."). To the contrary, "prosecution team" limitations "prudently prevent[] a prosecutor" from shouldering discovery obligations that are "unworkable." *United States v. Hunter*, 32 F.4th 22, 37 (2d Cir. 2022) (citation omitted).

Applying these principles, the Second Circuit and courts in this District have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, bankruptcy trustees, other government agencies, and even separate components of the Justice Department.

Only where the Government conducts a joint investigation does the prosecutor's duty extend to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence. *See, e.g.*, *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "made clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Government and the NYSE did not conduct a joint investigation); *Ferreira v. United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the Government and the Government had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with another entity:

> [W]e look to whether the actor (l) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings, and other factors may be pertinent as well.

*United States v. Bankman-Fried*, 179 F.4th 104, 121 (2d Cir. 2026) (citation omitted)[6]; *see also United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)). Over and again, courts in this district have rejected defense arguments that the Government and the SEC conducted a joint investigation. *See, e.g.*, *United States v. Castillero*, No. 23 Cr. 622 (JMF), 2024 WL 4815672, at *4 (S.D.N.Y. Nov. 18, 2024) (no joint investigation with SEC); *United States v. Kwok*, No. 23 Cr. 118 (AT), Dkt. 204, at 13-18 (S.D.N.Y. Dec. 21, 2023) (denying discovery into whether SEC is part of prosecution team); *United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5001186, at *4 (S.D.N.Y. Aug. 4, 2023) (no joint investigation with SEC); *United States v. Kakkera*, No. 22 Cr. 398 (GHW), Dkt. No. 93 (S.D.N.Y. July 19, 2023) (no joint investigation with SEC); *United States v. Ingarfield*, No. 20 Cr. 416 (RA), Dkt. No. 122 (S.D.N.Y. Apr. 27, 2023) (no joint prosecution team with SEC); *United States v. Hwang*, No. 22 Cr. 240 (AKH), Dkt. No. 66 (S.D.N.Y. Mar. 23, 2023) (denying joint prosecution team motion); *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *4-9 (S.D.N.Y. Jan. 26, 2023) (no joint investigation with CFTC); *United States v. Milton*, No. 21 Cr. 478 (ER), Tr. at 7-8 (S.D.N.Y. Sept. 8, 2022) (finding SEC investigation was parallel and not joint); *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 2392360, at *3 (S.D.N.Y. July 3, 2022) (no joint investigation with SEC); *United States v. Collins*, 409 F. Supp. 3d 228, 241-42 (S.D.N.Y. 2019) (Broderick, J.) (no

---

[6] Patrick James incorrectly argues in his motion that "any one" of these factors "may suffice" in finding a joint investigation. P. James Discovery Mot. at 10. That argument is atextual. *Bankman-Fried* expressly did not hold any single factor dispositive, instead noting that "other factors may be pertinent as well." 179 F.4th at 121. *Cf. Meregildo*, 920 F. Supp. 2d at 441–42. (remarking that "under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members," but recognizing that "[i]nteracting with the prosecution team, without more, does not make someone a team member.").

joint investigation with SEC); *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018) (no requirement to conduct search of Public Company Accounting Oversight Board); *United States v. Chow*, No. 17 Cr. 667 (GHW), Dkt. 83 at 82-90 (S.D.N.Y. Feb. 9, 2018) (no joint investigation with SEC); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934, at *7 (S.D.N.Y. Mar. 2, 2017) (CFTC, SEC, New York State Dept. of Fin. Servs., U.K. Serious Fraud Office, U.K. Financial Conduct Authority, and German Federal Financial Supervisory Authority all not part of prosecution team in LIBOR-related case); *United States v. Walters*, No. 16 Cr. 338 (PKC), Dkt. 51 at 1-14 (S.D.N.Y. Dec. 2, 2016) (requiring production of interviews and notes for joint interviews, but otherwise denying the motion); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (no joint investigation with SEC); *United States v. Gorman*, No. 21 Civ. 870 (JGLC) (S.D.N.Y. July 15, 2025) (*Brady* and *Giglio* do not apply to the CFTC, and SDNY is not in a joint investigation with the CFTC).

Specific to other government agencies, the Second Circuit has "long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor.'" (*United States v. Hunter*, 32 F.4th at 36 (citation omitted)); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *see also United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y.

2006) ("the Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases"). If government agencies conducting a separate investigation cannot be considered part of the prosecution team, it follows that the prosecution team does not have disclosure obligations with respect to the records held by those other agencies.

As to private entities, the Second Circuit has also rejected the argument that the "prosecution team" reaches anyone who provides information to the Government, including cooperating witnesses. *See, e.g., United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (noting that this Court "has never held that the 'prosecution team' includes cooperating witnesses" and holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) (same); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for *Giglio* purposes); *United States v. Merlino*, 349 F.3d 144, 154-55 (3d Cir. 2003) (holding that Government not required to obtain prison calls of cooperating witness to satisfy disclosure obligations); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for *Giglio* and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *see also Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team.").

Most recently, in *Bankman-Fried*, the Second Circuit rejected the exact arguments raised by Patrick James. The Court rejected a defendant's claims that FTX's counsel was part of the

prosecution team. 179 F.4th at 120-22. The Second Circuit specifically considered and rejected defense arguments that the prosecution team included FTX's counsel, even though counsel contacted federal prosecutors "which led to the beginning of the investigation," provided the government "extensive disclosure," "worked closely with federal prosecutors in preparing the case against him," spoke with prosecutors on a daily basis and responded to more than 150 requests, "collected tens of millions of documents and provided analysis of hundreds of thousands of documents to the prosecution team," provided "read-outs of its notes from interviews with current and former FTX employees and sometimes asked questions on behalf of prosecutors," and made presentation to the Government on topics that the Government requested. *Id.* The Second Circuit found that the District Court's conclusion that FTX and its counsel were not an "arm of the prosecution" was "sound and grounded in the record."

**B. Discussion**

1. <u>The Government Did Not Conduct a Joint Investigation with the SEC (ECF No. 119.)</u>

The SEC is not part of the Government's prosecution team. Nonetheless, Patrick James seeks, "documents obtained from third parties, and the notes, memoranda, transcripts, and recordings of interviews or testimony collected by the SEC." (ECF No. 119 at 13). In large part, Patrick James motion is moot because the Government has far exceeded its discovery obligations to obtain material from the SEC: the Government has confirmed that it has received and produced documents provided by third parties to the SEC as part of the SEC's investigation (and the Government continues to do so as the SEC obtains new documents). Further, the Government has confirmed with the SEC that much of what Patrick James seeks is a null set: the SEC has not taken testimony of any witnesses, the SEC has not conducted any witness interviews beyond the interviews that the SEC participated with SDNY; and the SEC did not take any notes of witness

interviews that they participated in with the SDNY. (Davis Decl. ¶ 6). Accordingly, Patrick James has what he wants.

Even if the Government had not taken any of the above steps to receive and produce documents provided to the SEC, and even if the SEC had taken witness testimony or conducted witness interviews, Patrick James's motion would fail. As set forth below, undisputed facts demonstrate that the SEC did not conduct a joint investigation with the Government:

- the SEC did not direct the Government's charging decisions or the development of the Government's prosecutorial strategy;
- likewise, the Government did not direct the SEC's charging decisions or the development of the SEC's litigation strategy;
- no one from the SEC was designated a Special Assistant U.S. Attorney to work on the criminal investigation;
- the SEC does not have any notes from witness interviews they attended with SDNY;
- at SDNY interviews that the SEC attended, witnesses were aware that the agencies' investigations were separate, that the interviews were conducted together as a matter of convenience, and that, if there were to be a proffer agreement, the witness would enter into a separate agreement with each agency;
- the SEC was not involved in presenting this case to the grand jury and did not receive grand jury transcripts;
- the Government did not provide SEC materials the Government received pursuant to grand jury subpoenas;
- the SEC did not participate in the execution of search warrants or the

responsiveness reviews of materials obtained pursuant to search warrants;

- the SEC has not accompanied the Government to court;
- the Government did not mention or thank the SEC in its press release announcing the indictment of the defendants;
- the SEC did not bring an enforcement action against the defendants or FBG.

These factors undercut the defense's argument that the Government and the SEC engaged in a joint investigation. *See United States v. Tournant*, No. 22 Cr. 276, 2023 WL 5001186, at *4 (S.D.N.Y. Aug. 4, 2023) (finding no joint prosecution based "on the number of joint interviews that the two agencies conducted, the volume of documents shared between the two entities, and the statements that they made to the press" and further denying motion for "an evidentiary hearing to determine the extent of cooperation between the two agencies."); *see also Collins*, 409 F. Supp. 3d at 242 (citing many of these factors in support of a finding that the SEC and the Government did not conduct a joint investigation); *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *6-8 (S.D.N.Y. Jan. 26, 2023) (same). Consider also that the SEC did not bring an enforcement action; nor has the Government charged securities fraud.

Any points of intersection between the Government and the SEC were limited and commonplace where two different agencies are investigating the same set of underlying facts. Patrick James nonetheless posits three arguments in support of his motion: (1) the SEC participated in interviews with the Government; (2) the SEC shared documents with the Government; and (3) the Government has produced documents to the defense that the Government received from the SEC (at the defense's request). Courts have rejected each of these arguments.

*First*, the SEC's participation in only a subset of witness interviews conducted by SDNY cuts against finding that they are an arm of the prosecution team. To start, as Patrick James

recognizes, the U.S. Attorney's Office for the Northern District of Ohio conducted witness interviews well before the SEC ever opened an investigation into FBG, *see* ECF No.119 at 3, 5 (referencing SEC entering a formal order of a private investigation on November 6, 2025, months after "N.D. Ohio interviewed two former FBG employees" in the Fall of 2024). Further, beginning in or about April 2026, the Government ceased including the SEC in witness interviews, Davis Decl. ¶ 5. This timeline demonstrates that SDNY was not relying on the SEC as an "arm of the prosecution" but instead that the SEC was a separate agency with its own investigative mandate. Even still, courts have been clear that the SEC's participation in interviews conducted by the SDNY does not "support a finding that the USAO and SEC conducted a joint investigation." *Collins*, 409 F. Supp. 3d at 242; *Blaszczak*, 308 F. Supp. 3d at 738.

*Second*, the Government's receipt of documents and information from the SEC is not unusual, let alone a basis to find that the SEC is part of the prosecution team. "Indeed, because '[s]ecurities fraud is a proper subject of both administrative and criminal investigations. . . SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other." *United States v. Rhodes,* 18 Cr. 887 (JMF), 2019 WL 316221, at * 3 (S.D.N.Y. July 16, 2019)(quoting *United States v. Fiore,* 381 F.3d 89, 94 (2d Cir. 2004)). It follows that "coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic." If anything, it would be unusual if the SEC refused to provide information to the Government in connection with an ongoing criminal inquiry into a massive fraud.

Patrick James fails to cite any authority for the proposition that an independent agency becomes part of the prosecution team simply by complying with an information request. Instead,

he points out that FBG's counsel appears to have produced documents to the DOJ and the SEC on the same schedule, P. James. Discovery Mot. at 11, but that only demonstrates that FBG was responding to two parallel investigations. Were the SEC and SDNY part of a joint investigation, separate productions to each agency would have been superfluous.

In fact, judges in this District have routinely deemed the overlap seen here as indicative of parallel, not joint, investigations. In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed. *Stanard*, 2007 WL 1834709, *2. Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government, Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument. *Id.*; *see also United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3; *Middendorf*, 2018 WL 3956494, at *4-5; *Blaszczak*, 308 F.Supp.3d at 741-42; *Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87.

*Third*, document sharing between the SEC and the Government does not fuse separate, parallel investigations into a joint one. That argument is particularly rich when a large portion of the documents the Government received from the SEC were gathered as a courtesy to defense counsel, who specifically requested those files. *See* ECF No. 119 at 8 (referencing a 700-page production of documents from the SEC in response to Patrick James's demand for disclosure of materials the SEC had gathered). The existence of documents initially produced by third parties

to the SEC, but not to SDNY, further demonstrates the distinction between the SEC's and SDNY's investigations.

The two cases Patrick James cites do not dictate a different outcome. In *United States v. Martoma*, Judge Gardephe found a joint investigation where "the SEC and the USAO also coordinated their efforts in conducting depositions of SAC Capital and its employees," which included the Government meeting with the SEC prior to their deposition of the founder and principal of the target company and the SEC updating the Government during the break in the deposition about how the deposition was proceeding. 990 F. Supp 2d 458, 462 (S.D.N.Y. 2014). There is no such allegation here; indeed, the SEC has not taken testimony of any witnesses, it has participated in only a subset of the Government's interviews, it did not take notes of the interviews they attended, and it did not bring charges. *See, e.g.*, *Collins*, 409 F. Supp at 242 (distinguishing *Martoma* and finding no joint prosecution).

Further still, even after finding a joint prosecution, Judge Gardephe ordered the U.S. Attorney's Office to make a limited production of non-cumulative *Giglio* and *Brady* materials in the form of correspondence between counsel for only two cooperating witnesses and the SEC that was in the sole possession of the SEC. That is, Judge Gardephe did not order a full-file review of the SEC case file, nor did the Court require a similar review for all twenty witnesses that were jointly interviewed by the two agencies. 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) (PGG).[7] In other words, even *Martoma* did not grant the sweeping review Patrick James seeks.

---

[7] Even assuming the logic of *Martoma* actually applied here, which it does not, the SEC's participation in witness interviews or defense presentations would only create an obligation for the Government to review the SEC's notes of those interviews for *Brady* evidence—not the SEC's entire case file. *See Gupta* , 848 F. Supp. 2d at 495 (requiring Government to review notes taken by SEC in context of joint investigation, but holding that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation").

Patrick James's other cited authority is also inapposite, involving an out-of-circuit decision that applies the wrong legal standard. *United States v. Blumberg* (ECF No. 120, Ex. 15) applied the Third Circuit's three-factor "constructive-possession test," which in turn relied on a pre-*Bankman-Fried* district court decision.[8] The Third Circuit rule does not apply here and contravenes the multi-factor test employed by the Second Circuit. *See* P. James Discovery Mot. at 13 (arguing that "the same standard" in that case "governs here"). Under the governing test in this Circuit, the SEC was not part of the Government's prosecution team, and the defendant's request to compel the Government to obtain and review materials from the SEC is without merit.

Because the SEC is not part of the prosecution team, Patrick James's request for review and production of SEC records related to investigations of "asset managers or financing parties implicated by the conduct charged in the Indictment," ECF No. 119 at 13, is moot. The Government cannot be compelled to collect documents in the possession of an agency that is not part of the prosecution team. *United States v. Giffen*, ECF No. 119, at 14, only undermines his argument. In *Giffen*, the Court required the Government to produce only the "documents it reviewed or had access to" and made clear that "[t]he prosecutor need not, however, produce documents from agencies that did not participate in the investigation of the defendant or documents of which it is unaware." 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004). This Court should apply the same rule here—the Government has produced to the defense documents it has received from the

---

[8] Even that underlying decision, *United States v. Gupta*, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (JSR), was limited to the SEC memoranda prepared in connection with 44 witness interviews jointly attended by the SEC and the Government, and the court also explicitly noted, "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation."

SEC, which are in its custody and control, but the "prosecutor is not required to conduct a separate investigation for the purpose of responding to a defendant's discovery requests." *Id.* [9]

Finally, Patrick James' efforts to distinguish *Blaszczak* are unavailing. According to the defendant, *Blaszczak* is inapplicable because the SEC withheld the relevant document from the Government, whereas here, "any discoverable SEC materials are *already* in the possession of the prosecution team, because the SEC is part of that team. ECF No. 119 at 12. But his argument is exactly backwards— that the Government could request a record from the SEC does not mean that the SEC is part of the prosecution team. As set forth above, the Government cannot be compelled to request any document from the SEC—irrespective of how that request would be received—if the SEC is not a member of the prosecution team.

***

Accordingly, for all the reasons set forth above, the Court should deny Patrick James's motion for a finding that the Government engaged in a joint investigation with the SEC, or an order directing the Government to search the SEC's files. The Court should also reject the defendant's request for an evidentiary hearing on the Government's coordination with the SEC. This Court needs no hearing to determine that the Government has neither the ability nor the obligation to access the files of an entirely separate government agency. Further, the defense has

[9] Citing no authority, Patrick James asks in the alternative "that the Court order the Government to identify . . . by matter number and subject" ongoing investigations by the SEC or other government agencies into the entities Patrick James has identified. ECF No. 119 at 14. This request is nothing short of extraordinary. Tacitly conceding that the SEC may not form part of the prosecution team, Patrick James nonetheless demands that the Government disclose non-public details about possible enforcement actions that may or may not be undertaken by the SEC pertaining to a slew of possible entities. This is the precisely the type of fishing expedition that courts have rejected as espousing reflecting a fundamentally flawed "monolithic" view of Government, *Avellino*, 136 F.3d at 255, or as otherwise treating the Government like "a private investigator and valet for the defendant," *Meregildo*, 920 F. Supp. 2d at 445.

not even attempted to make a "substantial preliminary showing" that "the agencies acted in bad faith," *Kwok*, 23 Cr. 118 (AT), Dkt. 204 at 17-18 (rejecting request for discovery because the defendant "does not contend that the SEC hid from him the possibility of a parallel criminal investigation. Nor does he argue that the SEC conducted its investigation solely to assist the criminal prosecution"). Accordingly, this motion fails at every level.

2. The Government Has Already Searched and Produced Materials in the Possession of Multiple Other Agencies that Have Formed Part of the Prosecution Team (ECF No. 119)

Patrick James next requests discovery from the U.S. Attorney's Office for the Northern District of Ohio ("N.D. Ohio"), the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the IRS Criminal Investigations ("IRS") related to this investigation,[10] but that request is moot. As the Government has already told the defense and as Patrick James acknowledges—this Office has conducted a review of those files and produced discoverable materials (and will produce any additional Rule 3500 material and *Giglio* material according to the pretrial schedule). On April 3, 2026, in response to a *Brady* demand from Patrick James, the Government stated:

> The SEC, and other agencies not working with this Office, are not part of the prosecution team. For the avoidance of doubt, "Government" refers to the United States Attorney's Office for the Southern District of New York. Additionally, to fulfill its disclosure obligations in this case, the Government has collected records from the United States Attorney's Office for the Northern District of Ohio; the Federal Bureau of Investigation' the Department of Homeland Security, Homeland

[10] Patrick James also demands that the Government produce information from the Secret Service, without ever setting forth facts justifying that agency's inclusion as a member of the prosecution team. Apart from an allegation that N.D. Ohio developed a relationship with a source "who had contacted the U.S. Secret Service Money Laundering Task Force," P. James Discovery Mot. at 15, the defendant points to no other facts to suggest that the U.S. Secret Service was part of the prosecution team at either the Northern District of Ohio or the Southern District of New York. A single source's initial contact with the Secret Service is plainly insufficient to bring that agency within the ambit of the prosecution team here. Consequently, Patrick James's demand that the Government review the files of the Secret Service should be denied.

> Security Investigations; and the Internal Revenue Service, Criminal investigations. The Government's *Brady* and Rule 16 obligations, however, run to the records and information in the prosecution team's possession, custody, and control, not to the federal government writ large.

ECF No. 120, Ex. 3. The Government reiterated this position in an April 17, 2026 letter to counsel. *Id.* Ex. 9. On April 28, 2026, the Government provided additional correspondence making certain disclosures, including the substance of witness statements, and informed Patrick James that:

> The Government has undertaken a review of notes and/or reports of interviews conducted by the United States Attorney's Office ("USAO"), Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI") and/or the Internal Revenue Service, Criminal Investigations ("IRS"), as well as notes from attorney proffers received by the USAO. The Government provides excerpts from these notes and memoranda to assist the defense in preparing for trial.

*Id.* Ex. 7. Perhaps in recognition that the thrust of his discovery request has already been addressed repeatedly by the Government, Patrick James instead asks that the Government disclose details about the investigation itself—rather than information gathered in the course of the investigation. Those details are not disclosable under Rule 16 and are shielded in part under the deliberative process privilege. Patrick James demands that the Government:

> (1) identify, by matter number and subject, the other Government entity investigations related to this case; (2) confirm it has reviewed, or will review, the investigative files of those entities—including interview notes, memoranda, transcripts, and recordings—and produce all discoverable material under Rule 16 and *Brady*; (3) disclose any material from those entities subject to *Giglio*, 18 U.S.C. § 3500, and Rule 26.2 by the Court's relevant disclosure deadlines; and (4) identify by Bates range, investigating agency, and original third-party custodian any materials it contends it has already produced.

ECF No. 119 at 2. In serial letters the Government has stated that it has reviewed the investigative files of the aforementioned government agencies related to this investigation and has made or will

make any necessary disclosures "by the Court's relevant disclosure deadlines," mooting the defendant's requests for "confirm[ation]" and "disclosure": the defendant has received both.

Patrick James's request for the matter number and subject of "the other Government entity investigations related to this case" cites no legal authority and should be denied. "The defendants have no right to be apprised of all investigatory work on a case." *United States v. Shoher*, 555 F. Supp. 346, 353 (S.D.N.Y. 1983) (quoting *United States v. Cafaro,* 480 F.Supp. 511, 520 (S.D.N.Y. 1979)). The internal reference number and name assigned to a given investigation by a given agency do not fall under any category of Rule 16. "Rule 16 . . . does not require that the prosecution disclose all the minutiae of its evidence[.]" *United States v. Elam*, 678 F.2d 1234, 1253 (5th Cir. 1982) (citing *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973); *United States v. Sherriff*, 546 F.2d 604 (5th Cir. 1977)); *see also Shoher*, 555 F. Supp. at 352 ("The Government need not provide internally generated summations that are only speculatively material to defendant's defense preparation and which it does not intend to use at trial.").

By that same measure, the Government is not required to identify which discovery materials or interview notes were collected or generated by a particular agency.[11] Stated differently, the defense is entitled to receive the materials and information, not to be apprised of

---

[11] As discussed above, with respect to the SEC, the Government has both requested non-duplicative materials from the SEC—which were produced to the defense and identified by the original producing party—and sought out directly from certain producing parties any records that had been produced to the SEC but not the Government, which were likewise produced and identified by the producing party. *See* April 17, 2026 Letter (ECF No. 120 Ex. 9) ("While the Government is under no obligation to obtain records in the SEC's possession . . . the Government has contacted the SEC" to gather "any non-duplicative documents that were produced by third parties to the SEC as part of its investigation" and that it "intends to collect and produce such documents," by April 27, 2026); June 5, 2026 Letter (ECF No. 120, Ex. 10) ("As a courtesy, the Government has obtained from third parties materials that those parties produced to the SEC in connection with the SEC's parallel investigation in this matter but were not separately produced to the Government. The Government has disclosed those materials to the defense.").

the personnel involved in gathering or creating the information.[12] That a particular document produced to the Government was first saved in the files of an agent with the IRS, HSI, or the FBI is irrelevant to Patrick James's defense. It is not Rule 16 material, nor is its disclosure otherwise required as *Brady*, *Giglio*, or 3500 material.

Moreover, to the extent the information James seeks would tend to reveal an agency's internal deliberations, such as the discretionary decision to assign a particular number to a particular investigation, such decisions are barred from disclosure under the deliberative process privilege. "'[T]he deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 19 F.4th 177, 182 (2d Cir. 2021) ("*NRDC*") (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021)) (quotation marks omitted). "The privilege 'encourages candor, which improves agency decisionmaking,' by 'blunting the chilling effect that accompanies the prospect of disclosure.'" *Id.* (quoting *Sierra Club*, 141 S. Ct. at 785) (alterations omitted). "Consistent with the rationale underlying the deliberative process privilege, it applies only to 'predecisional, deliberative documents.'" *Id.* (quoting *Sierra Club*, 141 S. Ct. at 785). "Generally, '[d]ocuments are 'predecisional' if they were generated before the agency's final decision on [a] matter, and they are 'deliberative' if they were prepared to help the agency formulate its position.'" *Id.* (quoting *Sierra Club*, 141 S. Ct. at 786). Accordingly, Patrick James's requests for the internal

---

[12] Patrick James cannot make a straight-faced claim that absent this information, he is "left unguided." ECF No. 119 at 16 (quoting *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987)). By receiving records in text-searchable format, and identifying such records by the producing party, his well-resourced defense team has all the information it needs to prepare for trial.

reference numbers and matter names assigned to related investigations by other agencies, and the Bates ranges for the documents collected should be denied as contrary to law, and his request for discovery should be denied as moot.

3. The Government Did Not Conduct a Joint Investigation with First Brands (ECF No. 113)

Patrick James's separate request that the Government obtain and inspect documents in the possession of First Brands fails because First Brands, and its private counsel and financial advisers, are not members of the prosecution team. FBG's records are therefore not subject to disclosure and not in the possession of the prosecution team. *See* ECF No. 113 at 5 (demanding "production of all witness statements and interview notes collected by the FBG Debtors and complete production of the contents of any devices imaged by the FBG Debtors belonging to" any trial witness "limited to material bearing on those witnesses' credibility or the impeachment of their anticipated testimony.").

Nor did the Government outsource its investigation to First Brands. Far from it. SDNY independently investigated the defendants' mammoth fraud, issuing over 100 grand jury subpoenas to over 100 third parties in the first 60 days after opening its investigation. SDNY has conducted scores of witness interviews, executed multiple search warrants, and retained its own experts who have conducted an independent review of the records in this case. As Patrick James knows, within months of opening its investigation, two of the most senior executives at First Brands, Graham and Brumbergs, proffered with the Government, entered cooperation agreements, and pleaded guilty to committing a massive fraud with the defendants. The facts of this investigation fall dramatically short of the coordination that the Second Circuit has already found insufficient in *Bankman-Fried*.

In *Bankman-Fried*, the Second Circuit rejected Patrick James's precise arguments in a case involving far more substantial overlap between the company (FTX) and the Government. Indeed,

in *Bankman-Fried*, counsel for FTX was explicit about coordinating with SDNY: Counsel treated FTX as a "crime scene," and told a court, "if it were not for [counsel's] prompt and immediate response, we would not have seen the indictments and the plea agreements that we have seen to date." ECF No. 115-5 at 20. Indeed, FTX counsel said that it "would do whatever the Government request[ed]" and give SDNY "full access to the information on a real time basis." (*Id.*). Further, when rejecting Bankman-Fried's argument that counsel for FTX was a member of the prosecution team, the Second Circuit noted that Bankman-Fried alleged that FTX counsel had "worked closely with federal prosecutors in preparing the case against him," spoken with the prosecutors on a "daily basis," "collected tens of millions of documents and provided analyses of hundreds of thousands of documents to the prosecution," "provided prosecutors with read-outs of its notes from interviews with current and former FTX employees and sometimes asked questions on behalf of prosecutors." 179 F.4th at 120-21.

Even a cursory review of the facts in *Bankman-Fried* makes clear that FBG was not part of the prosecution team. Take, for example, the origins of the FTX and FBG investigations. The Government's FTX investigation began when counsel for FTX reported concerns about the company to SDNY, without alerting Bankman-Fried (ECF No. 115, Ex. 5. at 9-10.), In this case, two days after the bankruptcy filing, on September 30, 2025, an Assistant United States Attorney for the Southern District of New York saw news of the bankruptcy and contacted First Brands' counsel. (Davis Decl. ¶ 2.) Further still, the U.S. Attorney's Office for the Northern District of Ohio had an open investigation for over a year before the bankruptcy filing. (*See* ECF No. 119 at 5.) Also, unlike in *Bankman-Fried*, the Government's investigation was not hidden from Patrick James. Indeed, the Government's overt outreach to First Brands occurred while Patrick James was still in charge of the company, and SDNY contacted Patrick James's personal counsel on October

10, 2025, and informed Patrick James's individual counsel that he was a "subject" of the SDNY's investigation. (Davis Decl. ¶ 2.)

Turning to the five-factor test articulated in *Bankman-Fried*, Patrick James's motion fails across the board.

*First*, FBG counsel did not participate in the Government's witness interviews. Patrick James's arguments on this score are counterfactual. Patrick James points to one interview that FBG counsel attended, on December 22, 2025. ECF No. 113 at 22. But that interview was of a First Brands, employee who was represented by counsel for FBG. FBG's counsel's attendance reflected their representation of the witness, not collaboration with the Government. (Davis Decl. ¶ 4.) Patrick James relies on pure speculation to suggest that FBG counsel attended other witness interviews. He cites time entries that prove the opposite—they show that FBG counsel was coordinating with independent counsel who represented individual witnesses during their interviews with the Government. Even where other agencies attended interviews, courts have declined to deem those agencies part of the prosecution team. Where FBG counsel did not attend witness interviews other than—on one occasion—to represent a witness, that conclusion applies with greater force. (Davis Decl. ¶ 4.)

Having failed to show that the FBG debtors participated in Government witness interviews, Patrick James highlights that FBG counsel conducted their own interviews with witnesses and "reported the information learned during interviews to the Government." (ECF No. 113 at 22.) Far from the "hallmark of a joint investigation," *id.*, the scant reporting SDNY may have received from FBG is evidence of separateness. Indeed, the Second Circuit rejected this argument in *Bankman-Fried*, finding no joint investigation where counsel for FTX "also provided prosecutors with read-outs of its notes from interviews with current and former FTX employees and sometimes

asked questions on behalf of prosecutors." 179 F. 4th at 121. Simply put, where a private company conducts its own investigation and reports to the Government, that company does not become an arm of the prosecution. *Id.*

Patrick James insists that that Brumbergs's initial interviews with the FBG counsel—which the Government did not attend—were "the kind of iterative, investigator-guided process that can shape a cooperating witness's account" and are "essential to understand[ing] how his testimony may have been shaped by early conversations" with FBG's advisors, P. James Discovery Mot. at 23-24. Patrick James is not entitled to records by hypothesizing how they could be helpful to him. The threshold inquiry is whether the entity holding those records—the FBG Debtors—is an arm of the prosecution team. Records do not "become discoverable simply because a defendant wishes to use those communications in his defense." *United States v. Milton*, No. 21 Cr. 478 (ER), 2022 WL 4110256, at *6 (S.D.N.Y. Sept. 8, 2022) (declining to require corporation to produce privileged records to its former CEO in response to a subpoena). Indeed, Bankman-Fried made this same argument to the Second Circuit: "[Bankman-Fried] argues that the FTX debtor estate had sole possession of much of the evidence—including exculpatory information—necessary for his defense, and the government's failure to disclose that information undermined the fairness and integrity of his trial." *Bankman-Fried*, 179 F.4th at 120. And the Second Circuit rejected this argument, because the FTX Debtors "were not arms of the prosecution," with the result that the Government's discovery obligations did not run to a private entity.[13]

*Second*, FBG was not "involved in presenting the case to the grand jury." *Bankman-Fried*, 179 F. 4th at 121. The defendant does not claim that the FBG Debtors attended the Government's

[13] Patrick James's request for any interview memos that may have been prepared by private counsel is extraordinary for the separate reason that it asks this Court to override attorney client privilege and work product productions that exist for a private counsel and its client.

grand jury presentations, made presentations to the grand jury, or were provided transcripts. (Davis Decl. ¶ 3.)

Unable to meet the Second Circuit's standard, Patrick James creates his own. He reasons that because the FBG Debtors provided facts and records to the Government "[i]n the months leading up to the grand jury" presentation, the FBG Debtors "were *constructively* involved in presenting the Government's case to the grand jury." ECF No. 113 at 24, 26 (emphasis added). Essentially, Patrick James's argument is that any entity that gives prosecutors information prior to indictment is a part of the prosecution team. Of course the Government learns of facts and receives documents from third parties. That is true of virtually every investigation. But that does not make all third parties part of the prosecution team.[14] In *Bankman-Fried*, the Second Circuit found that FTX and its counsel "did not have a role in the presentation of the case to the grand jury," even though counsel provided the Government with millions of documents, fact presentations, read-outs of witness interviews that FTX's counsel conducted, responded to over 150 requests, and were in daily contact with prosecutors. 179 F. 4th 104. Indeed, in *Bankman-Fried*, the defense argued that counsel for the company "drew prosecutors' attention to certain data that resembles a transfer discussed by Sam Bankman-Fried in Signal chats to address the $45 million 'hole' in the FTX.us balance sheet" and the Government "adopted [counsel's] summary in the Third Superseding Indictment." (*United States v. Bankman-Fried*, ECF No. 24-961, Dkt., 28.1 at 69.) Bankman-Fried further alleged that SDNY asked for a presentation from company counsel on a particular topic and then, "[o]ne week later, the government, superseded to add" a count. (*Id.* at 69-70.) The Second Circuit agreed that none of that alleged conduct transformed FTX or its counsel into an arm of the prosecution.

---

[14] Indeed, Patrick James's counsel made a presentation to the Government prior to the indictment.

By the same token, it does not matter that FBG filed an amended complaint in the bankruptcy before the grand jury returned an indictment charging the defendants in the instant case. *See* P. James ECF No. 113 at 25-26. Even *simultaneous* filings of criminal charges and civil actions drawing on the same facts do not give rise to a joint prosecution. *Cf. SEC v. Shkreli*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029, at *7 n.6 (E.D.N.Y. Mar. 22, 2016) ("The court finds no fault in the SEC's commencement of the civil action at or around the time the criminal indictment was unsealed, given the SEC's independent mandate to enforce the securities laws and the need to commence an action before expiration of the statute of limitations."). Overlapping facts in two publicly filed instruments is not enough to show a joint prosecution, otherwise every criminal action in which the SEC, CFTC, or other regulatory agency filing parallel civil charges would be subsumed by the prosecution team.[15]

*Third*, document sharing between FBG and the Government weighs against the defendant. For one thing, the Government did not provide grand jury material produced by other parties to FBG. Nor did it provide search warrant returns to FBG. (Davis Decl. ¶ 3.) Going the other direction, FBG produced records to the Government in response to a grand jury subpoena, Davis Decl. ¶ 2, and even then, has withheld certain documents on privilege grounds. In *Bankman-Fried*, by contrast, FTX's counsel *voluntarily* provided documents to the Government. *United States v. Bankman-Fried*, ECF No. 24-961, Dkt. 501 (2d Cir.). As to quantity, it is unremarkable that FBG should have produced to the Government a significant number of documents: Patrick James used FBG to commit his fraud, and that entity would be the repository of a significant set of relevant

[15]Patrick James points out that the Government relied on the FBG's public filings in its search warrant application. But the findings of an independent body filed in a public bankruptcy proceeding are an entirely appropriate source for the Government to draw from in the course of an investigation.

documents. *See* ECF No. 113 at 28. If the collection and production of "tens of millions of documents" in *Bankman-Fried* did not make counsel for FTX an arm of the prosecution team, then there is no basis to find FBG is one here, where FBG has produced considerably fewer records.[16]

*Fourth*, whether FBG "played a role in the development of prosecutorial strategy" also precludes a finding of joint prosecution. FBG did not direct the Government's charging decisions or the development of the Government's prosecutorial strategy. (Davis Decl. ¶ 3.) Nevertheless, Patrick James claims that the "FBG debtors did not merely hand over documents; they shared their investigative findings and helped shape how the Government understood and framed them." Even if true, that argument fails under *Bankman-Fried*. P. James Discovery Mot. at 31. The allegations in *Bankman-Fried* far exceed any supposed "shap[ing]" that Patrick James speculates here. (*See e.g.*, Bankman-Fried Br. at 69-70 (arguing that FTX counsel "proactively recommended new areas of inquiry," "vetted prosecution theories," and dictated government strategy regarding bail conditions").

*Finally*, FBG counsel did not accompany the Government to court proceedings, appear in court, or speak for the Government. Counsel for FBG merely sent a lawyer to observe the defendants' arraignment as a member of the public with a right of access to a judicial proceeding.

---

[16] Patrick James' complaints regarding the Government's handling of document productions from the FBG Debtors is also beside the point. The Government may exercise its judgment and discretion in pursuit of investigating a crime, which extends to its collection of records and engagement with third parties who are represented by independent counsel. This factor evaluates to what extent the Government *shared* information with the FBG Debtors. As discussed below, the same principle applies to the Government's engagement with other parties regarding their privilege assertions.

Whether considered individually or together, the factors articulated in *Bankman-Fried* do not suggest a joint prosecution between the prosecution team and a private entity that engaged with the Government in the course of its investigation.

Patrick James's remaining arguments fail. His claim that the Government has developed a "one-sided record" that uses "the FBG Debtors as both a sword and a shield" reflects a misunderstanding of how criminal investigations are conducted. ECF No. 113 at 37. Prosecutors collect evidence pertaining to a given investigation, which includes facts demonstrating that a crime was committed. They have discretion to demand records, information, and witness interviews in service of their mandate to investigate crimes. The Government does not have a parallel duty to affirmatively gather evidence on behalf of criminal defendants, only a duty to disclose any such material in its possession. *Meregildo*, 920 F. Supp. 2d at 445; *Avenatti*, 559 F.Supp.3d at 280; *Bonventre*, 2014 WL 3673550, at *22. These principles are neither nefarious nor new.

In making this meritless argument, Patrick James points to his unsupported assumption that FBG counsel produced skewed and misleading records and information to the Government to attack Patrick James.[17] Yet the Government is aware of no case finding that the motivations of a private entity may give rise to a joint prosecution with the Government.

Nor does *United States v. Connolly* offer any support to Patrick James's claim of a joint prosecution. No. 16 Cr. 0370 (CM), 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019). In *Connolly*, the district court analyzed whether a self-incriminating statement was procured in violation of the speaker's Fifth Amendment rights under *Garrity v. State of N.J.*, 385 U.S. 493,

[17] While Patrick James repeatedly asserts that the Government "deputized" FBG to assist in its investigation, ECF No. 113, at 35-36, the facts he cites do not bear that out and are in any event irrelevant to this Court's inquiry.

497 (1967). *Id.* Under that standard, "[a]n individual claiming a violation of the privilege against self-incrimination must prove that the statements at issue were both the product of coercion and attributable to the government." *Id.* As the *Connolly* court explained, the Second Circuit has set forth multiple scenarios under which "[p]rivate conduct is attributed to the government," and in addition to satisfying one of those conditions, "the Government must [also be found to have] influence[d] the specific conduct of which the party complains." *Id.* at *10-11 (citation omitted). Assuming the same standard applies in assessing whether a private entity is part of the prosecution team, the facts of *Connolly* bear no resemblance to what occurred here. The court in *Connolly* found that the Government had directed a private company to conduct a key witness interview, made no effort to interview that witness, instructed the company on what to ask and how to behave in that interview, and did so specifically to extract favorable statements. *Id.* at *11. There has been no such delegation or collaboration here. Instead, this case aligns with the many other courts that have declined to find a joint investigation between the Government and separate private entities. *See, e.g.*, *United States v. Pierre*, No. 22 Cr. 19 (PGG), 2023 WL 8550322, at *11 (S.D.N.Y. Dec. 11, 2023) (company's production of documents in response to subpoena did not make it part of prosecution team); *United States v. Hwa*, No. 18 Cr. 538 (MKB), 2021 WL 11723583, at *55 (E.D.N.Y. Sept. 3, 2021) (Goldman Sachs not part of prosecution team); *United States v. Tomasetta*, No. 10 Cr. 1205, 2012 WL 896152, at *5 (S.D.N.Y. Mar. 16, 2012) ("[T]he fact that a third-party corporation is cooperating with the government's investigation — as many do — does not turn it into an 'agent' of the government. Cooperating parties have their own sets of interests ...."); *United States v. Maxwell*, 534 F. Supp. 3d 299, 323 (S.D.N.Y. 2021) (Nathan, J.) (records in possession of third-party civilian are not in possession of prosecution team); *United States v.*

*Meregildo*, 920 F. Supp. 2d 434, 442 (S.D.N.Y. 2013) (cooperating witnesses are not part of the prosecution team).

Patrick James's alternate request for discovery and a hearing on the Government's interactions with FBG is meritless and should be denied. As set forth above, all of Patrick James's arguments fail under *Bankman-Fried¸* and his request for a hearing is predicated on a misreading of an isolated, out-of-circuit case. *United States v. Blumberg* analyzed the Third Circuit's three-prong "constructive-possession test" to determine whether there was a joint prosecution, *not* the multi-factor test articulated by the Second Circuit and historically applied by courts in this district. Moreover, unlike in this case, the corporation in *Blumberg* had entered into a deferred prosecution agreement with the Government that required it to "cooperate fully with the Department in any and all matters relating to the conduct" at issue, *United States v. Convergex Group, LLC*, No. 13-811 (JLL) (D.N.J. Dec. 18, 2013) (Dkt. 4), presenting a closer question under Third Circuit law of whether the Government had constructive control of that entity's records.

Courts in this District routinely reject similar motions without a hearing where, as here, the record shows nothing more than routine cooperation. *See Avellino,* 136 F.3d at 260-61 (where motion lacked "any nonspeculative basis," the district court did not abuse its discretion in denying a request for a hearing on an alleged *Brady* violation); *United States v. Mahaffy,* 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006) (the defendant's "conclusory" assertions that "the S.E.C. operated as a surrogate for the USAO, without more, do not warrant an evidentiary hearing"). Indeed, on far more evidence of overlap between corporate counsel and the Government, the Second Circuit affirmed the district court's rejection of Bankman-Fried's motion without conducting a hearing. As the Government argued to the Second Circuit, "Bankman-Fried was also not entitled to a hearing to prove that his assertions were anything other than outlandish. The concrete allegations

he made showed nothing more than the usual cooperation of corporate counsel with an investigation, meaning that even if proven true they would not have entitled him to relief. And his speculation that routine communications between the Debtors and the Government reflect a nefarious plot did not demand a hearing to reject." (*Bankman-Fried*, 24-961, Dkt. 50.1 at 68 (2d Cir.)) The Second Circuit agreed in *Bankman-Fried*, and the same is true here.

4. The Court Should Deny Edward James's Motion to Compel the Government to Request and Produce First Brands Documents Pursuant to Grand Jury Subpoenas (ECF No. 118)

Edward James separately requests an order from this Court compelling the Government to request particular records from First Brands. (ECF No. 118.) Edward James's request lacks legal authority. While he cites three cases, none supports the proposition that a district court can compel the Government to subpoena particular documents from a third party. Indeed, it is fundamental that Edward James lacks standing to enforce the Government's grand jury subpoena, and his request that this Court compel the Government to obtain from FBG—"(1) the invoices and other representations underlying the alleged accounts receivable factoring and accounts payable financing schemes; (2) the complete sets of electronic communications and other documents of Mr. James and Stephen Graham; and (3) a privilege log," ECF No. 118 at 19—should be denied in full.

The grand jury is "free to pursue its investigations unhindered by external influence." *United States v. Dionisio*, 410 U.S. 1, 17–18 (1973). Criminal defendants have no role whatsoever in the grand jury process. They may not conduct federal grand jury proceedings, issue grand jury subpoenas, or enforce compliance with them—those responsibilities lie with U.S. Attorneys and their appointed assistants. *See, e.g.*, 28 U.S.C. §§ 515(a). Nor may they determine the scope of a grand jury subpoena or direct how a recipient responds. They hold no sway over the scope of a grand jury subpoena's requests, or the scope of a subpoena recipient's response to such requests.

And in most instances defendants lack standing to challenge or object to grand jury subpoenas issued to third parties. *See In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990*, 741 F. Supp. 1059, 1060 (S.D.N.Y. 1990), *aff'd sub nom.*, *In re Grand Jury*, 956 F.2d 1160 (2d Cir. 1992). For those reasons, courts have held that a defendant's dissatisfaction with the breadth of a subpoena or with a recipient's production does not confer standing to challenge or enforce the subpoena. *See, e.g.*, *United States v. Skeddle*, 176 F.R.D. 258, 259 (N.D. Ohio 1997) ("With regard to any materials that LOF did not deliver to the grand jury, I remain of the view that the defendants are without standing to complain about any noncompliance by LOF with regard to the grand jury's subpoena."); *see also United States v. Javice et al.*, No. 23 Cr. 251 (AKH), Aug. 6, 2024 Conf. Tr. at 50 ("It's up to the government to enforce the subpoena or not. I'm not ruling on a grand jury subpoena.").

Defense counsel's cited cases say nothing to the contrary. As discussed above, *United States v. Giffen* stands only for the proposition that the Government must produce documents that it "has reviewed or has access to," but "need not, however, produce documents from agencies that did not participate in the investigation of the defendant or documents of which it is unaware." 379 F. Supp. 2d at 343. The other two authorities are non-binding opinions from nearly 50 years ago. *United States v. Trevino*, a Fifth Circuit case from 1977, declined to extend a prosecutor's discovery obligations to the probation department. 556 F.2d 1265, 1271 (5th Cir. 1977). And in *United States v. Fancher*—an opinion from 1961—the district court addressed the enforcement of a defendant's Rule 17 subpoena (which Edward James does not address), not whether the Government should be separately compelled to enforce a subpoena against a third party. 195 F Supp. 448, 449-50 & n.1 (D. Conn. 1961).

Accordingly, as to each request, Edward James is not entitled to demand the collection and production of documents purportedly held by FBG but not produced to the Government. With respect to the invoices related to the accounts receivable factoring and accounts payable financing frauds, the Government has fulfilled its Rule 16 obligations by producing the invoices it has received from FBG. As to Edward James's second request for the complete FBG custodial files for Edward James and Stephen Graham, the defendants have no standing to demand enforcement of grand jury subpoenas, or to direct the Government to collect additional discovery that they may find useful. As to Edward James's last request, for a privilege log from FBG, that request fails for the same reasons as his first two and, even if not, is ultimately moot. Although the Government is under no obligation to do so, it has requested a privilege log from FBG and informed the defense of this request. If and when the Government receives the privilege log, it will produce the log to the defendants.

## III. EDWARD JAMES'S MOTION TO DISMISS SHOULD BE DENIED (ECF NO. 114)

Edward James moves to dismiss certain counts of the indictment on multiplicity grounds, for lack of specificity, and for failing to adequately allege venue. (ECF No. 114.) These challenges are legally wrong, misread the indictment, and are best largely premature. The indictment is more than sufficient and the motion should be denied.

### A. The Defendant's Multiplicity Motion Should be Denied

Defendant's argument that Counts Three, Four, and Eight are multiplicitous of Count Six is legally unsound, misreads the indictment, and is premature.

1. Applicable Law

The multiplicity doctrine prevents the Government from charging a single offense in more than one count. An indictment is multiplicitous "when it charges a single offense as an offense

multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "To assess whether the two offenses charged separately in the indictment are really one offense charged twice, the 'same elements' test or the 'Blockburger' test is applied." *Id.* at 146 (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). "The Blockburger test examines whether each charged offense contains an element not contained in the other charged offense." *Id.* "If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." *Id.*

When conduct is alleged to have violated the same statute multiple times, the relevant question—one of statutory interpretation—is identification of the "unit of prosecution" established by the statute. *United States v. Regensberg*, 604 F. Supp. 2d 625, 629 (S.D.N.Y. 2009) ("When the same statutory violation is charged twice, . . . 'the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution.'" (internal citation omitted)); *United States v. Rigas*, 281 F. Supp. 2d 660, 666 (S.D.N.Y. 2003); *United States v. Bin Laden*, 91 F. Supp. 2d 600, 618 (S.D.N.Y. 2000) ("When a defendant claims that an indictment is multiplicitous because it is based on an erroneous interpretation of a statute (rather than because it violates the Double Jeopardy Clause), our analysis focuses on Congress's intent with respect to the appropriate unit of prosecution."). When the statute itself permits separate prosecutions for separate acts, such as each execution of a mail or wire communication, multiplicity is not present even where the acts arise from a single overarching scheme. *See United States v. Ramirez*, 420 F.3d 134, 145 (2d Cir. 2005) ("an indictment may charge multiple counts of mail fraud based on the same scheme to defraud without running afoul of double jeopardy" because the statute does

not punish the scheme "but rather each individual use of the mails in furtherance of that scheme" (citation omitted)).

2. Discussion

The defendant's motion should be denied for three reasons: the statute allows each wire to be charged separately; the indictment describes four distinct schemes with different victims and different wire transmissions; and courts in this Circuit regularly hold that multiplicity arguments like this are premature.

*First*, it is well-established in this Circuit that every use of an interstate wire can be charged as a separate offense. *See, e.g.*, *United States v. Eskow*, 422 F.2d 1060, 1064 (2d. Cir. 1970 ("Since each mailing pursuant to an alleged scheme to defraud constitutes a separate offence . . . the indictment is not vulnerable to a claim of multiplicity."). And the defendant's brief rightly acknowledges, as it must, that for wire fraud "each use of the wires" can constitute a separate, freestanding crime. (Def. Br. 8 (quoting *United States v. Fermin Castillo*, 829 F.2d 1194 (1st Cir. 1987).) That concession alone is a basis to deny the motion. Even if each charge of wire fraud addressed the same scheme to defraud—which is not necessarily the case here—they would not be subject to a multiplicity challenge because each wire used as part of the scheme can be charged as separate counts. Because the defendant does not dispute that the Government alleges more than four wires were used in furtherance of the wire fraud schemes charge in the Indictment, the motion fails as a matter of law.

*Second*, the defendant is wrong to suggest that the charged schemes are factually identical. Instead, each count charges a distinct scheme, affecting different victims, and, as the defendant does not dispute, a different sets of wires. Count Three charges a scheme to defraud and obtain money from "First Brands's factors" through fraudulent representations about "First Brands'

accounts receivable." (*Id.* ¶ 43.) Count Four charges a scheme to defraud and obtain money from "First Brands' supply chain financers" though fraudulent representations about "First Brands' accounts payable and First Brands' financial condition." (*Id.* ¶ 45.) Count Six charges a scheme to defraud First Brands' lenders through fraudulent representations regarding First Brands' financial condition. (*Id.* ¶ 49.) Count Eight charges a scheme to defraud First Brands' "off-sheet lenders" through fraudulent representations about "First Brands financial condition" and the collateral that were the subject of the financing arrangements. (*Id.* ¶ 53.)

Defendant's chart sidesteps these allegations and instead offers a distorted reconstruction of the Indictment. It also conflicts with his own bill of particulars motion, which previously acknowledged "*four separate schemes* alleged in the Indictment involve: (i) accounts receivable financing, (ii) accounts payable financing, (iii) off-balance-sheet debt, and (iv) false statements regarding First Brands' financial condition." (E.J. BOP Motion at 5.) That earlier description is correct: each scheme targeted a distinct lender group and involved different conduct.

The speaking indictment makes clear that Count Six—which involves disseminating false financial statements to First Brands' lenders—charges separate wires and applies to a different category of lenders than the accounts receivable factoring fraud, the accounts payable fraud, or the off-sheet lender alleged in Counts Three, Four, and Eight. (Indictment at ¶ 30) (after detailing the accounts receivable fraud on factors, supply chain financing fraud, and off-sheet lender fraud, alleging that the defendants "*also* defrauded First Brands' lenders by disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens"). That defendants also sent false financial statements in separate wires to the supply chain financers (Count Four), and Off-Sheet Lenders (Count Eight), does not make the counts multiplicitous. Indeed, defendants' cited authority makes

the Government's point. In *United States v. Blumhagen*, No. 09 Cr. 79S, 2016 WL 3563219, at *5 (W.D.N.Y. July 1, 2016), *on reconsideration in part*, No. 09 Cr. 79S, 2017 WL 1243038 (W.D.N.Y. Apr. 5, 2017), the court denied a motion to dismiss multiple wire fraud counts as multiplicitous because, "[a]lthough each was allegedly committed as part of the charged scheme to defraud, these offenses are not the same in fact and law. They are separate units of prosecution for purposes of wire fraud." The same is true here.

*Finally*, if nothing else, the motion "at best is premature" in light of "the Circuit's controlling view that the question of multiplicitiousness is properly considered only at a later point in the proceedings"—that is, after trial. *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018); s*ee United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020), *aff'd sub nom. United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ("Courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature."); *see also United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157, at *15 & n.6 (S.D.N.Y. Dec. 10, 2021) (same) (collecting cases).

As Judge Rakoff explained in *United States v. Gupta*, "neither of the two reasons for consolidating or dismissing multiplicitous counts applies at this juncture." No. 11 Cr. 907 (JSR), 2012 WL 1066804, at *2 (S.D.N.Y. Mar. 27, 2012). Dismissal of multiplicitous counts is appropriate where (1) "charging multiple counts for the same offense may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes," or (2) "because the Double Jeopardy Clause of the Fifth Amendment forbids punishing a defendant twice for committing the same offense." *Id.* (internal quotation marks omitted). The first circumstance does not apply given that the defendant is charged in multiple counts, and there is no reason to believe

that the jury would view the inclusion of five as opposed to eight counts as signaling greater culpability on Edward James's part. *See id.* As for punishment, that Double Jeopardy concern "arises only at sentencing and is not something the Court need take heed of at this pre-trial stage." *Id.* (citing *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006)). Accordingly, the motion should be denied.

**B. The Indictment Easily Satisfies Rule 7**

Defendant argues that Counts Two, Six, and Seven should be dismissed because they lack the specificity required by Rule 7(c). In his view, the Indictment does not identify which "lenders," "financers," collateral categories, or financial representations correspond to each count. This argument misstates the law, is a rehash of the defendant's motion for a bill of particulars, and ignores what the Indictment and discovery already provide.

Rule 7 requires only "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Second Circuit has repeatedly held that an indictment satisfies this standard when it sets out the statutory elements and provides the approximate time and place of the alleged crime. *See, e.g.*, *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."); *United States v. Alfonso,* 143 F.3d at 776 (the Second Circuit has consistently upheld indictments that "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."); *Hamling,* 418 U.S. at 117 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself."). Only in "very rare cases," such as congressional contempt prosecutions, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013)

(discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

Measured against that standard, defendant's argument falls short. He does not dispute that the indictment tracks the statutory elements of each charged offense. And far from providing a bare recitation of statutory terms, the Indictment describes the mechanics of each scheme in detail, identifies each category of financing arrangement alleged to have been misused, and explains how the defendants' conduct affected different lender groups. That is more than Rule 7 requires.

Nor does defendant identify any prejudice, which is required to dismiss an indictment for lack of specificity. *United States v. Walsh,* 194 F.3d 37, 45 (2d Cir. 1999) (explaining that the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss ... charges for lack of specificity"). Indeed, the record shows the opposite. The Government has already provided substantial disclosures, including a lengthy speaking indictment that details the mechanics of each defendants' fraudulent schemes, visual examples of flows of funds used to conceal the fraud, voluminous text searchable discovery, search warrant affidavits, witness summaries, and written responses to defense requests. Those disclosures identify (1) 11 financial institutions affected by the schemes, Apr. 3 Ltr. at 3; (2) lists of factored receivables and First Brands receivables data, *id.*; (3) the four factoring partners listed in paragraph 12 of the Indictment, *id.*; (4) particular examples of reports and communications discussing the "round trip" payments described in the Indictment, *id.*; (5) organizational charts describing entities owned and controlled

by the defendant described in the Indictment, *id.* at 4; (6) entities involved in the off-sheet lending described in the Indictment, *id.*; (7) the four Off-Sheet Lenders described in the Indictment, *id.*; (8) identified, by bates number, communications quoted in the Indictment, *id.*; and (9) particular communications in the discovery related to First Brands' communications with its auditors. Faced with that record, defendant offers no concrete example of uncertainty that impairs his ability to prepare his defense.

Unable to point to any defect under Second Circuit law, defendant relies on decades-old, out-of-circuit decisions involving indictments that omitted basic elements or failed even to describe the alleged scheme. Those cases bear no resemblance to this one. *See United States v. Strauss*, 285 F.2d 953 (5th Cir. 1960) (addressing a one count fraudulent transfer of property indictment), a Delaware District Court opinion from over fifty years ago, *United States v. Heinze*, 361 F. Supp 46, 56 (D. Del. 1973). And the only in-circuit case he cites—*United States v. Awan*—involved an indictment that did not specify which of several alternative statutory theories applied. 459 F. Supp. 167 (E.D.N.Y. 2006). No such problem exists here.

In short, Edward James has given the Court no reason to depart from the Second Circuit cases that have "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Walsh*, 194 F.3d at 44 (quotations and citation omitted). The indictment has gone far above those minimum requirements here and the motion should be denied.

### C. The Indictment Sufficiently Alleges Venue in the Southern District of New York

Edward James's venue challenge fails because the Indictment is facially valid and expressly alleges that each charged count occurred "in the Southern District of New York and elsewhere." At this stage, that allegation is enough to defeat a motion to dismiss.

It is well settled that, on a pretrial venue challenge, the government need only show that the indictment alleges facts supporting venue, and the Court must assume those allegations to be true. *See United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *16 (S.D.N.Y. Dec. 11, 2017); *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005); *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010). Courts in this District have recognized that "as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied." *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006); *see also United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *3 (S.D.N.Y. Nov. 15, 2021). "The question of whether there is sufficient evidence to support venue is appropriately left for trial." *Ohle*, 678 F. Supp. 2d at 231.

Applying those principles here, the motion must be denied. The indictment alleges, count by count, that the charged offenses occurred "in the Southern District of New York, and elsewhere." Indict. 37 (Count One), 39 (Count Two), 43 (Count Three), 45 (Count Four), 47 (Count Five); 49 (Count Six), 51 (Count Seven); 53 (Count Eight), 55 (Count Nine). That is sufficient to deny the motion. *See United States v. Leech*, 24 Cr. 658 (GHW), 11/7/2025 Tr. at 102-105 (denying motion to dismiss for lack of venue where charge alleged charge occurred "in the Southern District of New York and elsewhere"); *United States v. Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842, at *3 (S.D.N.Y. Jan. 10, 2008) (allegation that conduct occurred "in the Southern District of New York and elsewhere" is sufficient at the pleading stage); *United States v. Chocron*, No. 20 Cr. 400

(JSR), 2021 WL 3005086, at *1 (S.D.N.Y. July 14, 2021) (same); *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711, at *1 (S.D.N.Y. Nov. 4, 2019) (same); *United States v. Dupigny*, No. S1 18 Cr. 528 (JMF), 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019) (same); *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) (same); *United States v. Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440, at *3 (S.D.N.Y. Jan. 7, 2014) (same); *United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2013 WL 6877319, at *6 (S.D.N.Y. Dec. 31, 2013) (same); *Ohle*, 678 F. Supp. 2d at 231 (same); *United States v. Szur*, No. S5 97 Cr. 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) (same).

Nothing in defendant's motion changes that analysis. His assertion that the charged conduct occurred primarily outside this District is a factual argument for the jury, not a basis for pretrial dismissal. Venue in cases involving continuing offenses—and wire fraud, bank fraud, and conspiracies are classic examples—may lie in any district in which part of the offense was begun, continued, or completed. *See* 18 U.S.C. § 3237(a); *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010); *United States v. Rowe*, 414 F.3d 271, 278-79 (2d Cir. 2005). Because the indictment alleges conduct occurring in this District, and because venue for continuing offenses can rest on acts in more than one district, the challenge is doubly misplaced.

In short, the indictment alleges venue in the Southern District of New York. That is all Rule 12 requires. Any further dispute about whether these facts sufficiently support venue is appropriately left for trial. *See Ohle*, 678 F. Supp. 2d at 231 ("The question of whether there is sufficient evidence to support venue is appropriately left for trial.").[18]

---

[18] Defendant's alternative request for a bill of particulars regarding venue can also be denied. Significantly, defendant did not include this request in their initial motion for a bill of particulars and Edward James provides no reason for this belated request or why it was not included initially.

## IV. THE COURT SHOULD DENY DEFENDANTS' MOTION TO PRECLUDE EVIDENCE BECAUSE THEY FAIL TO IDENTIFY ANY DISCOVERY VIOLATION OR PREJUDICE. (ECF NOS. 118, 137)

Edward James and Patrick James's motion to preclude evidence fails both legally and factually. (ECF No. 118, 137). The Government has produced over 3 million documents totaling over 16 million pages received from over 100 third parties. (ECF No. 54.) Nonetheless, Edward James seeks the rare and extreme sanction of preclusion because the Government produced a single document and three sets of bank records over five months before trial. Those productions are consistent with Rule 16 productions of material in the Government's possession being "substantially complete," ECF No. 53, and with the Government's practice to quality-check its productions, to confer with defense counsel on any production issues, and to swiftly correct any production mistakes. As to the search warrants, Edward James highlights two productions of responsive material made nearly nine months before trial and before the June 1, 2026 date previewed by the Government. (*Id.*) In short, these productions—each made over five months before trial—are not untimely.[19]

Patrick James, for his part, joins in Edward James's motion. But his complaints fare no better. Patrick James relies primarily on the Government's production of material related to Lisa Ruth—a non-lawyer who worked directly for Patrick James during the fraudulent schemes but

---

Further still, Edward James does not describe how this request is not simply a request for the Government's trial proof ahead of schedule, which is not the proper basis for a bill of particulars. *See also United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories.").

[19] Moreover, Edward James ignores how the defendants' privilege assertions and the filter process impact the timing of the completion of the Government's responsiveness review. The Government can only identify responsive material in the possession of the Prosecution Team. The Government fully explains this background in opposition to Edward James's separate motion to suppress.

who counsel for Patrick James has "employed" as an alleged "member" of Patrick James's defense team. Even still, the Government obtained Orders from this Court permitting it to delay disclosure because of the Government's ongoing investigation into Ms. Ruth's conduct.

Patrick James's other grievances are similarly meritless. He, like Edward James, attempts to fault the Government for continuing to obtain materials and make discovery productions on a rolling basis. But far from a discovery violation, the Government is fulfilling its ongoing obligations when it produces material it obtains as it obtains it. Further still, when Patrick James identified a small gap in one volume of one production by First Brands, the Government realized that these materials had not been downloaded by the Government, requested a reproduction of the materials, obtained them, and produced them to the defense within a week. These are all examples of the Government complying with its ongoing discovery obligations in good faith, not a basis for an extreme and disfavored sanction.[20]

Revealingly, neither defendant attempts to articulate any prejudice tied to any alleged production or even suggest that the Government has acted in anything less than utmost good faith. Nor do defendants contend that an adjournment is necessary because they need more than four months to review any discovery production. This is because neither defendant can credibly do so given that they are represented by many sophisticated and well-resourced attorneys.

Accordingly, the defendant has failed to identify any untimely production, failed to articulate any prejudice resulting from any alleged delay, and does not provide any support for imposing any remedy, let alone the "drastic remedy" of preclusion. *See United States v. Wynder*, 147 F. 4th 200, 215 (2d Cir. 2025) ("Preclusion of evidence . . . is a drastic remedy and is not

---

[20] By contrast, neither defendant has produced even a single page of discovery notwithstanding the Government's repeated discovery demands.

warranted where, as here, the parties agreed that the nondisclosure was not a product of bad faith.”).

**A. Background**

On April 30, 2026, the Government updated the Court regarding the production of discovery. (ECF No. 53.) The Government stated that its production of Rule 16 discovery was “substantially complete” and that it “anticipate[d] producing the limited remaining materials in its possession no later than June 1[, 2026].” (*Id.*) The Government also explained that the remaining materials “include[d] data identified as responsive to the search warrant of Patrick James’s personal email account.” (*Id.*) The Government emphasized that, as is typical, it “continues to receive discovery material from third parties that are producing records in response to pending subpoenas or voluntary document requests; the Government will produce those materials to defense counsel as they are received on a rolling basis, consistent with its Rule 16 and *Brady* obligations.” (*Id.*) On May 8, 2026, the Court set a trial date of February 9, 2027. Since May 2026, the Government has continued to fulfill its ongoing discovery obligations by producing any newly obtained discovery material, quality-checking its productions, correcting any production mistakes, and by conferring with counsel on any discovery issues in good faith.

**B. Applicable Law**

Rule 16 of the Federal Rules of Criminal Procedure requires the Government to permit the defense, upon request, “to inspect and to copy or photograph” any “books, papers, documents, data, photographs, [or] tangible objects” in the Government’s possession, custody or control, that are “material to preparing the defense,” that the “Government intends to use . . . in its case-in-chief,” or that “was obtained from or belongs to the defendant.” Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii). Similarly, upon a defendant’s request, the Government must “disclose to the defendant, and

make available for inspection, copying, or photographing, . . . any relevant written or recorded statement by the defendant" within the Government's possession, custody, or control, or that the Government knows (or could, through "due diligence," know) exists. Fed. R. Crim. P. 16(a)(1)(B)(i). Rule 16's requirements "are intended to contribute to the fair and efficient administration of criminal justice by providing the defendant with sufficient information upon which to base an intelligent [] plea; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact finding process." *United States v. Alvarez*, 987 F.2d 77, 84-85 (1st Cir. 1993) (citing Fed. R. Crim. P. 16 advisory committee's note).

If the Government fails to comply with its disclosure obligations under Rule 16, the district court "has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997); *see also* Fed. R. Crim. P. 16(d)(2). Preclusion of evidence is a disfavored and extraordinary remedy when there are delays in the Government's Rule 16 disclosures. *United States v. Monsanto Lopez*, 798 F. App'x 688, 690-91 (2d Cir. 2020) (affirming district court's order of a brief continuance rather than preclusion, and holding that defendant suffered no prejudice where he "received the materials he argues were untimely produced over a month before trial ultimately began"); *see also United States v. Guerrero*, No. 09 Cr. 339 (RWS), 2010 WL 1790400, at *1 (S.D.N.Y. Apr. 30, 2010) ("Absent bad faith on the part of the Government, the preclusion of evidence is rarely an appropriate sanction for discovery delay."); *United States v. Graham*, No. 99 Cr. 271 (CFD), 2000 WL 1902425, at *2 (D. Conn. Dec. 21, 2000) (preclusion of evidence not appropriate where government did not act in bad faith and where "any prejudice to the defendant would be cured by granting her a continuance of the trial . . . . A continuance is the least severe remedy necessary to preserve the defendant's right to a fair trial, promote the fair and efficient administration of justice, and ensure full compliance with

Rule 16(a).”). Rather, a continuance is the preferred remedy “because it gives the defense time to alleviate any prejudice it may have suffered from the late disclosure.” *United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998) (citing *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985)); *see also United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976) (the court should consider, inter alia, “‘the feasibility of rectifying [any] prejudice by a continuance’” (quoting Advisory Committee Notes on Rule 16(g))).

**C. The Court Should Deny Defendants’ Motion for Preclusion**

As an initial matter, neither defendant contends that the Government has missed any court-ordered deadline for discovery productions or articulated any hint of bad faith. That alone is reason enough to deny the motion. The law is clear that preclusion is an extreme and undesirable remedy for a Rule 16 violation and not appropriate in the absence of bad faith. *See, e.g.*, *Monsanto Lopez*, 798 F. App’x at 690-91; *Marshall*, 132 F.3d at 70; *Guerrero*, 2010 WL 1790400, at *1; *Graham*, 2000 WL 1902425, at *2. This approach is consonant with the general principle that “suppression of evidence . . . has always been our last resort, not our first impulse,” and that, due to the “exclusionary rule’s costly toll upon truth-seeking and law enforcement objectives,” it is “applicable only where its remedial objectives are thought most efficaciously served.” *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984); *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998); and *United States v. Calandra*, 414 U.S. 338, 348 (1974)) (internal quotation marks and brackets omitted).

Instead, defendants highlight productions made over four months before trial and argue that they are untimely based on the Government’s statements about its “anticipate[d]” or “expect[ed]” timing. But the Government has always been clear that it will continue to obtain new discovery material and produce it on a rolling basis and that it can only produce what is currently

in its possession. Further still, the Government uses caveats such as "substantially complete," "anticipates," and "expected" when describing its document productions precisely because the Government routinely quality-checks its productions and works with defense counsel to fix any production issues. The defendants have not identified anything other than good faith discovery productions in a complex white collar matter involving millions of documents.

**1. Edward James Has Not Identified any Discovery Violation Or Any Prejudice**

Edward James highlights a few categories of productions in support of his motion. They each fail to provide any basis for relief:

*First*, as previewed to the Court, the Government has continued to make productions since April 30, 2026. These included two productions made on May 12, and May 20, 2026, which is before the June 1, 2026 "anticipate[d]" production date that the Government had previewed for the Court on April 30, 2026.[21] Those productions included (1) a set of responsive materials for the Patrick James email account; (2) a set of responsive materials for the Microsoft Warrant; and (3) nine documents consisting of Section 2703(d) applications and orders obtained by the Northern District of Ohio. (Def. Ex. Q.) As to the Patrick James responsive warrant returns and the Section 2703(d) applications and orders, Edward James does not explain how these were untimely given that the Government informed the Court it "anticipate[d]" producing "data identified as responsive to the search warrant of Patrick James's personal email account" and limited Rule 16 materials by June 1, 2026.

As to the Microsoft Warrant materials, Edward James notes that, on April 15, 2026, the Government wrote that "it expects that as of April 27, 2026, the sole remaining responsive report

---

[21] Patrick James also cites these two productions in his joinder, but they were produced before June 1, 2026 anticipated production date that the Government had previewed.

will pertain to Patrick James's personal emails." (ECF No. 45.) Edward James misreads the Government's stated "expectation" as a binding deadline. Nonetheless, the Government produced responsive data for the Microsoft warrants on April 27, 2026, and made a second production on May 12, 2026, which is only 15 days after April 27, 2026, and nearly nine months before trial.[22]

*Second*, Edward James highlights the Government's production of (1) one set of bank records on June 22, 2026—over seven months before trial; (2) two spreadsheets from the Federal Reserve Bank of New York and 19 documents from Huntington National Bank produced on August 18, 2026—nearly six months before trial; and (3) a single document produced on September 2, 2026—over five months before trial. (Def. Br. at 12.) None of these limited productions occurring over five months before trial can be reasonably described as either "substantial" or "exceedingly untimely." (Def. Br. 12.) They also reflect the Government's good faith review of its holdings to correct any mistakes and to engage with defense counsel on discovery issues.

In addition to failing to articulate any untimeliness, Edward James does not even attempt to articulate any prejudice. He does not claim that he is unable to review these limited materials in the forthcoming months or even to suggest that he needs an adjournment to do so. That silence demonstrates that this motion fails. It also distinguishes the opinion in *United States v. Mason*, 6 Cr. 80 (NRB), 2008 WL 281970, at *2 (S.D.N.Y. Jan. 25, 2008), where the defense contended that newly disclosed fingerprint evidence deprived him "the opportunity to challenge the government's fingerprint analysis and potentially to interpose a multiple conspiracy defense," and a "meaningful

[22] As discussed, following the assertion of privilege by the defendants and First Brands, the Filter Team released over 100,000 documents to the Prosecution Team in July and August 2026. The Government identified responsive material from that newly released set and completed its production of those materials by October 5, 2026.

opportunity to pursue these defenses" with "two and a half weeks remaining until the start of trial." This case is the opposite of *Mason*, rather than "ignor[ing] a specific request for the documents by" defense counsel, the Government has conferred with the defense in good faith and fixed any production issues swiftly.[23]

Acknowledging that he has failed to allege a Rule 16 violation and that there is ample time before trial, Edward James alternatively seeks a deadline for the Court to set "a reasonable date certain and well in advance of trial by which the government must produce relevant discovery material." (Br. 18.) Edward James cites no authority for this position and the Court should reject this invention.

**2. Patrick James Has Not Identified any Discovery Violation Or Any Prejudice**

In his Motion, Patrick James highlights a few categories of Government productions that he contends are untimely. Patrick James is wrong.

*Lisa Ruth Materials*. Patrick James argues that the Government's September 14, 2026 production of materials related to Lisa Ruth are untimely. However, the Government sought and obtained authority from this Court to delay disclosure of these materials because of the Government's ongoing investigation regarding Ms. Ruth, and they were produced over four months before trial. Accordingly, they are not untimely. Patrick James separately criticizes the Government for obtaining a warrant for Lisa Ruth's devices on August 18, 2026 and executing it on August 19, 2026. Patrick James cites no authority for his position that a defendant can choose

[23] In this way, this case is also fundamentally different than *United States v. Thomas*, 2026 WL 1972091, at *7 (D. Vt. July 8, 2026), where "late disclosures disrupted investigation, motions practice, client consultation, impeachment preparation, and the defense's ability to proceed on the scheduled June 4 trial date." The Court found that disclosures on May 29, 2026 (for a trial scheduled for June 4, 2026) "prevented the defense from proceeding to trial at all." *Id.* at *6. Defense does not articulate any prejudice, let alone the prejudice that the court found in *Thomas*.

the timing of when the Government obtains and executes a search warrant on a third party. Patrick James also fails to explain how he has standing to challenge that warrant on any grounds, let alone on the grounds that the Government should have sought and executed the warrant earlier. Because Patrick James has cited nothing to support his suggestion that a criminal defendant can dictate the timing of the Government's ongoing investigation and investigative steps, his motion fails.

*Rolling Document Productions of Newly Obtained Discovery*. Patrick James, like Edward James, is correct that the Government's produced additional discovery material on a rolling basis as it obtained it and will continue to do so. These are timely produced and made many months before trial is set to begin.

*Portion of Volume 11*. On or about September 8, 2026, Patrick James identified a missing Bates range in Volume 11 of First Brands production to the Government. The Government learned that the paralegals did not download this portion of this production, so the Government requested a reproduction and produced it to the defense a week later on September 15, 2026, which is over four months before trial. Far from a discovery violation, the Government never took possession of these documents initially because of an administrative error and, when counsel pointed that out, the Government corrected the error within a week. This is only further evidence of the Government's good faith discovery efforts.

Like Edward James, Patrick James articulates no prejudice from these disclosures. Nor does he suggest that he requires an adjournment to allow for sufficient time to review any particular production. Nor could he given that these documents were produced months before trial and that the defendant has basically unlimited attorney resources. Instead, Patrick James hypothesizes that if the Government disclosures "continue closer to trial, Mr. James *may* be denied sufficient time to meaningfully review and make use of that information, denying him a fair trial." (ECF No.137

at 5 (emphasis added).) But hypothetical prejudice based on hypothetical disclosures that the Government may make down the road do not provide a basis for relief under any legal standard. Both motions should be denied.

## V. EDWARD JAMES'S MOTION TO SUPPRESS SHOULD BE DENIED (ECF NO. 122)

Edward James seeks suppression of the fruits of two judicially authorized search warrants: (1) a First Brands corporate email account in Edward James's name (the "James FBG Email Account"); and (2) an Apple iCloud account in Edward James's name (the "James iCloud Account"). (Dkts. 122-123 "Supp. Mot."). His motion lacks any factual or legal foundation. The warrants were supported by robust affidavits, approved by neutral magistrate judges, and executed in full compliance with the Fourth Amendment. Nothing in the record remotely suggests a constitutional violation, much less the extraordinary circumstances required to justify suppression. The motion should be denied.

*First*, the defendant lacks standings to challenge search of the James FBG Email Account, and his motion with respect to that account may be denied on that basis alone. The defendant does not even assert—much less establish, as it is his burden to do—that he had a reasonable expectation of privacy in business records stored in work accounts owned by his former employer and now controlled by the Chapter 7 Bankruptcy Trustee. Nor could he. The email account at issue is a @firstbrandsgroup.com email, which, as the search warrant affidavit establishes, was used to communicate about First Brands-related matters. Because Edward James was using his employer's property to communicate about work-related matters, he lacked a reasonable expectation of privacy in records in that email account, particularly documents belonging to FBG. As to the James iCloud Account, while it appears to have been used for both business and personal purposes, the

defendant has made no effort to demonstrate that he had a his reasonable expectation of privacy when he was operating that account. The Court should deny the motion on this ground alone.

*Second*, because the affidavits supporting the warrants articulated probable cause that evidence of crimes would be found in the James FBG Email Account and the James iCloud Account, the issuing judges' probable cause determinations are entitled to "substantial deference," and the defendant has failed to provide any reason to disturb such deference, the motion should be denied. Moreover, the warrants are neither overbroad nor unparticularized because they identify categories of records to be seized with reference to specific offenses for which there is probable cause.

*Third*, the Government's review of materials obtained pursuant to the search warrants was reasonable and complied with the Fourth Amendment in all respects. Excluding time spent on filter reviews for potentially privileged records, the Government reviewed the nearly 2 million records obtained pursuant to the search warrants in about five months. To the extent there was delay, it was attributable to the defendants' voluminous and wide-ranging privilege assertions.

*Fourth*, even if the warrants or the Government's review were somehow deficient, suppression would be unwarranted based on the application of the good faith exception.

## A. Background

### i. *The Ohio Warrant*

On or about April 28, 2025, the Honorable Reuben J. Sheperd, United States Magistrate Judge for the Northern District of Ohio, signed a search warrant (the "Ohio Warrant") authorizing a search of the James FBG Email Account and three other FBG corporate email accounts to identify and seize from those accounts specific categories of records pertaining to fraudulent financial schemes at FBG involving, among other things, "fraudulently inflating the value of assets

that FBG [used] as collateral to obtain funding from various financial institutions" (the "FBG Financial Fraud"), in violation of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); 1349 (conspiracy to commit wire and bank fraud); and 1956 (money laundering).[24]

The Ohio Warrant was supported by an affidavit (the "Ohio Affidavit"), sworn to by Special Agent Benjamin Shaw. (Supp. Mot. Ex. A). The Ohio Affidavit set forth in detail the bases for believing the existence of the FBG Financial Fraud and that evidence of the fraud scheme would be found in the FBG Email Account and three other corporate email accounts. Among other things, the Ohio Affidavit summarized interviews of five witnesses who were FBG insiders and described, in detail, the inner workings of the FBG Financial Fraud. For example, one witness, who worked in treasury and business development from 2017 to 2022, described the means by which FBG defrauded lenders through false collateral and inventory reporting. (Supp. Mot. Ex. A ¶¶ 16-19). The witness explained how FBG "factored" non-existent accounts receivable and was asked by Andrew Brumbergs or Edward James to fabricate accounts receivable during an audit. (*Id.* at ¶¶ 18-19). The witness further explained how FBG purposefully transported inventory from Mexico to the United States at the end of each month before transporting the same inventory back to Mexico in order to fraudulently enhance the company's borrowing base and the inventory collateral against which the company was eligible to borrow. (*Id.* at ¶ 17).

Another witness explained how FBG inflated its borrowing base by overvaluing inventory. (*Id.* at ¶¶ 24-26). For example, the company purchased fuel pumps at $10 per unit but booked their value at the inflated price of $125-150 per unit. Another witness described how FBG falsely inflated accounts receivable and the value of inventory in order to artificially inflate its borrowing base. As explained in the Ohio Affidavit, this witness discovered in or about 2022 approximately

---

[24] The searches of the three other FBG corporate email accounts are unchallenged.

"$800 million in fraud" comprised of inflated accounts receivable and inventory and other misclassifications. (*Id.* at ¶ 30). This witness explained that "fake invoices" were used to inflate accounts receivable. This same witness, who worked at FBG from 2019 to 2022, explained how he met "every day" with Patrick James, Edward James, Andrew Brumbergs, and Stephen Graham.[25] The witness described discussions during these meetings of "shopping of the balance sheet," which involved making unsupportable adjustments to the balance sheet "that would result in increased income." While Patrick James typically provided targets, [i]t was up to the other meeting attendees [including Edward James] to figure out the specific approach, which usually involved inventory and accounts receivable." (*Id.* at ¶¶ 32-34).

The Ohio Affidavit explained how the target subjects of the investigation used their FBG email accounts to communicate including about the FBG Financial Fraud and thus evidence of the subject offenses was likely to be found on the FBG email accounts. The Ohio Affidavit summarized a lengthy email chain, in which Edward James partially participated, involving "FBG intentionally overfinanc[ing] a deal . . . to get additional cash. . . . FBG financed approximately $8.9 million, but the actual purchase price was $6.6 million." (*Id.* at ¶¶ 43-55).

The Ohio Warrant directed Microsoft to furnish a copy of the James FBG Email Account and the three other FBG corporate email accounts to law enforcement and authorized law enforcement to seize specific categories of records that constitute "evidence and/or instrumentalities of violations" of the specified subject offenses. (Supp. Mot. Ex. D).

---

[25] As the Court knows, both Brumbergs and Graham have pled guilty to participating in financial fraud schemes at FBG. *See United States v. Brumbergs and Graham*, 26 Cr. 25 (AT).

ii. *The SDNY Warrant*

On or about November 14, 2025, the Honorable Robyn F. Tarnofsky, United States Magistrate Judge for the Southern District of New York, signed a search warrant (the "SDNY Warrant") authorizing a search of the James iCloud Account and two Apple iCloud accounts belonging to Patrick James to identify and seize from those accounts specific categories of records pertaining to the FBG Financial Fraud, described as a "pattern of false statements, fabricated documents, misleading accounting practices, and use of transactions designed to conceal the existence and origin of various cash flows and debts from creditors and lenders," in violation of 18 U.S.C. § 1962(c) (RICO); (b) 18 U.S.C. § 225 (continuing financial crimes enterprise); (c) 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 (securities fraud); (d) 18 U.S.C. § 1343 (wire fraud); (e) 18 U.S.C. § 1344 (bank fraud); (f) 18 U.S.C. § 1956 (money laundering); and (g) 18 U.S.C. § 2, 18 U.S.C. § 371, 18 U.S.C. §§ 1349, 1956(h), and 1962(d) (aiding and abetting and conspiracy).[26]

The SDNY Warrant was supported by an affidavit (the "SDNY Affidavit"), sworn to by Special Agent Brandon Racz. (Supp. Mot. Ex. B). The SDNY Affidavit set forth in detail the bases for believing the existence of the FBG Financial Fraud and that evidence of the fraud would be found on the subject iCloud accounts. Among other things, the SDNY Affidavit summarized: interviews of witnesses who were FBG insiders; emails and text messages in furtherance of the fraud scheme; and financial analysis. The SDNY Affidavit explained in detail "irregularities with First Brands factoring arrangements, such as double pledging of receivables and the creation of fictitious receivables," "the generation of financial statements that did not reflect business reality

---

[26] Patrick James does not seek suppression of the fruits of the SDNY Warrant.

and that were sent to First Brands' creditors," and "efforts to conceal billions of dollars of 'off balance sheet debt' from First Brands' lenders and auditor." (Supp. Mot. Ex. B at ¶¶ 13-17).

As to the accounts receivable factoring fraud, the SDNY Affidavit summarized information that the FBI had obtained from FBG's former Senior Vice President of Finance, Andrew Brumbergs, who explained that Edward James directed Brumbergs to make various misrepresentations to FBG's lenders to fraudulently increase borrowing availability. (*Id.* at ¶ 14). The SDNY Affidavit described the various ways in which this was accomplished. At the direction of Edward James, Brumbergs altered the dollar amounts on customer invoices to inflate FBG's accounts receivable. The affidavit described an example of this type of document alteration, with reference to specific records: a May 2025 customer invoice for $179.84 was altered to $9,271.25. (*Id.* at ¶ 14(b)(i)). Edward James also directed fraudulent "pull aheads" or "bill and holds" where Brumbergs would generate customer invoices for sales that had not actually been placed. The SDNY Affidavit also described how Edward James directed a practice of selling or factoring the same customer invoice more than once, *i.e.*, double pledging. (*Id.* at ¶¶ 14(b)(ii)-(iii)).

The SDNY Affidavit also laid out facts establishing probable cause that evidence of the fraud scheme would be found on the James iCloud Account. The warrant explained that the James iCloud Account was registered to "Ed James" and that his FBG work cellphone was the verified phone number registered to the account. (*Id.* at ¶¶ 2(c), 23(c)). The James iCloud account had iCloud backup features enabled. (*Id.* at ¶¶ 23(e), 23(h)). The SDNY Affidavit then laid out in detail, with reference to specific communications, how Edward James used his work cellphone "to engage in communications during and relating to the Subject Offenses, and [how] such communications will be found in [the James iCloud Account]." (*Id.* at ¶ 24(b)(i)). The SDNY Warrant directed Apple to furnish a copy of the James iCloud Account to law enforcement and

authorized law enforcement to seize specific categories of records that constitute "evidence, fruits, and instrumentalities" of the specified subject offenses, *e.g.*, "altered or manipulated financial records," "evidence of attempts to defraud First Brands' creditors," and "financial records reflecting Patrick James's or Ed James's or co-conspirators' receipt of funds derived from First Brands Group and its subsidiaries and affiliates." (Supp. Mot. Ex. B at Attachment A).

iii. *The Government's Review of Search Warrant Materials*

In June 2025, Microsoft produced more than 1.9 million records in response to the Ohio Warrant. The United States Attorney's Office for the Northern District of Ohio, which originally led the investigation, quickly identified that there were many communications with attorneys and therefore implemented a privilege screen, which occurred over the summer and fall of 2025. In or about November 2025, the United States Attorney's Office for the Southern District of New York and the FBI became the primary investigative agencies and took over the review of the more than 1.9 million records obtained pursuant to the Ohio Warrant. To that end, the Government commenced a new filter review, which involved consultation with defense counsel, and a review of non-privileged materials to identify materials responsive to the warrant. On or about April 27, 2026, and on or about May 12, 2026, the Government made initial productions to the defendant of materials it had identified as responsive to the Ohio Warrant.

In November 2025, Apple produced records in response to the SDNY Warrant. On May 12, 2026, the Government made an initial production to the defendant of materials it had identified as responsive to the SDNY Warrant.

On March 25, 2026, the Government's filter team sent Edward James materials from the Ohio Warrant and the SDNY Warrant that it had identified as being potentially privileged and asked defense counsel to prepare a privilege log. On or about April 8 and 17, 2026, the Government's filter team produced to Patrick James materials from the SDNY Warrant and an

email search warrant that it had identified as being potentially privileged and asked defense counsel to prepare a privilege log. The Government's filter team identified that some of the communications in Edward James's iCloud account and FBG email account were with individuals whom Patrick James had previously claimed to have had communicated with about matters that were protected by the attorney-client privilege. Even though these communications were in Edward James's accounts, and even though some of the communications were with non-lawyers, out of an abundance of caution, on or about June 3, 2025, the Government's filter team provided those communications to counsel for Patrick James and requested a privilege log. In addition, the filter team identified materials that were potentially privileged as to First Brands and furnished those documents to FBG's counsel. Counsel for FBG used search terms to assert privilege over certain documents. The Government then requested a formal privilege log, which counsel for the Chapter 7 Trustee is in the process of creating. The prosecution team had no access to potentially privileged materials while the filter process was underway and thus could not review those materials to determine if they were responsive to the relevant search warrants.

Between approximately April 17, 2026, and approximately July 31, 2026, the defendants provided privilege logs concerning materials obtained pursuant to the Ohio Warrant and the SDNY Warrant. The Government is awaiting FBG's privilege log.[27] To the extent either Patrick James or Edward James did not assert privilege over materials that had been initially identified as potentially privileged by the filter team, those materials were released to the prosecution team. The prosecution team then reviewed those materials to determine whether they were responsive to the applicable search warrant. The last set of materials from the James FBG Email Account and the James iCloud Account was released to the prosecution team on or about August 25, 2026, and the

[27] FBG has asserted privilege over certain communications in the James FBG Email Account.

Government produced responsive materials to the defense on October 5, 2026.[28] While the Government's responsiveness reviews are complete as to materials the prosecution team currently has access to,[29] potentially privileged materials currently being withheld from the prosecution team may become available at a later date when FBG provides its privilege log or if the Government successfully challenges the defendants' privilege assertions, in which case the Government would review those materials to determine if they are responsive to the search warrant.

## B. Applicable Law

### 1. Standing in Fourth Amendment Challenges

"It has been clear for a generation that 'Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted.'" *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas*, 439 U.S. at 133-34). Accordingly, a defendant's Fourth Amendment rights are violated "only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980); *see also United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990) ("A defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party.").

Ultimately, the Fourth Amendment's standing inquiry is "whether defendant has established a legitimate expectation of privacy in the area searched." *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) (*citing United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987)). This

---

[28] Counsel for Patrick James sent the Government a revised privilege log on October 1, 2026, which resulted in the release of a small set of redacted documents to the prosecution team.

[29] Counsel for both defendants have recently provided redacted replacement images of a small subset of documents that has been released to the prosecution team for a responsiveness review.

threshold question involves two separate inquiries: (1) whether a defendant has demonstrated a subjective expectation of privacy in the places and items that were searched; and (2) whether that expectation was one that society accepts as reasonable. *Id.*

"One who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of th[e] right to exclude." *Rakas*, 439 U.S. at 143 n.12. When a person conveys or abandons property, however, "he forfeits any reasonable expectation of privacy that he might have had in the property." *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990). In fact, "[n]either possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others." *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991); *see also id.* at 607 ("It is well settled that an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when actions or statements disavow any expectation of privacy.").

When courts assess searches related to an employee, "defendants seeking suppression must establish both that they are associated with the business and that they have a legitimate expectation of privacy in the part of the business that was searched." *United States v. Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *18 (S.D.N.Y. May 18, 2012) (citing *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987)). Even where there is a subjective expectation of privacy in this setting, it gives rise to standing only where that expectation is one society considers reasonable. *See Chuang,* 897 F.2d at 650 (any subjective belief bank officer had in privacy of documents maintained at bank's premises objectively unreasonable given extensive regulation of banks). Where an employee lacks any personal or proprietary interest in a business's electronically stored information, he has no reasonable expectation of privacy in the business's materials. *See United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 53–54 (D. Conn. 2002) ("There is no evidence that [an employee] had

any personal or proprietary interest in the laptop computer."); *accord Chuang*, 897 F.2d at 649 (To show a legitimate expectation of privacy, an employee must have "possessory or proprietary interest in the area searched").

"When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States* v. *Paulino*, 850 F.2d 93, 96 (2d Cir. 1988).

**2. Deference to Judicial Findings of Probable Cause**

A judge's finding of probable cause is afforded significant deference. "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists . . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).

Moreover, "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "A judge's probable-cause determination is not overly strict. Presented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a *prima facie* showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). Neither is there any "bright-line rule for staleness." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("[A] magistrate is expected to consider the age of the facts in light of the conduct at issue with a view toward ensuring that

probable cause exists at the time the warrant is to be executed, not simply at some past time."). And, "in circumstances of continuing or ongoing conduct, as contrasted with isolated illegal acts, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *Id.* (quoting *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981)).

Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232). Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."' *Walczyk*, 496 F.3d at 156 (quoting *Gates*, 462 U.S. at 231). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Such determinations must be approached in a practical way, because "probable cause is a flexible, common-sense standard." *Gates,* 462 U.S. at 231-32, *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id*. at 231-32.

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)). The issuing magistrate's decision is "entitled to substantial deference, and doubts

should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993). Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236). Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

**3. Overbreadth in Complex Investigations**

With respect to overbreadth specifically, "a warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2nd Cir. 2013)); *see also United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (framing the overbreadth inquiry as "whether the magistrate judge authorized search warrants that were constitutionally overbroad because they provided for the seizure of specific items for which there is no probable cause").

The more complex the crimes under investigation, the broader the categories of documents and records that may properly be seized. *See, e.g.*, *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 304-05 (S.D.N.Y. 2018) ("The level of specificity required depends on the nature of the crime and its level of complexity."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014) (concluding that breadth of warrant, which contained no timeframe limitation, was justified

because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *7-8 (S.D.N.Y. Feb. 25, 2013) (explaining that broad warrant with no time limitation was justified by scope and complexity of fraud described in affidavit); *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) (describing how "[t]he nature of the crime . . . may require a broad search," including where "complex financial crimes are alleged")).

**4. Particularity in Complex Investigations**

"Although somewhat similar in focus, particularity and overbreadth are two distinct legal issues." *Lustyik*, 57 F. Supp. 3d at 228 (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013)). While "the overbreadth inquiry asks 'whether the warrant authorized the search and seizure of items as to which there is no probable cause,'" the particularity inquiry requires a court to assess "whether the warrant 'enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize.'" *Id.* A search warrant must be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017). It must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes." *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013)). "The Fourth Amendment does not require a perfect description of the data to be searched and seized . . . ." *Id.* at 100. Indeed, "[w]here, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents," *Dupree*, 781 F. Supp. 2d at 149, and "it may be appropriate to use more generic terms to describe what is to be seized," *United States v. Gotti*, 42

F. Supp. 2d 252, 274 (S.D.N.Y. 1999). "[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular. *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (citing *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985)); *see also United States v. Ables*, 167 F.3d 1021, 1034 (6th Cir. 1999) (upholding warrant over overbreadth challenge when it "supplied sufficient examples of the items that the IRS was authorized to seize . . ."); *Lustyik*, 57 F. Supp. 3d at 227 ("The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); *United States v. D'Amico*, 734 F. Supp. 2d 321, 363 (S.D.N.Y. 2010) ("Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize.").

The requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized them to seize. *See Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *Rosa*, 626 F.3d at 58. This does not mean that the warrant must leave nothing to the discretion of the executing officer. To the contrary, "[o]nce a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.2d at 845. "[A]

warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" *Id.*

Moreover, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Young*, 745 F.2d 733 at 759 (2d Cir. 1984). Indeed, "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized." *Gotti*, 42 F. Supp. 2d at 274 (citing *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a warrant must state its terms with particularity varies inversely with [the] complexity of the criminal activity investigated.")); *see also Pinto-Thomaz*, 352 F. Supp. 3d at 304-05 ("The level of specificity required depends on the nature of the crime and its level of complexity.").

**5. Reasonableness of Government Conduct**

While "'the reasonableness of government conduct in executing a valid warrant . . . can present Fourth Amendment issues,'" it is nevertheless the case that "searches performed pursuant to a warrant . . . 'will rarely require any deep inquiry into reasonableness.'" *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (quoting *United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) (en banc)). "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant[.]" *Dalia v. United States*, 441 U.S. 238, 257 (1979). For searches authorizing the seizure of electronically stored information, "the Fourth Amendment does not require a search warrant to specify computer search methodology." *United States v. Bowen*, 689 F. Supp. 2d 675, 681

(S.D.N.Y. 2010). Accordingly, courts "reviewing challenges to searches of electronically stored information have declined to require any particular protocols such as the use of specific search terms or methodologies." *United States v. Lebovits*, 11 Cr. 134 (SG), 2012 WL 10181099, at *22 (E.D.N.Y. Nov. 30, 2012), report and recommendation adopted *sub nom*. *United States v. Gutwein*, 11 CR 134 (SG), 2014 WL 201500 (E.D.N.Y. Jan. 16, 2014).

Search warrants also need not prescribe a specific protocol *ex ante*, and courts do not require any specific protocol in reviewing the reasonableness of a search *ex post*. *See, e.g.*, *United States v. Lumiere*, 16 Cr. 483 (JSR), 2016 WL 7188149, at *4 (finding search reasonable where agent did not follow formal document review protocol, did not mark documents "responsive" and "not responsive," and did not "otherwise memorialize his findings"). Instead, where a warrant authorizes "various techniques to locate information responsive to the warrant," courts recognize that searches conducted in a flexible manner are reasonable and "appropriate." *United States v. Mendlowitz*, 17 Cr. 248 (VSB), 2019 WL 1017533, at *12 (S.D.N.Y. Mar. 2, 2019) (internal quotations and citations omitted).

The reasonableness standard also affords significant flexibility as to the duration of a search. The Advisory Committee Notes to Rule 41(e)(2) states in part that "the practical reality is that there is no basis for a 'one size fits all' presumptive period." Fed. R. Crim. P. 41(e)(2) (advisory committee's note to 2009 amendments). There is thus "no established upper limit as to when the government must review seized electronic data to determine whether the evidence seized falls within the scope of a warrant." *Sosa*, 379 F. Supp. 3d at 222 (internal quotation marks omitted). Accordingly, lengthy periods of review of seized electronic data have been upheld without a requirement of any detailed accounting, or even any explanation at all, from the Government for the review's length. *See, e.g.*, *United States v. Olivo*, No. 22 Cr. 582 (VEC), 2023

WL 8432864, at *3 (S.D.N.Y. Dec. 5, 2023) (denying motion to suppress where Government did not begin reviewing seized cellphone for several months, concluding that delays were not "so extreme as to violate" the defendant's rights); *United States v. Aguilar,* 20 Cr. 390 (ENV), Dkt. 160 at 5-10 (E.D.N.Y. July 7, 2023) (denying defendant's motion to suppress responsive materials collected following two-and-a-half-year long review); *Sosa*, 379 F. Supp. 3d at 222 (15-month and 10-month review periods reasonable even though "the reasons for the delays" were "not made explicit in the record"); *United States v. Estime*, 19 Cr. 711 (NSR), 2020 WL 6075554, at *14-15 (S.D.N.Y. Oct. 14, 2020) (delay of ten months reasonable); *Mendlowitz*, 2019 WL 1017533, at *12 (upholding 18-month review period as reasonable); *United States v. Nejad*, 436 F. Supp. 3d 707, 736 (S.D.N.Y. 2020) (denying motion to suppress responsive materials identified as part of review that ranged between one and three years in total, "[g]iven the volume of documents, the various obstacles to review, and the resource constraints . . .").

**6. Good-Faith Reliance on Judicially Authorized Warrants**

Even if a warrant lacks probable cause, is insufficiently particular, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144; *see also Rosa*, 626 F.3d at 64, 66. As a result, exclusion should be a "last resort" rather than a "first impulse." *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 140).

Thus, suppression will generally not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Although the burden is on the Government to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry

into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*; *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Accordingly, considering this exception, "the Supreme Court [has] strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the] protection" of the good faith exception. *Clark*, 638 F.3d at 100 (2d Cir. 2011) (citing *Leon*, 468 U.S. at 922).

Indeed, there are only four narrow circumstances in which the good-faith exception does not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *Id.*

### C. Argument

#### 1. Edward James Lacks Standing to Challenge the Seizure of Property Obtained Pursuant to the Ohio Warrant and SDNY Warrant

The defendant's motion fails at the very outset because the defendant lacks standing under the Fourth Amendment. To start, Edward James clearly had no property interest in the FBG corporate email account. *See Kazarian*, 2012 WL 1810214, at *18 ("defendants seeking suppression must establish both that they are associated with the business and that they have a legitimate expectation of privacy in the part of the business that was searched"). The defendant does not even *assert* in his brief, much less meet his burden of establishing, that he held some kind of personal privacy interest in a corporate email account belonging to his former employer, FBG, and for which he no right to exclude others—nor any other personal or proprietary interest of any

sort. Indeed, as the Indictment alleges, FBG exercised control over FBG email accounts and used that control to monitor and regulate access. (*See* Indict. ¶ 13).

Underscoring the fact that the defendant had no reasonable expectation of privacy in these materials is the fact that the FBG debtors and now the Chapter 7 Trustee currently have access to them. In other words, the Government could obtain records from the James FBG Email Account in the same way that the Government obtained email records of other former FBG employees (including emails from Edward James and the James FBG Email Account)—pursuant to a subpoena. Neither defendant has ever claimed, or even suggested, that the Government's obtaining their work email accounts without a warrant violated their privacy rights. Nor could they. The defendants have no reasonable expectation of privacy in business records that belong to FBG. *See Chuang*, 897 F.2d at 649; *United States v. Chu*, No. 25 Cr. 579 (PKC), 2026 WL 2742739, at *4 (S.D.N.Y. Sept. 16, 2026) (no reasonable expectation of privacy in the work emails of executive); *Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 53-54 (denying motion to suppress for lack of standing because "[t]here is no evidence that [an employee] had any personal or proprietary interest in the laptop computer"). Accordingly, the motion to suppress should be denied.

As to the James iCloud Account, the defendant makes no effort to establish—much less through a sworn affidavit, as the law requires—that he had a reasonable expectation of privacy in that account. That alone defeats his motion. *United States v. Ruggiero*, 824 F. Supp. 379-391 (S.D.N.Y. 1993) ("It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search."); *United States v. Tranquillo*, 606 F. Supp. 2d 370, 378 (S.D.N.Y. 2009) ("As a preliminary matter, [defendant] has not put forth the foregoing facts—or, indeed, any facts relevant and probative of

his privacy interest in the [seized computers]—in a sworn affidavit."); *United States v. Sorcher*, No. 05 CR 0799 NG RLM, 2007 WL 1160099, at *8 (S.D.N.Y. Apr. 18, 2007) ("Indeed, the record contains no affidavits from defendants asserting their possessory or proprietary interest in the documents.").

Nor could Edward James make such a showing. Although the iCloud account bears his name, the record establishes that it functioned, at least in part, as an extension of his FBG work environment: it was registered to "Ed James," but tied to his FBG-issued work cellphone and email address, used for business communications, and backed up automatically to Apple's servers with no evidence that he maintained control over, restricted access to, or otherwise treated the account as a private repository. An employee cannot claim a legitimate expectation of privacy in business-related electronic accounts or devices when he neither owns the underlying equipment nor exercises exclusive control over the data stored on it. He must do more than point to an account in his name; he must show "a possessory or proprietary interest" and that he "vigilantly protect[ed] the right to exclude others." *See Chuang*, 897 F.2d at 649; *Torres*, 949 F.2d at 607-08. Here, James does not even assert, because he cannot, that he excluded FBG or others from accessing the iCloud data, that the account was used or configured solely as a personal archive, or that its contents were meaningfully segregated from the business communications tied to his FBG role. To the contrary, the SDNY Affidavit describes how his FBG work phone was used to communicate about FBG's financial fraud schemes, and how those communications synced to the iCloud account as part of routine workplace usage, not private storage. Under these circumstances, Edward James has not met his burden to show any legitimate expectation of privacy, and the motion to suppress should be denied on that basis alone.

**2. There is No Basis to Disturb the Substantial Deference Owed to the Judges Who Issued the Challenged Warrants.**

Even if Edward James has standing to challenge the warrants, he is unable to set forth a compelling basis to disturb the "substantial deference" owed to the probable cause finding by the judges who signed the Ohio Warrant and the SDNY Warrant.

The defendant claims that the Ohio Warrant is overbroad because the "earliest dated fact relating to Mr. James is a July 31, 2021 email" and the warrant authorizes seizure of materials beginning in January 1, 2020. (Supp. Mot. at 8-10). He is wrong. As explained above, the Ohio Affidavit summarizes an interview of an FBG insider who worked at FBG from 2019 to 2022 and explained how he met "every day" with Patrick James, Edward James, Andrew Brumbergs, and Stephen Graham. The witness described discussions during these meetings of "shopping of the balance sheet," which involved making unsupportable adjustments to the balance sheet "that would result in increased income." While Patrick James typically provided targets, [i]t was up to the other meeting attendees [including Edward James] to figure out the specific approach, which usually involved inventory and accounts receivable." (Supp. Mot. Ex. A at ¶¶ 32-34). In other words, the Ohio Affidavit provided a basis for seizing records going back to at least 2019, earlier than the January 1, 2020 start date. In any event, the Government is unaware of any authority—and the defendant cites none—even requiring a temporal range. *Triumph Cap. Grp., Inc.*, 211 F.R.D. at 58 ("absence of a temporal limitation does not render the warrant a prohibited general warrant.").

The defendant repeatedly asserts that the probable cause allegations as to his involvement in the FBG Fraud Scheme are "thin" and "sparse." (Supp. Mot. at 7-9). But the detailed factual statements in the affidavit state otherwise. And having based a probable cause finding on those facts, the issuing judge's determination is entitled to "substantial deference." *Wagner*, 989 F.2d at 72. But even if the proffered evidence as to Edward James's commission of the subject offenses

were "sparse," the question is not whether there is probable cause to believe Edward James engaged in the subject offenses. Rather, the inquiry is whether there is probable cause to believe evidence of the subject offenses will be found in the defendant's email account. *See United States v. Martin*, 426 F.3d 83, 86 (2d Cir. 2005) (holding it "untenable to conclude that property may not be searched unless its occupant is reasonably suspected of a crime and is subject to arrest"). The Ohio Affidavit set forth sufficient evidentiary detail establishing probable cause that evidence of the FBG Fraud Scheme would be found on the James FBG Email Account.

Next, the defendant contends that the Ohio Warrant is unparticularized because it authorized law enforcement to seize broad categories of records without offering the executing officers "meaningful guidance for distinguishing responsive material from the quantity of non-responsive material." (Supp. Mot. at 10). The Ohio Warrant authorized seizure of specified categories of records that "constitute fruits, evidence and/or instrumentalities" of the identified subject offenses, *e.g.*, 18 U.S.C. § 1344 (bank fraud). Nothing more is required. A warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See Riley*, 906 F.2d at 843-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); *Lustyik*, 57 F. Supp. 3d at 227-28 (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *Jacobson*, 4 F. Supp. 3d at 524 ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."). The Ohio Warrant did exactly that. It listed the specific Subject Offenses (further particularized by a date range) and contained an illustrative list of

information that agents were authorized to seize, *e.g.*, "Records or information evidencing assets, liabilities, equity, expenses, revenue, and overall profitability of the Relevant Entities." (Supp. Mot. Ex. D Sec. II). That the warrant left discretion to the executing agents does not render it unparticularized. *See Riley*, 906 F.2d at 845. Indeed, as courts have explained, it is especially appropriate for search warrants in complex financial cases to give "more flexibility to the searching agents." *Gotti*, 42 F. Supp. 2d at 274.

As to the SDNY Warrant for the James iCloud Account, the defendant first claims that the warrant "fails to establish probable cause to seize the entirety of Mr. James's iCloud account." (Supp. Mot. at 17). The defendant's argument rests on the mistaken premise that the SDNY Warrant authorizes seizure of "the entirety of Mr. James's iCloud account." (*Id.*) It does not. While the warrant directs Apple to produce the entirety of portions of the iCloud account, *e.g.*, email, messages, photos and videos, it authorizes seizure of *only* certain categories of information that constitute "evidence, fruits, and instrumentalities of" specific subject offenses, *e.g.*, "altered or manipulated purchase or sales invoices," "altered or manipulated financial records," "factoring and borrowing records, such as factoring agreements." (Supp. Mot. Ex. D Sec. II). Moreover, the SDNY Warrant provided detailed support for the probable cause finding that evidence of the FBG Financial Fraud would be found in the types of records that Apple was directed to provide to the Government and the specific categories of information that law enforcement was authorized to produce. (Supp. Mot. Ex. B ¶¶ 22-25). As with the Ohio Warrant, Edward James claims the SDNY Warrant lacks particularity. His argument fails for the same reason. The SDNY Warrant authorizes seizure of only certain categories of information that constitute "evidence, fruits, and instrumentalities of" specific subject offenses. *See Jacobson*, 4 F. Supp. 3d at 524 ("The reference

to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

### 3. The Government's Review was Reasonable

Edward James claims that the Government failed to execute the Ohio Warrant and the SDNY Warrant in a reasonable time because the Government's review is ongoing. Specifically, the defendant points out that the Ohio Warrant was executed in April 2025 (with records returned in June 2025), and the Apple Warrant was executed in November 2025 (with records returned later that month). (Supp. Mot. at 12-16, 20). This argument is wholly without merit. Neither the timing nor the sequence of the review, or the duration of time the review has taken, was unreasonable, and the Government's execution of the warrants complied with the Fourth Amendment in all respects.

The basic facts of the Government's execution of the warrants and review of the returns suffice to deny the defendant's motion. The warrants returned nearly two million records. Collectively, the defendants identified dozens of individuals with whom they may have had communications protected by the attorney-client privilege and, as a result, the Government's filter team spent a significant amount of time screening potentially privileged records from the prosecution team. The Government completed its responsiveness review of the more than 1 million remaining documents and produced those materials to the defendants on April 27, 2026, and May 12, 2026—less than four months from the defendants' arrests. As to the documents that the filter team identified as potentially privileged and withheld from the prosecution team, the defendants did not complete their privilege logs until July 31, 2026, and FBG has still not completed its

privilege log.[30] Based on the defendants' privilege logs, the filter team released additional documents to the Government, and the Government quickly reviewed those documents, identified which documents were responsive to the search warrants, and produced the responsive materials to the defendants by October 5, 2026—less than two months after the records were released to the prosecution team.

Neither the timing nor the sequence of the review, or the duration of time that the review took, was unreasonable for a review of nearly 2 million electronic files, large chunks of which were withheld from the prosecution team based on the defendants' wide-ranging privilege assertions. Indeed, "numerous cases have held that 'a delay of several months or even years between the seizure electronic evidence and the completion of the government's review of it is reasonable.'" *Aguilar*, 20 Cr. 390 (ENV), Dkt. 160 at 6 (quoting *Sosa*, 379 F. Supp. 3d at 222) (collecting cases)); *see also United States v. Almaleh*, 17 Cr. 25 (ER), 2022 WL 602069, at *20 (S.D.N.Y. Feb. 28, 2022) (denying motion to suppress where evidence where defendant was provided with rolling productions over a fifteen-month period); *Mendlowitz*, 2019 WL 1017533, at *12 (S.D.N.Y. Mar. 2, 2019) (finding a review process of 18 months reasonable).

The defendant cites a single case in support of his argument that the Government's execution of the warrants was unreasonable, *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012). In that case, 15 months after seizing electronic devices, the Government had not reviewed them and had "no plans whatsoever to *begin* review of that data." *Id.* at 215. But in the process *Metter* correctly observed that "[n]umerous cases hold that a delay of several months between the seizure of electronic evidence and the completion of the government's review ... is

[30] Indeed, Patrick James sent the Government a revised privilege log on October 1, 2026, a month *after* Edward James filed his motion challenging the reasonableness of the Government's review.

reasonable." *Id.* For that reason, courts have routinely declined to follow *Metter*, limiting it to situations where the government had "no plans whatsoever to *begin* review of [the] data." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 313 n.14 (S.D.N.Y. 2018) (emphasis in original); *see also United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (describing *Metter* as "readily distinguishable precedent"); *United States v. Daskal*, 676 F. Supp. 3d 153, 177 (E.D.N.Y. 2023) ("The execution of a responsiveness review distinguishes this case from *Metter*, where the Government conducted no such review."). Here, by contrast, there was a prompt responsiveness review: but for records withheld from the prosecution team based on the *defendants'* privilege assertions, the Government completed its responsiveness review within several months of the defendants' arrests. As to the potentially privileged documents, the defendants did not complete their privilege logs until July 31, 2026, after which the Government promptly reviewed the newly released documents, identified documents responsive to the search warrants, and produced those records to the Government in less than two months.

The defendant incorrectly claims that the Government "has been reviewing Mr. James's email accounts for sixteen months." (Supp. Mot. at 14). That is inaccurate. But for privilege screens, which were delayed considerably by the defendants' preparation of privilege logs, the Government's reviewed nearly 2 million documents in just over five months. The defendant claims the documents over which he asserted privilege are "a small subset of documents" and that he furnished a privilege log to the Government on April 10, 2026. But this ignores Patrick James's voluminous privilege assertions and his July 31, 2025 privilege log—including privilege assertions over records in Edward James's accounts—and FBG's privilege assertions for which the Government has not yet received a privilege log.

#### 4. The Government Acted in Good Faith

Finally, even if there were some flaw in the warrants or the Government's execution of them, suppression would be unwarranted based on the application of the good faith exception. The Ohio Affidavit and SDNY Affidavit were not "so lacking in indicia of probable cause as to render reliance upon it unreasonable." As discussed above, there were more than sufficient facts set forth in the affidavits to support the magistrate judges' independent probable cause determinations. The Second Circuit has observed that "[t]his is a very difficult threshold to meet, as evidenced by the many decisions of this Court rejecting objections to the good-faith exception on this basis." *United States* v. *Falso*, 544 F.3d 110, 128 n.24 (2d Cir. 2008) (collecting cases); *see also Leon*, 468 U.S. at 926 (concluding that the good faith exception applies where a warrant affidavit "provide[s] evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause"); *United States* v. *Clark*, 638 F.3d 89, 103 (2d Cir. 2011) (noting that "[s]uch a concern most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations").

Rather than engage with this case law and his very high burden to overcome the good faith exception, the defendant reiterates many of his meritless arguments, including that the probable cause allegations as to Edward James are "thin" and that the Ohio Affidavit provided no factual basis to seek records dating back to 2020. For the reasons explained above, these arguments have no merit. In any event, the warrants were not "so facially deficient" that reliance on them was unreasonable. This is a very difficult threshold for a defendant to meet. It requires a demonstration that "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987). The defendant has not attempted to make such a demonstration, nor would he be able to.

## VI. THE COURT SHOULD DENY PATRICK JAMES'S MOTION FOR EARLY WITNESS STATEMENTS (ECF NO. 116)

Patrick James asks this Court, again, to order disclosure of certain witness statements months before trial and the December 30, 2026, Jencks Act deadline. (Dkt. 116). This is the defendant's second attempt to obtain premature disclosure of these materials. On August 20, 2026, Patrick James asked for early "[d]isclosure of 3500 material for attorney witnesses." (Dkt. 100). The defendant claimed "an early disclosure of 3500 material related to any potential attorney witnesses" was necessary to assess the viability of an advice-of-counsel defense. (*Id.* at 3). The Government opposed that motion, noting that the defendant knows (and does not need witness notes to know) whether or not he relied in good faith on the advice of counsel, and that early disclosure of so-called "attorney 3500" would be unprecedented. (Dkt. 101 at 7-8). Indeed, courts uniformly order disclosure in the other direction—the defendant must disclose to the Government the substance of the alleged legal advice. This Court declined the defendant's invitation to set an unprecedented early "attorney 3500" deadline. (*See* Dkt. 104 (ordering all 3500 materials to be disclosed December 30, 2006—seven weeks before trial—and declining to impose a separate "attorney 3500" deadline)).

Unsuccessful the first time, the defendant again seeks the same records but rebrands his request as a "*Brady*" motion, this time claiming that attorney interview notes "go to a core defense." (Dkt. 116 at 2). Stripped of its new label, the defendant's request is identical to his prior one. (*Compare* Dkt. 100 (seeking interview notes of "any potential attorney witnesses"), *with* Dkt. 116 (seeking interview notes of "Government interviews of current or former in-house attorneys")). As set forth below, the defendant's motion fails for the same reasons, and the Government has complied with its *Brady* obligations.

First, the Government is aware of its *Brady* obligations and has worked diligently to comply with them. Indeed, the Government has disclosed summaries of witness statements, including an attorney witness, that far exceed what the law requires. (*See, e.g.*, Dkt. 116 Ex. 3). The Government also recognizes that its *Brady* obligation is ongoing and, to that end, routinely reviews its witness notes and has sent updated disclosures to the defense. The law requires nothing more.[31] *See United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *9 (S.D.N.Y. May 22, 2018) ("The Government's good faith representations of its continuing compliance with its *Brady* disclosure obligations is sufficient.").

Moreover, the defendant knows the identity of the lawyers who allegedly gave him legal advice, and the defendant's large and well-funded defense team knows how to contact those witnesses. Indeed, the exhibits to the defendant's motion confirm that defense counsel has communicated with counsel for one of the attorney witnesses. (Dkt. 116 Ex. 10). "Knowledge of the identity of a potential witness, and the 'the essential facts which would enable' a defendant 'to call the witness and thus take advantage of any exculpatory testimony that he might furnish,' is sufficient to discharge the Government's *Brady* obligation." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (quoting *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975)). "To the extent the statements of [attorney witnesses] and the other individuals are potentially exculpatory, the Government has informed the Defendants of

---

[31] No doubt early disclosure of attorney interview notes may "engender investigative steps." (Dkt. 116 at 2). But the same is true for all witness statements, regardless of whether those witnesses are attorneys. But that does not subject all 3500 materials to disclosure under *Brady*. *See United States v. Chu*, 25 Cr. 579 (PKC) (March 19, 2026 Conf.) ("And I do want to make it clear here that 3500 material is not discovery material. And I have had criminal defense counsel whom from time to time say, 'I have many new ideas based on the 3500 material that I now feel I need to pursue, etc.' That's not the purpose of the 3500 disclosure in the main.").

those witnesses' identities and the essential facts about which they could testify. And there is no reason to believe that the Government is withholding the identity of other individuals who made similar statements. *Brady* requires nothing more from the Government under these circumstances." *Id.* The same is true here. The defendant knows the identities of the attorney witnesses who gave him putative legal advice, and the defendant knows the general nature of the topics about which those witnesses could testify. The Government is required to disclose nothing more.

Second, the defendant does not need additional disclosures from the Government to know whether he relied in good faith on counsel's advice in engaging in the conduct alleged in the Indictment. "In a fraud case . . . the advice-of-counsel defense is . . . evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). To make an advice-of-counsel defense, a defendant must show "that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly la[id] all the facts before his counsel; and (3) in good faith and honestly follow[ed] counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012). Patrick James has access to all the information he needs to determine whether he has a viable advice-of-counsel defense. He knows what information he told FBG's lawyers, including "if he fully and honestly laid all the facts" before them. And he knows whether he followed those lawyers' advice in good faith. To the extent the Government possesses information from FBG's former lawyers unknown to the defendant, it is irrelevant to a good-faith defense because the defendant could not have relied upon information unknown to him.

In any event, the Government's 3500 material would not reflect legal advice given to the defendant. The Chapter 7 Bankruptcy Trustee, which currently controls FBG's privilege (Dkt. 116

at 4), has not waived the attorney-client privilege, and the Government has not sought from witnesses any privileged information between Patrick James (or any former FBG employee) and FBG's former attorneys.

Much of the defendant's motion is dedicated to whether three former FBG employees—Michael Baker, Shekhar Kumar, and Laurie Stein—acted in a legal capacity. The Government understands that, although they are attorneys, neither Baker, Kumar, nor Stein acted in a legal capacity while they worked at First Brands. And, apparently, Mr. Baker's counsel has confirmed this to the defense. (*See* Dkt. 116 Ex. 10). Nonetheless, whether these three witnesses acted in a legal capacity, a disputed issue, is not relevant to the defendant's motion. Even assuming they acted as attorneys and provided legal advice to Patrick James, it does not change the Government's position that it has fulfilled its *Brady* obligation.

Third, the defendant's arguments concerning FBG's privilege log is a red herring. The Government sought and obtained a search warrant for four former FBG employees' email accounts. None of the accounts belonged to Patrick James. Cautious of potentially privileged communications, the Government's filter team sent potentially privileged materials to three privilege holders (Patrick James, Edward James, and FBG) and requested privilege logs. Based on search terms, counsel for the FBG debtors identified approximately 110,000 communications that it identified as privileged and furnished to the Government an index of records for which it was claiming privilege. The filter team has withheld those records from the prosecution team. The Government has asked FBG for a formal privilege log to substantiate its privilege assertions and

so the Government can assess the validity of those assertions.[32] The Government has disclosed to the defense the index of records for which FBG is asserting privilege and the list of attorneys that FBG used to identify privileged records. At the request of counsel for Patrick James, the Government's filter team produced to the defense the metadata fields—to, from, cc, bcc, and date—associated with the privileged records. The Government has also committed to producing to the defense FBG's formal privilege log once it is completed. Notably, Michael Baker and Shekhar Kumar, two of the three attorneys whom the defendant identifies as most important to his potential advice-of-counsel defense, were not on FBG's list of attorneys that was used to identify privileged communications and thus FBG did not assert privilege over their communications.

It is unclear how the defendant's privilege log arguments relate to his *Brady* motion. The prosecution team and the defendants are in the same position vis-à-vis the records that FBG has identified as privileged—we do not have access to them. To the extent either defendant disputes FBG's privilege determinations or seeks access to the privileged communications, their fight is with FBG and not the Government. In short, records over which FBG has asserted privilege are not in the prosecution team's possession and therefore are not, and cannot, be subject to disclosure under *Brady*.

Finally, the defendant's complaint that he is unable to obtain information about the attorney witnesses from other sources is irrelevant and untrue. The defendant and the Government have

[32] The defendant labors to suggest to the Court that the Government misled him about FBG's privilege log. He is wrong, and his argument is wholly irrelevant. The Government represented to both defendants that it would produce to them privilege logs it received from third parties, including FBG, and that FBG was preparing an "index" of documents over which it was asserting privilege in the search warrant return. (Dkt. 116 at 7). These representations were true when made and remain true. The Government fulfilled its promise by producing the index and will produce FBG's privilege log upon receipt.

equal access to witnesses and, as noted above, the defendant, by his own admission, knows the identity of the attorneys who purportedly gave him legal advice and is free to contact them. Whether those witnesses are willing to speak with him has no bearing on the Government's *Brady* obligation. *See Middendorf*, 2018 WL 3956494, at *4. The defendant also has extensive information available to him to preview the attorney witnesses' possible testimony. In the bankruptcy proceeding, Shekhar Kumar was deposed, and the Government produced the deposition transcript to the defense. Michael Baker has also filed extensive pleadings in the bankruptcy proceeding, providing meaningful insight into his potential testimony. *See, e.g.*, Michael Baker Mot. to Dismiss in *First Brands Group, LLC et al., v. Patrick James et al.*, 25-03803 (Bankr. S.D.Tex) (ECF Doc. 173) (disclaiming knowledge of the fraudulent conduct at First Brands and asserting that Patrick James and Edward James deliberately kept him in the dark about their massive fraud scheme).

The defendant's argument that he lacks sufficient information to comply with the January 11, 2027, Court ordered advice-of-counsel deadline is both factually and legally incorrect. As explained above, the defendant has more than sufficient evidence to meet that deadline even today. By January 11, the defendant will also have the Government's 3500 materials. The defendant does not cite a single case where a court has ordered the Government to disclose records to the defense to assist the defendant in determining the viability of an advice-of-counsel defense. That is because the law requires the exact opposite: disclosures by the defense to the Government. *See, e.g., United States v. Mattera*, No. 24 Cr. 117 (LAP), 2025 WL 2841162, at *2 (S.D.N.Y. Oct. 7, 2025) (requiring notice in advance of trial); *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *2 (S.D.N.Y. Feb. 7, 2024) (requiring pretrial disclosure); *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020) (requiring

advanced advice of counsel disclosure); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018) (defendant should have made pertinent disclosures in advance of trial); *United States v. Rubin/Chambers, Dunhill*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring notification to the Government of advice-of-counsel defense sufficiently before pre-trial conference to permit litigation over disputes). And that makes sense. The defendant knows the legal advice he received. The Government does not. The Court should decline the defendant's invitation to turn the law on its head.

Finally, the defendant will receive 3500 materials on December 30, 2026—more than seven weeks before trial. The Jencks Act disclosure deadline in this case is far earlier than what is customary or what the law requires.[33] *See United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *23 (S.D.N.Y. Jan. 18, 2017) ("[I]t is a widely recognized customary practice in this District that *Giglio* material is turned over at the same time as material under the Jen[c]ks Act . . . . Both types of material are typically produced a week or two before the start of trial, depending on the complexity of the case." (internal quotation marks and citations omitted). The defendant will have more than seven weeks to make use of the 3500 materials.

The defendant's motion for early and unprecedented disclosure of attorney witness statements is meritless and should be denied.

---

[33] Indeed, the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001).

## CONCLUSION

For the foregoing reasons, the defendants' motions should be denied.

Dated: New York, New York
October 19, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Nicholas Chiuchiolo
Marguerite B. Colson
Peter J. Davis
Assistant United States Attorneys